# Exhibit A

Exhibit A - 001



October 1, 2019

**<u>Via E-mail</u>**
**<u>and U.S. Mail</u>**
Amber Heard
c/o Macias, Gini & O'Connell
Attn: John Blakeman
2029 Century Park East, #1500
Los Angeles, CA 90067
*jblakeman@mgocpa.com*

Re:     **John C. Depp, II v. Amber Laura Heard**
         Circuit Court of Fairfax County, Virginia, Civil Action No. 2019 02911
         Insureds:     Under the Black Sky, Inc.; Amber Heard, an individual
         Insurer:       New York Marine and General Insurance Company
         Policy No.:    GL201800012500 eff. 7/18/2018 – 7/18/2019
         Our File No.:  LAX00177770

Dear Ms. Heard:

We are writing to advise you of New York Marine and General Insurance Company's determination of its potential obligation to provide coverage to you for defense and any potential liability arising out of the lawsuit referenced above. Based on our review of your insurance policy, the allegations at issue in the lawsuit and the facts of which we have been informed, New York Marine has determined that it will provide you with a legal defense under a reservation of rights. This defense will be effective as of September 4, 2019, the date this matter was first tendered to New York Marine.

In providing your legal defense, we do not waive any rights under your policies or otherwise, all of which rights are reserved.

Notwithstanding that New York Marine has determined that it will provide a legal defense to you, to the extent that California law does not permit an insurer to indemnify the insured, no indemnity can be provided.

We have assigned defense counsel to represent and defend you in this matter. The assigned defense counsel is Cameron McEvoy, PLLC, 4100 Monument Corner Drive, #420, Fairfax, VA 22030 | Tel.: 703-273-8898 | Website:

Amber Heard
c/o Macias, Gini & O'Connell
October 1, 2019
Page 2 of 11

http://www.cameronmcevoy.com. We ask you to cooperate fully with your attorneys in defending against the lawsuit.

I have summarized and discussed below the allegations in the Complaint, however, we understand that the allegations may be incomplete, embellished, or untrue. We do not conclude that any allegation is true, and no statement in this letter shall be construed otherwise.

## THE COMPLAINT

The Complaint alleges generally as follows: On December 18, 2018, you published an op-ed in the Washington Post in which you purported to write from the perspective of a public figure representing domestic abuse. You published another op-ed on December 19, 2018 in the hardcopy edition of the Washington Post which contained similar implications. You also tweeted a link of the op-ed on December 19, 2018. Although the Plaintiff was not mentioned by name in the op-ed, the op-ed was about the Plaintiff, your former husband. You allegedly publicly accused the Plaintiff of domestic abuse occurring in 2016, which the Plaintiff denies. The Plaintiff alleges the 2016 allegations as well as the op-ed were part of an elaborate hoax to generate positive publicity you to advance your career. The Plaintiff alleges your actions were malicious, willful, and wanton. The also Plaintiff alleges your false implications in the op-ed prejudiced the Plaintiff in his career as a film actor and damaged his reputation as a public figure. The Plaintiffs seeks damages under three (3) causes of action, or Counts:

> Count One:    Defamation for statements in your December 18, 2018 op-ed in the online edition of the Washington Post
>
> Count Two:    Defamation for statements in your December 19, 2018 op-ed in the print edition of the Washington Post
>
> Count Three:  Defamation for statements in your op-ed which you republished by tweeting a link to the op-ed on December 19, 2018

The Plaintiff requests that the Court enter an award against you for compensatory damages of not less than $50,000,000, for punitive damages no less than $50,000, for expenses and costs, including attorneys' fees, and for such other and further relief as the Court deems appropriate.

## THE POLICY

New York Marine issued policy number GL201800012500 to Under the Black Sky, Inc., for the policy period July 18, 2018 through July 18, 2019. Per a Named Insured Extension

Amber Heard
c/o Macias, Gini & O'Connell
October 1, 2019
Page 3 of 11

Schedule, you are a named insured under the policy. The policy provides Commercial General Liability Coverage subject to limits of $1,000,000 Each Occurrence, $1,000,000 Personal & Advertising Injury, $1,000,000 General Aggregate, and $1,000,000 Products/Completed Operations Aggregate. The policy also provides Comprehensive Personal Liability Coverage subject to limits of $1,000,000 Each Occurrence for Personal Liability.

The Commercial General Liability Coverage part provides, in pertinent part, as follows:

**SECTION I - COVERAGES**
**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

    **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

        **(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

        **(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

    **b.** This insurance applies to "bodily injury" and "property damage" only if:

        **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

Exhibit A - 004

Amber Heard
c/o Macias, Gini & O'Connell
October 1, 2019
Page 4 of 11

***

## COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

**1.  Insuring Agreement**

    **a.**  We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

        **(1)**  The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

        **(2)**  Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

        No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

    **b.**  This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

Pursuant to Section II – "Who Is An Insured", the policy provides, in pertinent part:

## SECTION II – WHO IS AN INSURED

**1.**  If you are designated in the Declarations as:

    **a.**  An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

    . . .

The policy also contains the following relevant definitions:

Exhibit A - 005

Amber Heard
c/o Macias, Gini & O'Connell
October 1, 2019
Page 5 of 11

## SECTION V - DEFINITIONS

· · ·

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

· · ·

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   **a.** False arrest, detention or imprisonment;

   **b.** Malicious prosecution;

   **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   **d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   **e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

   **f.** The use of another's advertising idea in your "advertisement"; or

   **g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

· · ·

**17.** "Property damage" means:

   **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

Exhibit A - 006

Amber Heard
c/o Macias, Gini & O'Connell
October 1, 2019
Page 6 of 11

    **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

    • • •

The Comprehensive Personal Liability Coverage part provides, in pertinent part, as follows:

    COVERAGE L. PERSONAL LIABILITY

    The Insuring Agreement of Coverage L states:

    If a claim is made or a suit is brought against any "Insured" for damages because of "bodily injury", "property damage" or "personal injury" caused by an "occurrence" to which this coverage applies, we will:

    a.    pay up to our limit of liability for the damages for which the "Insured" is legally liable; and

    b.    provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may make any investigation and settle any claim or suit that we decide is appropriate. Our obligation to defend any claim or suit ends when the amount we pay for damages resulting from the "occurrence" equals our limit of liability.

Coverage L contains the following exclusions as follows:

    **EXCLUSIONS**

    1.    COVERAGE L. – Personal Liability and Coverage M. Medical Payments to Others do not apply to "bodily injury" or "property damage":

        a.    which is expected or intended by the "Insured"; or

        b.    arising out of business pursuits of an "Insured" or the rental or holding for rental of any part of any premises by an "Insured."

    This exclusion does not apply to:

        (1)    activities which are ordinarily incidental to non-business pursuits; or

Exhibit A - 007

Amber Heard
c/o Macias, Gini & O'Connell
October 1, 2019
Page 7 of 11

. . .

The following relevant definitions apply to the Comprehensive Personal Liability Coverage part:

**DEFINITIONS**

1. "Bodily Injury" means bodily harm, sickness or disease, including required care, loss of services and death that results.

2. "Business" includes trade, profession or occupation.

. . .

5. "Personal Injury" means injury other than "bodily injury", arising out of one or more of the following offenses.

. . .

d. oral or written publication of material that slanders or libels a person or organization including other forms of defamation; or

. . .

6. "Occurrence" means an accident, including continuous or repeated exposure to conditions, which results during the policy period, in:

a. "bodily injury", or

b. "property damage"; or

c. "personal injury".

7. "Property damage" means physical injury to, destruction of, or loss of use of tangible property.

The Comprehensive Personal Liability Coverage part also provides as follows regarding other insurance:

**CONDITIONS**

. . .

Exhibit A - 008

Amber Heard
c/o Macias, Gini & O'Connell
October 1, 2019
Page 8 of 11

8.  Other Insurance – Coverage L – Personal Liability

This insurance is excess over any other valid and collectible insurance written specifically to cover as excess over the limits of liability that apply in this policy.

. . .

The policy also contains the following endorsement, which states, in pertinent part, as follows:

## LIMITATION – NO STACKING OF OCCURRENCE LIMITS OF INSURANCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following condition is added to **Section IV. – Commercial General Liability Conditions: <u>Two or More Coverage Forms or Policies Issues By Us</u>**

If this policy and any other policy, policies or coverage form(s) issued to you by use or any of our affiliated companies apply to the same or related damages, the most that will be paid by us and our affiliated companies either individually or collectively for the sum of all those damages is the single largest applicable Each Occurrence Limit or similar per occurrence limit of insurance available under any one of those policies or coverage forms.  Same or related damages include the continuation of injury or damages from a prior policy period into a subsequent policy period, or any injury or damage resulting from the same cause or "occurrence."

However, this provision does not apply to umbrella or similar policies or coverage forms that are purchased specifically to apply in excess of another policy or coverage form that is scheduled as underlying insurance.

In no event will coverage be provided during the policy period after (1) the applicable aggregate Limit of Insurance under any one coverage form or policy has been exhausted, or (2) the applicable aggregate Limit of Insurance under any one coverage form or policy would have been exhausted had all covered claims been submitted under that one coverage form or policy rather than under two or more coverage forms or policies.

Exhibit A - 009

Amber Heard
c/o Macias, Gini & O'Connell
October 1, 2019
Page 9 of 11

The terms of this endorsement will govern as respect the application of any limits of insurance. If this policy or coverage form contains any other language regarding limits of insurance that is in conflict with the terms of this endorsement, such other language is subject to the terms of this endorsement.

## AN EXPLANATION OF NEW YORK MARINE'S COVERAGE DETERMINATION

**Commercial General Liability Coverage Part**

The Commercial General Liability Coverage part provides *commercial* liability coverage; it provides coverage to insureds with respect to their business-related activities. The allegations in the Complaint make it clear that the events at issue arise from your personal activities. As an individual, you qualify as an insured only with respect to the conduct of a business of which you are the sole owner. Therefore, you do not qualify as an insured under the Commercial General Liability Coverage part in the policy. Accordingly, New York Marine must respectfully disclaim coverage under the Commercial General Liability Coverage part as this matter does not arise from your business-related activities.

**Comprehensive Personal Liability Coverage Part**

As stated in the insuring agreement of the Comprehensive Personal Liability Coverage part, if a suit is brought against an insured for damages because of "bodily injury", "property damage" or "personal injury" cause by an "occurrence" to which the coverage applies, New York Marine will pay up to our limit of liability for the damages for which the insured is legally liable. It is clear the Plaintiff is not seeking damages because of "bodily injury" or "property damage" in the Complaint. However, the Plaintiff is seeking damages for defamation, which falls under the definition of "personal injury", 5.d.; oral or written publication of material that slanders or libels a person or organization including other forms of defamation. Accordingly, New York Marine will provide you with a defense under the Comprehensive Personal Liability Coverage part. Notwithstanding that New York Marine has determined that it will provide you with a legal defense to, to the extent that California law does not permit an insurer to indemnify the insured, no indemnity can be provided.

New York Marine also reserves the right to limit coverage under the policy pursuant to the "Limitation – No Stacking Of Occurrence Limits Of Insurance" endorsement outlined above.

## CONCLUSION

Amber Heard
c/o Macias, Gini & O'Connell
October 1, 2019
Page 10 of 11

For the reasons set forth above, New York Marine will agree to defend you under a reservation of rights outlined above.

By mentioning and/or quoting certain provisions from the policy in this correspondence, New York Marine is not waiving any of its rights to assert or rely on additional policy provisions in the policy. Actions taken by New York Marine, its agents, representatives or attorneys in investigating this matter do not constitute, and are not intended as, a waiver of any rights or defenses available to New York Marine. The specific issues raised herein shall not be interpreted as limiting the scope of the rights reserved by New York Marine. Accordingly, New York Marine shall not be precluded from asserting any rights or defenses that may be available now or at any time. All rights and defenses are hereby expressly reserved.

If you disagree with the coverage determination outlined above, or believe that New York Marine's coverage determination is incorrect or that New York Marine does not have complete information, please contact the undersigned. We will review and evaluate any additional information that you feel would assist in the determination of coverage under the policy.

Additionally, if you believe that New York Marine has incorrectly denied this claim, or any portion thereof, or if you or disagree with any other coverage determination taken with regard to this claim, you are entitled to have the matter reviewed by the California Department of Insurance. The contact information for the California Department of Insurance is as follows:

Consumer Communications Bureau
California Department of Insurance
300 S. Spring Street, South Tower
Los Angeles, CA 90013
Telephone: 1-800-927-4357

Please feel free to contact the undersigned should you wish to discuss the content of this letter.

Sincerely,

Steven Battaglia
Claims Specialist
Tel.: 973.532.6395
E-mail: sbattaglia@prosightspecialty.com

11

Amber Heard
c/o Macias, Gini & O'Connell
October 1, 2019
Page 11 of 11


cc:

Claire Boxer
Integro USA, Inc.
Via E-mail Only: *claire.boxer@epicbrokers.com*

Richard A. Schwartz
Browne George Ross, LLP
Via E-mail Only: *rschwartz@bgrfirm.com*

12

# Exhibit B

Exhibit B - 001





# REPORT A CLAIM

## QUICK. CONVENIENT. FOCUSED.

## TELL US WHAT HAPPENED AND WE'LL IMMEDIATELY BEGIN TO DELIVER THE AWESOME SERVICE THAT IS THE HALLMARK OF PROSIGHT.

We'll focus first on assuring your well-being. Then, we'll tend to every detail of your claim with care.

 **EMAIL**    claims@prosightspecialty.com

 **FAX**    1-855-657-3534

 **MAIL**    ProSight Specialty Insurance Claims Department
412 Mt. Kemble Avenue Suite 300C
Morristown, NJ 07960

 **PHONE**    1-800-774-2755
Press '1' to Report a Claim / Anytime - days, nights & weekends
*For inquiries on previously reported claims:*
Press '2' Workers' Compensation Claims
Press '3' All Other Claims

**ONLINE**    customer.prosightspecialty.com    

PN 04 99 37    11/17    As used herein, "ProSight" refers to the insurers of ProSight Specialty Insurance Group underwriting insurance policies or bonds, which include New York Marine and General Insurance Company, Gotham Insurance Company and Southwest Marine and General Insurance Company. Actual coverage is specified by the policies or bonds issued. ProSight Specialty, 412 Mt Kemble Ave, Morristown, NJ 07960.

Exhibit B - 002

# NEW YORK MARINE AND GENERAL INSURANCE COMPANY

59 Maiden Lane, 27th Floor
New York, NY 10038-4647

# COMMON POLICY DECLARATIONS

**POLICY NUMBER:** GL201800012500          **PREVIOUS POLICY NUMBER:** NEW

| COMPANY NAME | PRODUCER NAME                    00609 |
|---|---|
| New York Marine and General Insurance Company<br>59 Maiden Lane, 27th Floor<br>New York, NY 10038-4647 | Integro USA, Inc.<br>21650 Oxnard St., Suite 2350<br>Woodland Hills, CA 91367-7824 |

**NAMED INSURED:** Under the Black Sky, Inc.
As Per Named Insured Extension Schedule

**MAILING ADDRESS:** c/o MACIAS, GINI & O'CONNELL
2029 Century Park East, #1500
Los Angeles, CA 90067

**POLICY PERIOD:  FROM**  07/18/2018  **TO**  07/18/2019
**AT 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS SHOWN ABOVE.**

**BUSINESS DESCRIPTION** Shell Corporation

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.**

| | PREMIUM |
|---|---|
| COMMERCIAL GENERAL LIABILITY COVERAGE PART | ███ |
| TERRORISM - CERTIFIED ACTS (GENERAL LIABILITY) | ███ |
| TOTAL: | ███ |

IL DS 00 09 08          © ISO Properties, Inc., 2007          **Page 1 of 3**  ☐

Exhibit B - 003

**POLICY NUMBER:** GL201800012500

| FORMS APPLICABLE TO ALL COVERAGE PARTS (SHOW NUMBERS): |
| --- |
| See Schedule of Forms and Endorsements. |

| Countersigned | By: |
| --- | --- |
| **(Date)** | **(Authorized Representative)** |

# NAMED INSURED EXTENSION SCHEDULE

| POLICY NUMBER: | EFFECTIVE DATE: |
|---|---|
| GL201800012500 | 07/18/2018 |

Under the Black Sky, Inc.
Amber Heard, an Individual

IL DS 00 09 08                              Original                        Page 3 of 3

Exhibit B a 005

SIGNATURE PAGE

**In witness whereof**, New York Marine and General Insurance Company has caused this policy to be signed by its president and secretary.

**Joseph J. Beneducci**
President

**Frank D. Papalia**
Secretary

---

Named Insured: Under the Black Sky, Inc.
Policy #:     GL201800012500
Policy Period:  07/18/2018 – 07/18/2019

IL 0001 (1010)

Exhibit B - 006

# SCHEDULE OF FORMS AND ENDORSEMENTS

| POLICY NUMBER:<br>GL201800012500 | EFFECTIVE DATE:<br>07/18/2018 |
|---|---|

**NUMBER**                 **TITLE**

### COMMON

| | |
|---|---|
| IL DS 00 (09-08) | Common Policy Declarations |
| IL 0001 (10-10) | Signature Page |
| IL 00 03 (09-08) | Calculation Of Premium |
| IL 09 85 (01-15) | Disclosure Pursuant To Terrorism Risk Insurance Act |
| IL 00 17 (11-98) | Common Policy Conditions |
| IL 00 21 (09-08) | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |
| IL 02 70 (09-12) | California Changes - Cancellation And Nonrenewal |

### GENERAL LIABILITY

| | |
|---|---|
| DL 24 33 (05-04) | Workers Compensation Certain Residence Employees - California |
| CG DS 01 (10-01) | Commercial General Liability Declarations |
| CG 00 01 (12-07) | Commercial General Liability Coverage Form |
| CG 00 68 (05-09) | Recording And Distribution Of Material Or Information In Violation Of Law Exclusion |
| CG 20 11 (01-96) | Additional Insured - Managers Or Lessors Of Premises |
| CG 20 23 (10-93) | Additional Insured - Executors, Administrators, Trustees Or Beneficiaries |
| CG 20 34 (07-04) | Additional Insured - Lessor Of Leased Equipment - Automatic Status When Required In Lease Agreement With You |
| CG 21 46 (07-98) | Abuse or Molestation Exclusion |
| CG 21 47 (12-07) | Employment-Related Practices Exclusion |
| CG 21 67 (12-04) | Fungi or Bacteria Exclusion |
| CG 21 70 (01-15) | Cap on Losses From Certified Acts of Terrorism |
| CG 21 76 (01-15) | Exclusion of Punitive Damages Related to a Certified Act of Terrorism |
| CG 21 84 (01-15) | Exclusion Of Certified Nuclear, Biological, Chemical Or Radiological Acts Of Terrorism; Cap On Losses From Certified Acts Of Terrorism |
| CG 21 96 (03-05) | Silica Or Silica-Related Dust Exclusion |
| GL 0001 (06-10) | Absolute Asbestos Exclusion |
| GL 0002 (06-10) | Absolute Lead Exclusion |
| GL 0008 (06-10) | Amendment of Employee Definition (Temporary Employee) |
| GL 0011 (06-10) | Comprehensive Personal Liability Coverage |
| GL 0019 (06-10) | Cross Liability Exclusion |
| GL 0025 (06-10) | Exclusion - Communicable Diseases |
| GL 0029 (06-10) | Exclusion - Designated Activites |
| GL 0030 (06-10) | Exclusion - Fireworks With Exception for Concussion Effects, Flashpots and Smokepots |
| GL 0035 (06-10) | Exclusion - Personal And Advertising Injury Liability - Entertainment Industry |
| GL 0041 (06-10) | Knowledge Of Occurrence |
| GL 0042 (06-10) | Limitation - No Stacking Of Occurrence Limits of Insurance |
| GL 0065 (10-10) | Comprehensive Personal Liability Coverage Declarations |
| GL 0452 (04-16) | CALIFORNIA EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY - WITH LIMITED BODILY INJURY EXCEPTION |

IL 00 03 09 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

© ISO Properties, Inc., 2007    20    Exhibit 008 Page 1 of 1    □

POLICY NUMBER: GL201800012500

IL 09 85 01 15

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**SCHEDULE**

| SCHEDULE – PART I |
|---|
| **Terrorism Premium (Certified Acts)** ▮ |
| **This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(ies):** |
| Certified Acts - General Liability ▮ |
| **Additional information, if any, concerning the terrorism premium:** |

| SCHEDULE – PART II |
|---|
| **Federal share of terrorism losses** ▮ **% Year: 20** 18 |
| (Refer to Paragraph **B.** in this endorsement.) |
| **Federal share of terrorism losses** ▮ **% Year: 20** 19 |
| (Refer to Paragraph **B.** in this endorsement.) |

| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |
|---|

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part **II** of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

 Copyright, Insurance Services Office, Inc., 1998 Exhibit 01 Page 1 of 1 □

IL 00 21 09 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".

© ISO Properties, Inc., 2007
Exhibit 1, 012

24

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

   **(a)**  Any "nuclear reactor";

   **(b)**  Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

   **(c)**  Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

   **(d)**  Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

© ISO Properties, Inc., 2007

IL 02 70 09 12

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALIFORNIA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraphs **2.** and **3.** of the **Cancellation** Common Policy Condition are replaced by the following:

**2. All Policies In Effect For 60 Days Or Less**

If this policy has been in effect for 60 days or less, and is not a renewal of a policy we have previously issued, we may cancel this policy by mailing or delivering to the first Named Insured, at the mailing address shown in the policy, and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:

**a.** 10 days before the effective date of cancellation if we cancel for:

(1) Nonpayment of premium; or

(2) Discovery of fraud by:

(a) Any insured or his or her representative in obtaining this insurance; or

(b) You or your representative in pursuing a claim under this policy.

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**3. All Policies In Effect For More Than 60 Days**

**a.** If this policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may cancel this policy only upon the occurrence, after the effective date of the policy, of one or more of the following:

(1) Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.

(2) Discovery of fraud or material misrepresentation by:

(a) Any insured or his or her representative in obtaining this insurance; or

(b) You or your representative in pursuing a claim under this policy.

(3) A judgment by a court or an administrative tribunal that you have violated a California or Federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

© Insurance Services Office, Inc., 2012
Exhibit 01 Page 14 of 4

**(4)** Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by you or your representative, which materially increase any of the risks insured against.

**(5)** Failure by you or your representative to implement reasonable loss control requirements, agreed to by you as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

**(6)** A determination by the Commissioner of Insurance that the:

**(a)** Loss of, or changes in, our reinsurance covering all or part of the risk would threaten our financial integrity or solvency; or

**(b)** Continuation of the policy coverage would:

**(i)** Place us in violation of California law or the laws of the state where we are domiciled; or

**(ii)** Threaten our solvency.

**(7)** A change by you or your representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the policy.

**b.** We will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the first Named Insured, at the mailing address shown in the policy, and to the producer of record, at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium or discovery of fraud; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason listed in Paragraph **3.a.**

**B.** The following provision is added to the **Cancellation** Common Policy Condition:

**7. Residential Property**

This provision applies to coverage on real property which is used predominantly for residential purposes and consisting of not more than four dwelling units, and to coverage on tenants' household personal property in a residential unit, if such coverage is written under one of the following:

Commercial Property Coverage Part

Farm Coverage Part – Farm Property – Farm Dwellings, Appurtenant Structures And Household Personal Property Coverage Form

**a.** If such coverage has been in effect for 60 days or less, and is not a renewal of coverage we previously issued, we may cancel this coverage for any reason, except as provided in **b.** and **c.** below.

**b.** We may not cancel this policy solely because the first Named Insured has:

**(1)** Accepted an offer of earthquake coverage; or

**(2)** Cancelled or did not renew a policy issued by the California Earthquake Authority (CEA) that included an earthquake policy premium surcharge.

However, we shall cancel this policy if the first Named Insured has accepted a new or renewal policy issued by the CEA that includes an earthquake policy premium surcharge but fails to pay the earthquake policy premium surcharge authorized by the CEA.

**c.** We may not cancel such coverage solely because corrosive soil conditions exist on the premises. This restriction **(c.)** applies only if coverage is subject to one of the following, which exclude loss or damage caused by or resulting from corrosive soil conditions:

**(1)** Commercial Property Coverage Part – Causes Of Loss – Special Form; or

**(2)** Farm Coverage Part – Causes Of Loss Form – Farm Property, Paragraph **D.** Covered Causes Of Loss – Special.

27

**C.** The following is added and supersedes any provisions to the contrary:

**Nonrenewal**

**1.** Subject to the provisions of Paragraphs **C.2.** and **C.3.** below, if we elect not to renew this policy, we will mail or deliver written notice, stating the reason for nonrenewal, to the first Named Insured shown in the Declarations, and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date.

We will mail or deliver our notice to the first Named Insured, and to the producer of record, at the mailing address shown in the policy.

**2. Residential Property**

This provision applies to coverage on real property used predominantly for residential purposes and consisting of not more than four dwelling units, and to coverage on tenants' household property contained in a residential unit, if such coverage is written under one of the following:

Commercial Property Coverage Part

Farm Coverage Part – Farm Property – Farm Dwellings, Appurtenant Structures And Household Personal Property Coverage Form

**a.** We may elect not to renew such coverage for any reason, except as provided in **b., c.** and **d.** below.

**b.** We will not refuse to renew such coverage solely because the first Named Insured has accepted an offer of earthquake coverage.

However, the following applies only to insurers who are associate participating insurers as established by Cal. Ins. Code Section 10089.16. We may elect not to renew such coverage after the first Named Insured has accepted an offer of earthquake coverage, if one or more of the following reasons applies:

**(1)** The nonrenewal is based on sound underwriting principles that relate to the coverages provided by this policy and that are consistent with the approved rating plan and related documents filed with the Department of Insurance as required by existing law;

**(2)** The Commissioner of Insurance finds that the exposure to potential losses will threaten our solvency or place us in a hazardous condition. A hazardous condition includes, but is not limited to, a condition in which we make claims payments for losses resulting from an earthquake that occurred within the preceding two years and that required a reduction in policyholder surplus of at least 25% for payment of those claims; or

**(3)** We have:

**(a)** Lost or experienced a substantial reduction in the availability or scope of reinsurance coverage; or

**(b)** Experienced a substantial increase in the premium charged for reinsurance coverage of our residential property insurance policies; and

the Commissioner has approved a plan for the nonrenewals that is fair and equitable, and that is responsive to the changes in our reinsurance position.

**c.** We will not refuse to renew such coverage solely because the first Named Insured has cancelled or did not renew a policy, issued by the California Earthquake Authority, that included an earthquake policy premium surcharge.

**d.** We will not refuse to renew such coverage solely because corrosive soil conditions exist on the premises. This restriction **(d.)** applies only if coverage is subject to one of the following, which exclude loss or damage caused by or resulting from corrosive soil conditions:

**(1)** Commercial Property Coverage Part – Causes Of Loss – Special Form; or

**(2)** Farm Coverage Part – Causes Of Loss Form – Farm Property, Paragraph **D.** Covered Causes Of Loss – Special.

**3.** We are not required to send notice of nonrenewal in the following situations:

**a.** If the transfer or renewal of a policy, without any changes in terms, conditions or rates, is between us and a member of our insurance group.

Exhibit 3 Page 036

**b.** If the policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph **C.1.**

**c.** If you have obtained replacement coverage, or if the first Named Insured has agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

**d.** If the policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.

**e.** If the first Named Insured requests a change in the terms or conditions or risks covered by the policy within 60 days of the end of the policy period.

**f.** If we have made a written offer to the first Named Insured, in accordance with the timeframes shown in Paragraph **C.1.,** to renew the policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

© Insurance Services Office, Inc., 2012

IL 02 70 09 12

DWELLING
DL 24 33 05 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# WORKERS COMPENSATION RESIDENCE EMPLOYEES – CALIFORNIA

## A.  Agreement

We agree, with respect to "residence employees":

**Under Coverage I**

To pay when due all benefits required of an "insured" by the California Workers' Compensation Law; and

**Under Coverage II**

To pay on behalf of an "insured" all damages for which the "insured" is legally liable because of "bodily injury" sustained by a "residence employee". The "bodily injury" must be caused by accident or disease and arise out of and in the course of employment by the "insured" while:

**1.** In the United States of America, its territories or possessions, or Canada, or

**2.** Temporarily elsewhere if the "residence employee" is a citizen or resident of the United States or Canada.

Coverage **II** does not apply to any suit brought in or judgment rendered by any court outside the United States of America, its territories and possessions, or Canada, or to any action on such judgment.

## B.  Who Is Covered

A "residence employee" is covered if during the 90 calendar days immediately before the date of injury the employee has:

**1.** Actually been engaged in such employment by the "insured" for no less than 52 hours, and

**2.** Earned no less than one hundred dollars ($100) in wages.

## C.  Application Of Coverage

This insurance applies only to "bodily injury" which occurs during the policy period. If the "bodily injury" is a disease, it must be caused or aggravated by the conditions of the "residence employee's" employment by the "insured".

## D.  Policy Provisions

This insurance is subject to all the provisions of this endorsement and the following provisions of this policy:

**1.** Under Conditions:

   **C.** Duties After "Occurrence".

   **F.** Suit Against Us.

**J.** Subrogation.

**2.** Under Additional Policy Conditions:

   **B.** Waiver or Change of Policy Provisions.

   **C.** Assignment.

   **E.** Cancellation.

**3.** Our agreement to defend an "insured" as provided under **Coverage L – Personal Liability.**

**4.** Under Additional Coverages:

   **A.** Claim Expenses.

   **B.** First Aid Expenses.

**5.** The definitions of "bodily injury", "business", "insured" and "residence employee".

## E.  Additional Provisions Applicable To Coverage I

The following provisions are applicable to Coverage **I**:

**1.** We shall be directly and primarily liable to any "residence employee" of an "insured" entitled to the benefits of the California Workers' Compensation Law.

**2.** As between the "residence employee" and us, notice to or knowledge of the occurrence of the injury on the part of an "insured" will be deemed notice or knowledge on our part.

**3.** The jurisdiction of an "insured" will, for the purpose of the law imposing liability for compensation, be our jurisdiction.

**4.** We will be subject to the orders, findings, decisions or awards rendered against an "insured", under the provisions of the law imposing liability for compensation, subject to the provisions, conditions and limitations of this policy.

This policy shall govern as between an "insured" and us as to payments by either in discharge of an "insured's" liability for compensation.

**5.** The "residence employee" has a first lien upon any amount which we owe you on account of this insurance. In case of your legal incapacity or inability to receive the money and pay it to the "residence employee", we will pay it directly to the "residence employee". Your obligation to the "residence employee" will be discharged to the extent of such payment.

 © ISO Properties, Inc.,  2004 30 Exhibit 018 Page 1 of 2

**F. Limits Of Liability Coverage II**

Our total limit of liability will not exceed $100,000 for all damages because of "bodily injury":

**1.** Sustained by one or more "residence employees" in any one accident; or

**2.** Caused by disease and sustained by a "residence employee".

Our total limit of liability will not exceed $500,000 for all damages arising out of "bodily injury" by disease regardless of the number of "residence employees" who sustain "bodily injury" by disease.

**G. Other Insurance**

This insurance does not apply to any loss to which other valid and collectible Workers' Compensation or Employers' Liability Insurance applies

**H. Conformity To Statute**

Terms of this insurance which are in conflict with the California Workers' Compensation Law are amended to conform to that law.

**I. Exclusions**

This policy does not apply:

**1.** To liability for additional compensation imposed on an "insured" under Sections 4553 and 4557, Division IV, Labor Code of the State of California, because of the serious and willful misconduct of an "insured", or because of "bodily injury" to an employee under 16 years of age and illegally employed at the time of injury;

**2.** To liability for "bodily injury" arising out of or in connection with a "business" engaged in by an "insured".

**3.** Under Coverage **II:**

   **a.** To liability assumed by the "insured" under any contract or agreement.

   **b.** To "bodily injury" by disease unless a written claim is made or suit brought against the "insured" within 36 months after the end of the policy period.

   **c.** To any obligation under a workers' compensation, unemployment or disability benefits law or any similar law.

All other provisions of this policy apply.

© ISO Properties, Inc., 2004
HO 24 33 05 04

POLICY NUMBER: GL201800012500

**COMMERCIAL GENERAL LIABILITY**
CG DS 01 10 01

# COMMERCIAL GENERAL LIABILITY DECLARATIONS

| **COMPANY NAME** | **PRODUCER NAME** 00609 |
|---|---|
| New York Marine and General Insurance Company<br>59 Maiden Lane, 27th Floor<br>New York, NY 10038-4647 | Integro USA, Inc.<br>21650 Oxnard St., Suite 2350<br>Woodland Hills, CA 91367-7824 |

NAMED INSURED Under the Black Sky, Inc.
                           As Per Named Insured Extension Schedule

MAILING ADDRESS c/o MACIAS, GINI & O'CONNELL
                                2029 Century Park East, #1500
                                Los Angeles, CA 90067

POLICY PERIOD: FROM    07/18/2018    TO    07/18/2019    AT 12:01 A.M. TIME AT
YOUR MAILING ADDRESS SHOWN ABOVE

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| **LIMITS OF INSURANCE** | | |
|---|---:|---|
| EACH OCCURRENCE LIMIT | $1,000,000 | |
| DAMAGE TO PREMISES RENTED TO YOU LIMIT | $300,000 | Any one premises |
| MEDICAL EXPENSE LIMIT | $5,000 | Any one person |
| PERSONAL & ADVERTISING INJURY LIMIT | $1,000,000 | Any one person or organization |
| GENERAL AGGREGATE LIMIT | $1,000,000 | |
| PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT | $1,000,000 | |

| **RETROACTIVE DATE (CG 00 02 ONLY)** |
|---|
| THIS INSURANCE DOES NOT APPLY TO "BODILY INJURY", "PROPERTY DAMAGE" OR "PERSONAL AND ADVERTISING INJURY" WHICH OCCURS BEFORE THE RETROACTIVE DATE, IF ANY, SHOWN BELOW.<br>RETROACTIVE DATE: _____<br>(ENTER DATE OR "NONE" IF NO RETROACTIVE DATE APPLIES) |

| **DESCRIPTION OF BUSINESS** |
|---|
| FORM OF BUSINESS: |

☐ INDIVIDUAL        ☐ PARTNERSHIP        ☐ JOINT VENTURE        ☐ TRUST

☐ LIMITED LIABILITY COMPANY        ☒ ORGANIZATION, INCLUDING A CORPORATION (BUT NOT IN-CLUDING A PARTNERSHIP, JOINT VENTURE OR LIMITED LIABILITY COMPANY)

BUSINESS DESCRIPTION: Shell Corporation

POLICY NUMBER: GL201800012500

**COMMERCIAL GENERAL LIABILITY**
**CG DS 01 10 01**

| ALL PREMISES YOU OWN, RENT OR OCCUPY | |
|---|---|
| LOCATION NUMBER | ADDRESS OF ALL PREMISES YOU OWN, RENT OR OCCUPY |
| 1 | ███████████████ ██████████████████ |

| CLASSIFICATION AND PREMIUM | | | | | | | |
|---|---|---|---|---|---|---|---|
| LOCATION | CLASSIFICATION | CODE | PREMIUM | RATE | | ADVANCE PREMIUM | |
| NUMBER | | NO. | BASE | Prem/ Ops | Prod/Comp Ops | Prem/ Ops | Prod/ Comp Ops |
| 1 | Shell Corp - Includes office liability at loc 1 | | 1 | Flat | Included | ███ | |
| - | Increased Premises Rented To You Limit | | $300,000 Limit | Flat | Included | ██ | |

STATE TAX OR OTHER (if applicable)  $ ██████████

TOTAL PREMIUM (SUBJECT TO AUDIT)  $ _____

PREMIUM SHOWN IS PAYABLE:

AT INCEPTION  $ ██████████

AT EACH ANNIVERSARY  $ _____

(IF POLICY PERIOD IS MORE THAN ONE YEAR AND PREMIUM IS PAID IN ANNUAL INSTALLMENTS)

| AUDIT PERIOD (IF APPLICABLE) | ☐ ANNUALLY | ☐ SEMI-ANNUALLY | ☐ QUARTERLY | ☐ MONTHLY |
|---|---|---|---|---|

| ENDORSEMENTS |
|---|
| ENDORSEMENTS ATTACHED TO THIS POLICY: |
| See Schedule of Forms and Endorsements. |

**THESE DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) AND ANY ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.**

| Countersigned: | By: |
|---|---|
| (Date) | (Authorized Representative) |

**NOTE**

OFFICERS' FACSIMILE SIGNATURES MAY BE INSERTED HERE, ON THE POLICY COVER OR ELSEWHERE AT THE COMPANY'S OPTION.

**CG DS 01 10 01**

© ISO Properties, Inc.,  2000

**Page 2 of 2**
☐

Exhibit B - 021

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERAGES

## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

© ISO Properties, Inc., 2006

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

**(b)** the operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

© ISO Properties, Inc., 2006
**CG 00 01 12 07**

37

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Distribution Of Material In Violation Of Statutes**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

 © ISO Properties, Inc., 2006

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

## COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of websites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Distribution Of Material In Violation Of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**COVERAGE C MEDICAL PAYMENTS**

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A.**

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by,

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

 © ISO Properties, Inc., 2006

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

  **(1)** With respect to liability arising out of the maintenance or use of that property; and

  **(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage **C;**

**b.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage **B.**

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A;** and

**b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

  **(1)** How, when and where the "occurrence" or offense took place;

  **(2)** The names and addresses of any injured persons and witnesses; and

© ISO Properties, Inc., 2006

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

© ISO Properties, Inc., 2006

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

**9.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

 © ISO Properties, Inc., 2006

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

   **(1)** Products that are still in your physical possession; or

   **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

      **(a)** When all of the work called for in your contract has been completed.

      **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

      **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

      Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

   **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

   **(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

   **(3)** Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a.** Means:

   **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

      **(a)** You;

      **(b)** Others trading under your name; or

      **(c)** A person or organization whose business or assets you have acquired; and

   **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

   **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

© ISO Properties, Inc., 2006

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

  **a.** Means:

    **(1)** Work or operations performed by you or on your behalf; and

    **(2)** Materials, parts or equipment furnished in connection with such work or operations.

  **b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

    **(2)** The providing of or failure to provide warnings or instructions.

COMMERCIAL GENERAL LIABILITY
CG 00 68 05 09

# RECORDING AND DISTRIBUTION OF MATERIAL OR INFORMATION IN VIOLATION OF LAW EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **q.** of Paragraph **2. Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**B.** Exclusion **p.** of Paragraph **2. Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

© Insurance Services Office, Inc., 2008

POLICY NUMBER: GL201800012500

**COMMERCIAL GENERAL LIABILITY**
**CG 20 11 01 96**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - MANAGERS OR LESSORS OF PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

**1.** Designation of Premises (Part Leased to You):  Per Locations on Declarations page

**2.** Name of Person or Organization (Additional Insured):  As per written contract

**3.** Additional Premium:  None

(If no entry appears above, the information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN INSURED (Section **II**) is amended to include as an insured the person or organization shown in the Schedule but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

**1.** Any "occurrence" which takes place after you cease to be a tenant in that premises.

**2.** Structural alterations, new construction or demolition operations performed by or on behalf of the person or organization shown in the Schedule.

Copyright, Insurance Services Office, Inc.,  1994

Exhibit 5 -139

51

COMMERCIAL GENERAL LIABILITY
CG 20 23 10 93

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – EXECUTORS, ADMINISTRATORS, TRUSTEES OR BENEFICIARIES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

WHO IS AN INSURED (Section **II**) is amended to include as an insured any executor, administrator, trustee or beneficiary of your estate or living trust while acting within the scope of their duties as such.

COMMERCIAL GENERAL LIABILITY
CG 20 34 07 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – LESSOR OF LEASED EQUIPMENT – AUTOMATIC STATUS WHEN REQUIRED IN LEASE AGREEMENT WITH YOU

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.  Who Is An Insured (Section II)** is amended to include as an additional insured any person or organization from whom you lease equipment when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person or organization.

A person's or organization's status as an additional insured under this endorsement ends when their contract or agreement with you for such leased equipment ends.

**B.** With respect to the insurance afforded to these additional insureds, this insurance does not apply to any "occurrence" which takes place after the equipment lease expires.

© ISO Properties, Inc., 2004

Exhibit 2 Page 41 of 1 □

COMMERCIAL GENERAL LIABILITY
CG 21 46 07 98

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ABUSE OR MOLESTATION EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:

**1.** The actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured, or

**2.** The negligent:

  **a.** Employment;

  **b.** Investigation;

  **c.** Supervision;

  **d.** Reporting to the proper authorities, or failure to so report; or

  **e.** Retention;

of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by Paragraph **1.** above.

Copyright, Insurance Services Office, Inc.,  1997

Exhibit Page 042 Page 1 of 1

**COMMERCIAL GENERAL LIABILITY**
**CG 21 47 12 07**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

  **(a)** Refusal to employ that person;

  **(b)** Termination of that person's employment; or

  **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

  **(a)** Refusal to employ that person;

  **(b)** Termination of that person's employment; or

  **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

COMMERCIAL GENERAL LIABILITY
CG 21 67 12 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

COMMERCIAL GENERAL LIABILITY
CG 21 70 01 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

COMMERCIAL GENERAL LIABILITY
CG 21 76 01 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF PUNITIVE DAMAGES
# RELATED TO A CERTIFIED ACT OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM PUNITIVE DAMAGES**

Damages arising, directly or indirectly, out of a "certified act of terrorism" that are awarded as punitive damages.

**B.** The following definition is added:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

 © Insurance Services Office, Inc., 2015

COMMERCIAL GENERAL LIABILITY
CG 21 84 01 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED NUCLEAR, BIOLOGICAL, CHEMICAL OR RADIOLOGICAL ACTS OF TERRORISM; CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism". However, this exclusion applies only when one or more of the following are attributed to such act:

**1.** The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

**2.** The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**3.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

Exhibit 047

**D.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

© Insurance Services Office, Inc., 2015

COMMERCIAL GENERAL LIABILITY
CG 21 96 03 05

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

   **2. Exclusions**

   This insurance does not apply to:

   **Silica Or Silica-Related Dust**

   **a.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

   **b.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

   **c.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

   **2. Exclusions**

   This insurance does not apply to:

   **Silica Or Silica-Related Dust**

   **a.** "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

   **b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the **Definitions** Section:

   **1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

   **2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

# ABSOLUTE ASBESTOS EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" involving or arising out of, directly or indirectly, asbestos, in any manner or form.

This exclusion includes, but is not limited to, claims or "suits" concerning exposure or alleged exposure to asbestos, as well as claims or "suits" concerning the incorporation, presence, or removal of asbestos in any building, structure, or product.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

# ABSOLUTE LEAD EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the existence or control of the hazardous properties of lead, irrespective of the form or source of such lead.

This exclusion applies, but is not limited to the following:

1. To liability assumed under any contract or agreement;

2. To any obligation to pay or indemnify any person, organization, or governmental agency for any portion of the injury, damage, or expense; and

3. To any supervision, instructions, recommendations, requests, warranties or representations (expressed or implied), warnings, or advice given or which should have been given regarding the existence or control of the lead.

When used in this exclusion:

I.   "Control" includes, but is not limited to testing, monitoring, abatement, clean-up, removal, containment, treatment, or disposal.

II.  "Form" means anything containing lead, including, but not limited to air, water, earth, dust, paint, plumbing solder, and pipes and fixtures.

**COMMERCIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF EMPLOYEE DEFINITION (TEMPORARY EMPLOYEE)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The definition of "Employee" in the **Definitions** Section is deleted and replaced by the following:

"Employee" includes a "leased worker" or a "temporary worker".

GL 0008 0610        Includes copyrighted material of Insurance Services Office, Inc., with its permission.        Page 1 of 1

Exhibit B - 052

# COMPREHENSIVE PERSONAL LIABILITY COVERAGE

Throughout this policy, "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

## LIABILITY COVERAGES

### COVERAGE L. PERSONAL LIABILITY

If a claim is made or a suit is brought against any "Insured" for damages because of "bodily injury", "property damage" or "personal injury" caused by an "occurrence" to which this coverage applies, we will:

a.  pay up to our limit of liability for the damages for which the "Insured" is legally liable; and

b.  provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may make any investigation and settle any claim or suit that we decide is appropriate. Our obligation to defend any claim or suit ends when the amount we pay for damages resulting from the "occurrence" equals our limit of liability.

### COVERAGE M. MEDICAL PAYMENTS TO OTHERS

We will pay the necessary medical expenses incurred or medically ascertained within three years from the date of any accident causing "bodily injury". Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household other than "resident employees". As to others, this coverage applies only:

a.  to a person on the "insured location" with the permission of an "Insured"; or

b.  to a person off the "insured location", if the "bodily injury":

(1)  arises out of a condition in the "insured location" or the ways immediately adjoining;

or

(2)  is caused by the activities of an "Insured"; or

(3)  is caused by a "residence employee" in the course of the "residence employee's" employment by an "Insured"; or

(4)  is caused by an animal owned by or in the care of an "Insured".

## EXCLUSIONS

1.  COVERAGE L. - Personal Liability and

Coverage M. Medical Payments to Others do not apply to "bodily injury" or "property damage":

a.  which is expected or intended by the "Insured"; or

b.  arising out of business pursuits of an "Insured" or the rental or holding for rental of any part of any premises by an "Insured".

This exclusion does not apply to:

(1)  activities which are ordinarily incidental to non-business pursuits; or

(2)  the rental or holdings for rental of a residence of yours:

(a)  on an occasional basis for the exclusive use as a residence; or

(b)  in part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

(c)  in part, as an office, school, studio or private garage;

c.  arising out of the rendering or failing to render professional services; or

d.  arising out of an oral or written publication or other forms of defamation that occurred prior to the inception date of this policy; or

e.  arising out of:

(1)  the ownership, maintenance, use, loading or unloading of motor vehicles or all other motorized land conveyances, including trailers, owned or operated by or rented or loaned to an "Insured"; or

(2)  the entrustment by an "Insured" of a motor vehicle or any other motorized land conveyance to any person; or

(3)  statutorily imposed vicarious parental liability for the actions of a child or minor using a conveyance excluded in paragraph 1. or 2. above.

This exclusion does not apply to:

(1)  a trailer not towed by or carried on a motorized land conveyance; or

GL 0011 0610          Includes copyrighted material of Insurance Services Office, Inc., with its permission.          Page 1 of 6

65

Exhibit B - 053

(2) a motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration; or

(3) a motorized golf cart; or

(4) a vehicle or conveyance not subject to motor vehicle registration which is:

    (a) used to service an "Insured's" residence; or

    (b) designed for assisting the handicapped; or

    (c) in dead storage on an "insured location".

f. arising out of:

(1) the ownership, maintenance, use, loading or unloading of a watercraft described as follows:

    (a) with inboard or inboard-outdrive motor power more than 50 horsepower; or

    (b) that is a sailing vessel, with or without auxiliary power, 26 feet or more in length owned by or rented to an "Insured"; or

    (c) powered by one or more outboard motors with more than 50 total horsepower if the outboard motor is owned by an "Insured". But, outboard motors of more than 50 horsepower are covered for the policy period if:

        (i) you acquire them prior to the policy period and you declare them at policy inception; or

        (ii) your intention to insure is reported to us in writing within 45 days after you acquire the outboard motors;

        (iii) you acquire them during the policy period.

    This exclusion does not apply while the watercraft is stored.

(2) the entrustment by an "Insured" of a watercraft described above to any person; or

(3) statutorily imposed vicarious parental liability for the actions of a child or minor using a watercraft described above.

g. arising out of:

(1) the ownership, maintenance, use, loading or unloading of an aircraft; or

(2) the entrustment by an "Insured" of an aircraft to any person; or

(3) statutorily imposed vicarious parental liability for the actions of a child or minor using an aircraft.

An aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo.

h. arising out of war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

Exclusions d., e., f., and g. do not apply to "bodily injury", property damage or personal injury to a residence employee arising out of and in the course of the residence employee's employment by an Insured.

2. Coverage L. - Personal Liability, does not apply to:

a. liability:

(1) for your share of any loss assessment charged against all members of an association, corporation or community of property owners; or

(2) under any contract or agreement.

However, this exclusion does not apply to written contracts:

    (a) that directly relate to the ownership, maintenance or use of an "insured location"; or

    (b) where the liability of others is assumed by the "insured" prior to an "occurrence"; unless excluded in 1. above or elsewhere in this policy;

b. "property damage" to property owned by the Insured; or

c. "property damage" to property rented to, occupied or used by or in the care, custody or control of the "Insured". This exclusion does not apply to "property damage" caused by fire, smoke, explosion or water damage; or

d. "bodily injury" to any person eligible to receive any benefits required to be provided or voluntarily provided by the "Insured" under any Workers' or Workmen's Compensation, non-occupational disability, or occupational disease law; or

e. "bodily Injury" or "property damage" for which any "Insured" under this policy is also an "Insured" under a nuclear energy liability policy or would be an "Insured" but for its termination upon exhaustion of its limit of liability. A nuclear energy liability policy is a

GL 0011 0610    Includes copyrighted material of Insurance Services Office, Inc., with its permission.    Page 2 of 6

66

Exhibit B - 054

policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada, or any of their successors.

3. Coverage M - Medical Payments to Others, does not apply to bodily injury:

   a. to a residence employee if the "bodily injury" occurs off the "insured" location and does not arise out of or in the course of the "residence employee's" employment by any "Insured"; or

   b. to any person eligible to receive any benefits required to be provided or voluntarily provided under any Workers' or Workmen's Compensation, non-occupational disability or occupational disease law; or

   c. from any nuclear reaction, radiation or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these; or

   d. to any person, other than a "residence employee" of an "Insured", regularly residing on any part of the "insured location".

**ADDITIONAL COVERAGES**

We cover the following in addition to the limits of liability:

1. Claim Expenses

   We pay:

   a. expenses incurred by us and costs taxed against any "Insured" in any suit we defend; and

   b. premiums on bonds required in a suit defended by us, but not for bond amount greater than the limit of liability for Coverage L. We need not apply for or furnish a bond; and

   c. reasonable expenses incurred by an "Insured" at our request, including actual loss of earnings (but not loss of other income) up to $100 per day for assisting us in the investigation or defense of a claim or suit; and

   d. interest on the entire judgment which accrues after entry of the judgment and before we pay or tender or deposit in court the part of the judgment which does not exceed the limit of liability that applies.

2. First Aid Expenses

   We will pay expenses for first aid to others incurred by any "Insured" for "bodily injury" covered under this policy. We will not pay for first aid to you or any other "Insured".

3. Damage to Property of Others in Your Care Custody or Control

   We will pay up $500 per occurrence for "property damage" to Property of Others caused by an "Insured". We will not pay for "property damage":

   a. caused intentionally by an "Insured" who is 16 years of age or older; or

   b. to property owned by an "Insured"; or

   c. to property owned by or rented to a tenant of an "Insured" or a resident in your household; or

   d. arising out of:

      (1) business pursuits; or

      (2) any act or omission in connection with a premises owned, rented or controlled by an Insured, other than the insured location; or

      (3) the ownership, maintenance, or use of aircraft, watercraft or motor vehicles or all other motorized land conveyances.

      This exclusion does not apply to a motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and not owned by an Insured.

**DEFINITIONS**

1. "Bodily Injury" means bodily harm, sickness or disease, including required care, loss of services and death that results.

2. "Business" includes trade, profession or occupation.

3. "Insured" means you and:

   a. your relatives who are part of your household; and

   b. other persons under age 21 living with you and under the care of a person named above; and

   c. with respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person included in 3a. or 3b. A person or organization using or having custody of these animals or watercraft in the course of any business, or without consent of the owner is not an Insured; and

d. with respect to any vehicle to which this policy applies:

   (1) persons while engaged in your employ or that of any person included in 3a. or 3b. above; or

   (2) other persons using the vehicle on an "insured location" with your consent.

4. "Insured location" means:

a. the residence premises; and

b. that part of any other premises, other structures and grounds, used by you as a residence and which is shown in the Declarations or which is acquired by you during the policy period for your use as a residence; and

c. any premises used by you in connection with the premises included in 4a. or 4b.; and

d. any part of a premises not owned by any "Insured" but where any "Insured" is temporarily residing; and

e. vacant land, other than farm land, owned by or rented to an "Insured"; and

f. land owned by or rented to any "Insured" on which a one or two family dwelling is being constructed as a residence for an "Insured";and

g. individual or family cemetery plots or burial vaults of an "Insured"; and

h. any part of a premises occasionally rented to any "Insured" for other than business purposes.

5. "Personal Injury" means injury other than "bodily injury", arising out of one or more of the following offenses:

a. false arrest, detention or imprisonment;

b. malicious prosecution;

c. the wrongful eviction from wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

d. oral or written publication of material that slanders or libels a person or organization including other forms of defamation; or

e. oral or written publication of material including other forms of defamation that violates a person's right of privacy.

6. "Occurrence" means an accident, including continuous or repeated exposure to conditions, which results during the policy period, in:

a. "bodily Injury"; or

b. "property damage"; or

c. "personal injury".

7. "Property damage" means physical injury to, destruction of, or loss of use of tangible property.

8. "Residence employee" means:

a. an employee of an Insured whose duties are related to maintenance or use of the residence premises, including household or domestic services; or

b. one who performs similar duties elsewhere not related to the business of an Insured.

9. "Residence premises" means a one to four family dwelling, other structures and grounds or that part of any other building where you reside and which is shown as the "residence premises" in the Declarations.

**CONDITIONS**

1. Limit of Liability

Regardless of the number of Insureds, claims made, or persons injured, total liability under Coverage L stated in this policy for all damages resulting from any one "occurrence" shall not exceed the limit of liability for Coverage L stated in the policy. The limit is the same regardless of the number of "Insureds", claims made or persons injured.

Our total liability under Coverage M for all medical expense payable for bodily injury to one person as the result of one accident will not exceed the limit of liability for Coverage M stated in this policy.

2. Severability of Insurance

This insurance applies separately to each "Insured". This condition will not increase our limit of liability for any one "occurrence".

3. Duties after Loss

In case of an accident or "occurrence", the "Insured" will perform the following duties that apply. You will help us by seeing that these duties are performed:

a. give written notice to us or our agent as soon as practicable, which sets forth:

   (1) the identity of the policy and "Insured"; and

   (2) reasonably available information as to the time, place and circumstances of the accident or "occurrence"; and

   (3) names and addresses of any claimants and witnesses;

b. promptly forward to us every notice, demand, summons or other process relating to the accident or "occurrence"; and

c. at our request, help us:

(1) to make settlement; and

(2) to enforce any right of contribution or indemnity against any person or organization who may be liable to an "Insured"; and

(3) with the conduct of suits and attend hearings and trials; and

(4) to secure and give evidence and obtain the attendance of witnesses.

d. under the coverage "Damage to the Property of Others" submit to us within 60 days after the loss, a sworn statement of loss and exhibit the damaged property, if within the "Insured's" control; and

e. the "Insured" will not, except at the "lnsured's" own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of the "bodily injury".

4. Duties of an Injured Person-Coverage M - Medical Payments to Others The injured person or someone acting for the injured person will:

a. give us written proof of claim, under oath if required, as soon as is practical; and

b. execute authorization to allow us to obtain copies of medical reports and records; and

c. the injured person will submit to physical examination by a physician selected by us when and as often as we reasonably require.

5. Payment of Claim - Coverage M – Medical Payments to Others Payment under this coverage is not an admission of liability by any insured or us.

6. Suit Against Us

No action shall be brought against us unless there has been compliance with the policy provisions.

No one will have any right to join us as a party to any action against an "Insured". Also, no action with respect to Coverage L will be brought against us until the obligation of the "Insured" has been determined by final judgment or agreement signed by us.

7. Bankruptcy of any "Insured"

Bankruptcy or insolvency of an "Insured" will not relieve us of any of our obligations under this policy.

8. Other Insurance - Coverage L – Personal Liability

This insurance is excess over any other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

9. Policy Period

This insurance applies only to "bodily injury" or "property damage" which occurs on and after the policy effective date and during the policy term.

10. Subrogation

Any "Insured" may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, any "Insured" shall sign and deliver all related papers and cooperate with us in any reasonable manner.

Subrogation does not apply to Medical Payments to Others or Damage to Property of Others.

11. Concealment or Fraud.

We do not provide coverage for an "Insured" who has:

a. intentionally concealed or misrepresented any material fact or circumstance; or

b. made false statements or engaged in fraudulent conduct relating to this insurance.

12. Liberalization Clause

If we adopt any revision which would broaden the coverage under this policy without additional premium within 60 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

13. Waiver or Change of Policy Provisions

A waiver or change of any provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination shall not waive any of our rights.

14. Assignment

Assignment of this policy shall not be valid unless we give our written consent.

15. Death

If you or any member of your household dies while a resident of your household, we insure:

a. the legal representative of the deceased but only with respect to the premises or

property covered under this policy at the time of death; and

b. with respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative has occurred.

16. Cancellation

a. You may cancel this policy at any time by returning it to us or by notifying us in writing of the date cancellation is to take effect.

b. We may cancel this policy by notifying you at least 10 days before the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address in the Declarations. Proof of mailing shall be sufficient proof of notice.

c. If this policy is canceled, the premium for the period from the date of cancellation to the expiration date will be refunded as follows: If you request cancellation, the return premium will be based on our short rate rules; if we cancel, the return premium will be pro rata. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

# CROSS LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

This insurance does not apply to any claim made or "suit" brought by or on behalf of your parent corporation, a subsidiary of your parent corporation or your subsidiary. This insurance also does not apply to any claim made or "suit" brought by or on behalf of any insured covered hereunder against any other insured covered by this policy.

This exclusion does not apply to a person or organization that would not be an insured under this policy except for an endorsement to this policy adding them as an additional insured.

**GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - COMMUNICABLE DISEASES

This insurance does not apply to "bodily injury," "property damage," "personal and advertising injury" or medical payments arising out of the transmission of any communicable diseases by an insured.

GL 0025 0610                              Page 1 of 1

Exhibit B - 060

**COMMERCIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – DESIGNATED ACTIVITIES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Description of Designated Activities: |
| --- |
| Excludes Special Events, Promotion, Live Performances, Motion Picture &/or Video Production unless declared and approved by underwriter prior to exposure commencement. |

| Specified Location (If Applicable): |
| --- |
| |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

The following exclusion is added to Paragraph **2.**, **Exclusions** of **Section I. – Coverage A – Bodily Injury And Property Damage Liability** and to Paragraph **2.**, **Exclusions** of **Section I. – Coverage B – Personal And Advertising Injury Liability**:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the activities described in the Schedule of this endorsement, regardless of whether such activities are conducted by you or on your behalf or whether the activities are conducted for you or for others.

Unless a "location" is specified in the Schedule, this exclusion applies regardless of where such activities are conducted by you or on your behalf. If a specific "location" is designated in the Schedule of this endorsement, this exclusion applies only to the described activities conducted at that "location".

For the purpose of this endorsement, "location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

**COMMERCIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - FIREWORKS
# WITH EXCEPTION FOR CONCUSSION EFFECTS, FLASHPOTS AND SMOKEPOTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2.**, **Exclusions** of **Section I. – Coverage A – Bodily Injury And Property Damage Liability** and to Paragraph **2.**, **Exclusions** of **Section I. – Coverage B – Personal And Advertising Injury Liability**:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of fireworks, pyrotechnic devices, or any explosive materials.

This exclusion does not apply to any "concussion effect", "flashpot" or "smokepot" that is induced electrically in a cylinder with no projectile, wadding or wrapping and is used to create visual effects and/or an explosive noise.

**B.** For the purpose of this endorsement, the following definitions apply:

1. "Concussion effect" means an effect intended to produce a loud noise and a violent jarring shock for dramatic effect.
2. "Flashpot" means a device containing flashpowder and intended to produce a flash of light and capable of directing the flash in an upward direction.
3. "Smokepot" is a pyrotechnic device used to create smoke.

GL 0030 0610          Includes copyrighted material of Insurance Services Office, Inc., with          Page 1 of 1
its permission.

74

Exhibit B - 062

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – PERSONAL AND ADVERTISING INJURY LIABILITY - ENTERTAINMENT INDUSTRY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2.**, **Exclusions** of **Section I. – Coverage B – Personal And Advertising Injury Liability**:

This policy does not apply to:

"Personal and advertising Injury" arising out of the development, creation, pre-production, production, postproduction, distribution, exploitation, writing, broadcasting, airing, performing or exhibition of films, television/cable programs, radio programs, stage plays, video/audio cassettes, music, sheet music, computer programs, books or other similar materials, and properties; or to any advertising or broadcasting activities.

Exhibit B - 063

**COMMERCIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# KNOWLEDGE OF OCCURRENCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Paragraph **a.** of **2.Duties In The Event of Occurrence, Offense, Claim or Suit** under **SECTION IV. – COMMERCIAL GENERAL LIABILITY CONDITIONS**, is deleted and replaced by the following:

**a.** You must notify us as soon as practicable of an "occurrence" or an offense which may result in a claim. You, your insurance manager, or someone acting on your behalf, must give this notice to us or to any of our authorized agents as soon as practicable after you know of the "occurrence" or offense. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**COMMERCIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIMITATION – NO STACKING OF OCCURRENCE LIMITS OF INSURANCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following condition is added to **Section IV. – Commercial General Liability Conditions**:
**Two or More Coverage Forms or Policies Issued By Us**

If this policy and any other policy, policies or coverage form(s) issued to you by us or any of our affiliated companies apply to the same or related damages, the most that will be paid by us and our affiliated companies either individually or collectively for the sum of all those damages is the single largest applicable

Each Occurrence Limit or similar per occurrence limit of insurance available under any one of those policies or coverage forms. Same or related damages include the continuation of injury or damages from a prior policy period into a subsequent policy period, or any injury or damage resulting from the same cause or "occurrence."

However, this provision does not apply to umbrella or similar policies or coverage forms that are purchased specifically to apply in excess of another policy or coverage form that is scheduled as underlying insurance.

In no event will coverage be provided during the policy period after (1) the applicable aggregate Limit of Insurance under any one coverage form or policy has been exhausted, or (2) the applicable aggregate Limit of Insurance under any one coverage form or policy would have been exhausted had all covered claims been submitted under that one coverage form or policy rather than under two or more coverage forms or policies.

The terms of this endorsement will govern as respect the application of any limits of insurance. If this policy or coverage form contains any other language regarding limits of insurance that is in conflict with the terms of this endorsement, such other language is subject to the terms of this endorsement.

GL 0042 0610          Includes copyrighted material of Insurance Services Office, Inc., with          Page 1 of 1
its permission.

77

Exhibit B - 065

Policy Number:  GL201800012500
Renewal of Number:  NEW

## COMPREHENSIVE PERSONAL LIABILITY COVERAGE DECLARATIONS

| Item 1. Named Insured and Mailing Address | Agent Named and Address Sub-Producer : 00609 |
|---|---|
| Under the Black Sky, Inc.<br>As Per Named Insured Extension Schedule<br>c/o MACIAS, GINI & O'CONNELL<br>2029 Century Park East, #1500<br>Los Angeles, CA 90067 | Integro USA, Inc.<br>21650 Oxnard St., Suite 2350<br>Woodland Hills, CA 91367-7824 |

**Item 2. Policy Period**   From: 07/18/2018   To: 07/18/2019
At 12:01AM Standard Time at the Mailing Address Shown Above

**Item 3. Limits of Liability**

| | | |
|---|---|---|
| Coverage L. Personal Liability | $1,000,000 | Each Occurrence |
| Coverage M. Medical Payment | $5,000 | Each Person |

**Item 4. "Residence Premises"**

1   █████████████████████████████

| Loc. | Premises Location | Premium Base | Rate | Premium |
|---|---|---|---|---|
| 1 | CPL - Primary Residence | █ | ████ | ████ |
| Additional Coverage: | Terrorism - Certified Acts | | | ██ |
| Policy Premium: | | | | ████ |
| Taxes, Surcharges and Fees: | | | | ███ |

Item 6. Form(s) and Endorsement(s) made a part of the policy at time of issue:

Countersigned:
Date: _____   By: _____

THIS POLICY TOGETHER WITH THE POLICY CONDITIONS, COVERAGE PARTS AND FORMS AND
ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY

Exhibit B - 066

COMMERCIAL GENERAL LIABILITY
GL 0452 0416

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALIFORNIA
# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.p.** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

However, unless Paragraph **(1)** above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

        Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Exhibit B - 067

# Exhibit C

Exhibit C - 001

# CIVIL INTAKE
# SHEET

**CIVIL ACTION NUMBER:** CL- 2019 02011

**HOW RECEIVED:**   **COUNTER**

**JUDGMENT AMOUNT:** $ 50,000,000 +

**FILING FEE:** $ 346  CHECK ✓ CASH ___ MO ___ CREDIT CARD ___

**CREDIT CARD FEE:** $ _____

**TOTAL AMOUNT:** $ 346   **VS-4 FORM:**  YES ____  NO ____

**CLERKS INITIALS:** ___ M ___   **ID Presented (CWP):** _____

**SERVICE TYPE:**

SHERIFF: _____   SPS: ✓
RM: _____
OPUB: _____   CM: _____

SOC: ____ DMV: ____ SCC: ____

| SHERIFF | AMOUNT |
|---------|--------|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

**SPECIAL INSTRUCTIONS:**

**CERTIFIED COPIES:** _____

Defamation

# FINAL DISPOSITION

Fiduciary #: _____

Case #: CL-__2 0__1 9__0 2 9 1 1__ - _____ - _____

| DEFENDANTS | Date Final | | | Final Order #1 | Final Order #2 | Final Order #3 | Final Order #4 |
|---|---|---|---|---|---|---|---|
| 1. | | TRIAL-JURY | (TJ) | | | | |
| 2. | | TRIAL-JUDGE w/WITNESS | (TNJ) | | | | |
| 3. | | DEFAULT JUDGMENT | (DJ) | | | | |
| 4. | | SETTLEMENT | (SETL) | | | | |
| 5. | | NONSUIT | (NS) | | | | |
| 6. | | VOLUNTARY DISMISSAL | (DIS) | | | | |
| 7. | | DECREE ON DEPOSITION | (DD) | | | | |
| 8. | | REPORT BY COMMISSIONER | (FDCR) | | | | |
| Other Comments: | | OTHER – (FO) (SJ) (FD) | | | | | |
| | | GARNISHMENT | | | | | |
| | | CONCEALED WEAPON PERMIT | | | | | |
| | | APPT CHURCH TRUSTEES/Substitute FID | | | | | |
| | | NAME CHANGE | | | | | |
| | | PURGED AFTER 2 YEARS | (2YO) | | | | |
| | | PURGED AFTER 3 YEARS | (3YO) | | | | |
| E.H. Date:_____ | | | | | | | |
| E.H. Date:_____ | | | | | | | |

| | TRIAL DATE | NUMBER OF JURY DAYS | FINAL ALL DEFENDANTS | CLERK'S OFFICE |
|---|---|---|---|---|
| 1. | | | | |

| | RE-OPEN DATE | REMAND (REM) REINSTATE (REI) MISTRIAL (MIS) | MOTION TYPE | RE-CLOSE DATE | CLERK'S OFFICE |
|---|---|---|---|---|---|
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |

Civil Intake – Final Disposition Form

Updated 9/2008

**FAIRFAX CIRCUIT COURT**
**CIVIL CASE COVERSHEET**   2019  02911

### Parties:

| Plaintiffs | Defendants |
|---|---|
| 1. John C. Depp II | 1. Amber Laura Heard |
| 2. | 2. |
| 3. | 3. |

***Plaintiff proceeding without Counsel – Address and Daytime Phone Number required on Complaint**

**Plaintiff Attorney:**

Name: **Benjamin G. Chew**                Bar ID: 29113

Firm: Brown Rudnick LLP

Street: 601 13th Street, NW, Suite 600

City: **Washington**        State: **DC**       Zip: 20005

Phone Number: **202-536-1785**          Fax Number: 202-536-1701

E-mail Address: bchew@brownrudnick.com

*[FILED stamp: 2019 MAR -1 PM 12: 46  JOHN T. FREY CLERK, CIRCUIT COURT FAIRFAX, VA — CIVIL INTAKE]*

**Nature of Complaint** (Check only one)        ***Cases in the Civil Tracking Program**

| | | |
|---|---|---|
| Administrative Appeal | ✔ Defamation * | Malpractice – Medical * |
| Affirmation of Marriage | Delinquent Taxes * | Mechanics/Vendors Lien * |
| Aid & Guidance | Eminent Domain | Partition * |
| Appeal Decision of Board of Zoning | Encumber/Sell Real Estate | Personal Injury – Assault * |
| Appeal of Process/Judicial Appeal | Erroneous Assessments | Personal Injury – Auto * |
| Appointment Church/Organization Trustees | Expungement | Personal Injury – Emotional * |
| Arbitration | False Arrest/Imprisonment* | Personal Injury – Premises Liability* |
| Attachment | Fiduciary/Estate Complaint | Property Damage* |
| Complaint – Equity * | Garnishment–Federal–180 days | Products Liability* |
| Complaint – Legal Cause of Action * | Garnishment–Wage–180 days | Quiet Title * |
| Compromise Settlement | Garnishment–Other – 90 days | Real Estate * |
| Condemnation* | Guardian/Conservator Adult | Restoration of Driving Privilege |
| Confession of Judgment | Guardianship/Minor | Vital Record Correction |
| Construction * | Injunction | Writ Habeas Corpus |
| Contract * | Interpleader | Writ Mandamus |
| Conversion* | Insurance * | Wrongful Death* |
| Court Satisfaction of Judgment | Judicial Review | Wrongful Discharge * |
| Declare Death | Malicious Prosecution * | **OTHER:** |
| Declaratory Judgment * | Malpractice – Legal * | |

**Damages in the amount of $** 50,000,000 and punitives **are claimed.**

**Requested Service:** Sheriff ☐  Private Process Server ✔  DMV ☐  Secretary of Commonwealth ☐  State Corporation Commission ☐  Publication ☐  No Service at this time ☐

FILED
CIVIL INTAKE

JOHN T. FREY
CLERK. CIRCUIT COURT
FAIRFAX, VA

**VIRGINIA:**

**IN THE CIRCUIT COURT OF FAIRFAX COUNTY** 2019 MAR -1  PM 12: 45

| | |
|---|---|
| **John C. Depp, II,** | ) |
| | ) |
| **Plaintiff,** | ) |
| **v.** | ) Civil Action No. **2019   02911** |
| | ) |
| **Amber Laura Heard,** | ) |
| | ) |
| **Defendant.** | ) |

## COMPLAINT

Plaintiff John C. Depp, II, a/k/a Johnny Depp, in support of his Complaint against Defendant Amber Laura Heard hereby states the following:

## NATURE OF THE ACTION

1.      This defamation action arises from an op-ed published in the *Washington Post* by actress Amber Heard ("Ms. Heard").   In the op-ed, Ms. Heard purported to write from the perspective of "a public figure representing domestic abuse" and claimed that she "felt the full force of our culture's wrath for women who speak out" when she "spoke up against sexual violence."

2.      Although she never identified him by name, the op-ed plainly was about (and other media consistently characterized it as being about) Ms. Heard's purported victimization after she publicly accused her former husband, Johnny Depp ("Mr. Depp"), of domestic abuse in 2016, when she appeared in court with an apparently battered face and obtained a temporary restraining order against Mr. Depp on May 27, 2016.  The op-ed depended on the central premise that Ms. Heard was a domestic abuse victim and that Mr. Depp perpetrated domestic violence against her.

Exhibit C - 005

3.      The op-ed's clear implication that Mr. Depp is a domestic abuser is categorically and demonstrably false. Mr. Depp never abused Ms. Heard. Her allegations against him were false when they were made in 2016. They were part of an elaborate hoax to generate positive publicity for Ms. Heard and advance her career. Ms. Heard's false allegations against Mr. Depp have been conclusively refuted by two separate responding police officers, a litany of neutral third-party witnesses, and 87 newly obtained surveillance camera videos.  With a prior arrest for violent domestic abuse and having confessed under oath to a series of violent attacks on Mr. Depp, Ms. Heard is not a victim of domestic abuse; she is a perpetrator. Ms. Heard violently abused Mr. Depp, just as she was caught and arrested for violently abusing her former domestic partner.

4.      Ms. Heard's implication in her op-ed that Mr. Depp is a domestic abuser is not only demonstrably false, it is defamatory *per se*.  Ms. Heard falsely implied that Mr. Depp was guilty of domestic violence, which is a crime involving moral turpitude.  Moreover, Ms. Heard's false implication prejudiced Mr. Depp in his career as a film actor and incalculably (and immediately) damaged his reputation as a public figure.

5.      Unsurprisingly, Mr. Depp's reputation and career were devastated when Ms. Heard first accused him of domestic violence on May 27, 2016.  Ms. Heard's hoax allegations were timed to coincide with the day that Mr. Depp's film, *Alice Through the Looking Glass*, was released in theatres.  Her op-ed, with its false implication that she was a victim of domestic violence at the hands of Mr. Depp, brought new damage to Mr. Depp's reputation and career. Mr. Depp lost movie roles and faced public scorn.  Ms. Heard, an actress herself, knew precisely the effect that her op-ed would have on Mr. Depp.  And indeed, just four days after Ms. Heard's op-ed was first published on December 18, 2018, Disney announced on December 22, 2018 that

Exhibit C - 006

it was dropping Mr. Depp from his leading role as Captain Jack Sparrow—a role that he created—in the multi-billion-dollar-earning *Pirates of the Caribbean* franchise.

6.      Ms. Heard published her op-ed with actual malice.  She knew that Mr. Depp did not abuse her and that the domestic abuse allegations that she made against him in 2016 were false.  She knew that the testimony and photographic "evidence" that she presented to the court and the supporting sworn testimony provided by her two friends were false and perjurious.  Ms. Heard knew that the truth was that she violently abused Mr. Depp—just as she violently abused her prior domestic partner, which led to her arrest and booking for domestic violence, as well as a night in jail and a mug shot.  Ms. Heard revived her false allegations against Mr. Depp in the op-ed to generate positive publicity for herself and to promote her new movie *Aquaman*, which premiered across the United States and in Virginia only three days after the op-ed was first published.

7.      Mr. Depp brings this defamation action to clear his name.  By this civil lawsuit, Mr. Depp seeks to restore his reputation and establish Ms. Heard's legal liability for continuing her campaign to push a false narrative that he committed domestic violence against her.  Mr. Depp seeks an award of compensatory damages for the reputational harm that he suffered as a result of Ms. Heard's op-ed, with its false and defamatory implication that Mr. Depp was a domestic abuser.  Further, given the willfulness and maliciousness that Ms. Heard demonstrated when she knowingly published the op-ed with the false implication that Mr. Depp violently abused her, Mr. Depp also seeks an award of punitive damages.

## PARTIES

8.      Plaintiff John C. Depp is an individual and a resident of the State of California.  For decades, he has been one of the most prominent actors in Hollywood.  Mr. Depp was married

Exhibit C - 007

to Ms. Heard for approximately 15 months between February 1, 2015 and May 23, 2016. They had no children together. Mr. Depp was the target of Ms. Heard's false and defamatory op-ed in the *Washington Post*.

9.  Defendant Amber Laura Heard is an individual and a resident of the State of California. Ms. Heard is an actress and Mr. Depp's former wife. Ms. Heard authored and published the defamatory op-ed in the *Washington Post* that falsely implied that Mr. Depp abused her during their marriage.

## JURISDICTION AND VENUE

10.  This Court has specific personal jurisdiction over Defendant under Virginia's long-arm statute, Va. Code § 8.01-328.1, as well as under the Due Process Clause of the U.S. Constitution, because, among other things, the causes of action in this Complaint arise from Defendant transacting business in this Commonwealth and causing tortious injury by an act or omission in this Commonwealth. Moreover, exercising jurisdiction would not offend traditional notions of fair play and substantial justice because Defendant could have — indeed should have — reasonably foreseen being haled into a Virginia court to account for her false and defamatory op-ed which was published: in a newspaper that is printed in Springfield, Virginia; in an online edition of the newspaper that is created on a digital platform in Virginia and routed through servers in Virginia; in a newspaper that has wide circulation in Virginia and even publishes a Virginia local edition in which the false and defamatory op-ed appeared; and in a newspaper that maintains two physical offices in Virginia. Further, Defendant published the false and defamatory op-ed to promote her new movie which was in Virginia theatres for viewing by Virginia audiences.

Exhibit C - 008

11.     Venue is proper in this circuit under Va. Code § 8.01-262 because the causes of action asserted herein arose in this Circuit.

## FACTS

**Ms. Heard Wrote An Op-Ed In The *Washington Post* That Implies That She Was A Victim Of Domestic Abuse At The Hands Of Mr. Depp**

12.     Mr. Depp has appeared in more than 50 films over the last three decades.  He has worldwide name recognition and has played a diverse array of iconic roles, including Edward Scissorhands, Willy Wonka, Captain Jack Sparrow, The Mad Hatter, Grindelwald, John Dellinger, and Whitey Bulger.  His movies have grossed over $10 billion dollars in the United States and around the world.  He has won the People's Choice Award 14 times.

13.     Mr. Depp married Ms. Heard on February 1, 2015.  The two met when Ms. Heard was cast in Mr. Depp's film *The Rum Diary*.

14.     The marriage lasted only 15 months.

15.     Unbeknownst to Mr. Depp, no later than one month after his marriage to Ms. Heard, she was spending time in a new relationship with Tesla and Space-X founder, Elon Musk. Only one calendar month after Mr. Depp and Ms. Heard were married—while Mr. Depp was out of the country filming in March 2015—Eastern Columbia Building personnel testified that Ms. Heard received Musk "late at night" at Mr. Depp's penthouse.  Specifically, Ms. Heard asked staff at the Eastern Columbia Building to give her "friend Elon" access to the building's parking garage and the penthouse elevator "late at night," and they testified that they did so.  Building staff would then see Ms. Heard's "friend Elon" leaving the building the next morning.  Musk's first appearance in Mr. Depp's penthouse occurred shortly after Ms. Heard threw a vodka bottle at Mr. Depp in Australia, when she learned  that Mr. Depp wanted the couple to enter into a post-

Exhibit C - 009

nuptial agreement concerning assets in their marriage.  Ms. Heard's violently aimed projectile virtually severed Mr. Depp's middle finger on his right hand and shattered the bones.

16.      Mr. Depp's marriage to Ms. Heard came to an end in May 2016.  After Mr. Depp indicated to Ms. Heard that he wanted to leave the marriage, Ms. Heard lured Mr. Depp to his penthouse to pick up his personal items.  Unaware that members of Mr. Depp's security team (including an 18-year veteran of the Los Angeles County Sherriff's Department) were mere feet away, Ms. Heard falsely began yelling "stop hitting me Johnny."  The interaction culminated with Ms. Heard making false allegations that Mr. Depp struck her with a cell phone, hit her, and destroyed the penthouse.  There were multiple eyewitnesses to this hoax.  Ms. Heard's friend then called the police, who arrived promptly.  Upon their arrival, Ms. Heard refused to cooperate with police or make any claims that she had been injured or assaulted, and two domestic abuse trained police officers testified that after close inspection of Ms. Heard and the penthouses, they observed no injury to Ms. Heard or damage to the penthouses.  But then, six days later, Ms. Heard presented herself to the world with a battered face as she publicly and falsely accused Mr. Depp of domestic violence and obtained a restraining order against him, based on false testimony that she and her friends provided.

17.      Now there are newly obtained surveillance camera videos, depositions, and other evidence that conclusively disprove Ms. Heard's false allegations.  Although much of this exculpatory evidence was collected by certain members Mr. Depp's then-legal team in 2016, it only recently came into Mr. Depp's possession, as it had been hidden from him for a period of years.

18.      Ms. Heard later withdrew her false domestic violence allegations and dismissed the restraining order.  She and Mr. Depp finalized their divorce in January 2017.

Exhibit C - 010

19.     Despite dismissing the restraining order and withdrawing the domestic abuse allegations, Ms. Heard (and her surrogates) have continuously and repeatedly referred to her in publications, public service announcements, social media postings, speeches, and interviews as a victim of domestic violence, and a "survivor," always with the clear implication that Mr. Depp was her supposed abuser.

20.     Most recently, in December 2018, Ms. Heard published an op-ed in the *Washington Post* that falsely implied that Ms. Heard was a victim of domestic violence at the hands of Mr. Depp.   The op-ed was first published on the *Washington Post's* website on December 18, 2018 with the title, "Amber Heard: I spoke up against sexual violence — and faced our culture's wrath.  This has to change."   The op-ed appeared again on December 19, 2018 in the *Washington Post's* hardcopy edition under the title, "A Transformative Moment For Women."   Except for their titles, the online and hard copy versions of the op-ed were substantively identical and are referred to collectively herein as the "Sexual Violence" op-ed.

21.     The "Sexual Violence" op-ed's central thesis was that Ms. Heard was a victim of domestic violence and faced personal and professional repercussions because she "spoke up" against "sexual violence" by "a powerful man."

22.     Although Mr. Depp was never identified by name in the "Sexual Violence" op-ed, Ms. Heard makes clear, based on the foundations of the false accusations that she made against Mr. Depp in court filings and subsequently reiterated in the press for years, that she was talking about Mr. Depp and the domestic abuse allegations that she made against him in May 2016.  Ms. Heard wrote:

- "Amber Heard: I spoke up against sexual violence — and faced our culture's wrath. That has to change."

- "Then two years ago [the precise time frame of her allegations against and divorce from Mr. Depp], I became a public figure representing domestic abuse, and I felt the full force of our culture's wrath for women who speak out."

- "I had the rare vantage point of seeing, in real time, how institutions protect men accused of abuse."

- "I write this as a woman who had to change my phone number weekly because I was getting death threats.  For months, I rarely left my apartment, and when I did, I was pursued by camera drones and photographers on foot, on motorcycles and in cars.  Tabloid outlets that posted pictures of me spun them in a negative light.  I felt as though I was on trial in the court of public opinion — and my life and livelihood depended on myriad judgments far beyond my control."

23.     As these statements reflect, the whole op-ed proceeds from the notion—presented as an unassailable truth—that Ms. Heard was the victim of domestic violence at the hands of Mr. Depp.  She was not.  Ms. Heard is not a victim of domestic violence, and Mr. Depp is not a perpetrator of domestic violence.  And the centerpiece of Ms. Heard's attention-seeking hoax— her claim that Mr. Depp savagely injured her face by throwing her own iPhone at her from point blank range as hard as he could and then continued to beat her face with other "appendages of his body" on the evening of May 21, 2016, which caused her to have the battered face that she first presented to the court and the world on May 27, 2016—was a poorly executed lie that nevertheless has endured for nearly three years.  The statements in her "Sexual Violence" op-ed that imply otherwise are false and defamatory.

### Ms. Heard Was Not A Victim Of Domestic Violence: She Was A Perpetrator

24.     Long before Ms. Heard became a self-described "public figure representing domestic abuse" based on her false domestic violence allegations against Mr. Depp, Ms. Heard was in an abusive relationship.  But Ms. Heard was not the victim in that relationship.  She was the abuser.

Exhibit C - 012

25.     On September 14, 2009, police officers at the Seattle-Tacoma International Airport witnessed Ms. Heard physically assault her then-domestic partner, Tasya van Ree.  Ms. Heard grabbed Ms. van Ree by the arm, hit Ms. van Ree in the arm, and yanked Ms. van Ree's necklace off her neck.  Ms. Heard was arrested.  She was booked for misdemeanor domestic violence, a mug shot was taken of her, and she spent the night in jail.  The following day, the Seattle-based prosecutor declined to press charges against Ms. Heard, but only because both she and her domestic abuse victim were California residents who were merely passing through Washington state.

26.     Since casting herself as a domestic abuse victim, Ms. Heard has attempted to blame misogyny and homophobia for her domestic violence arrest—claiming that she was arrested "on a trumped up charge" because she was in a same-sex relationship.  In truth, the police officer who arrested Ms. Heard for domestic violence was both a woman and a lesbian activist, who publicly said so after she was publicly disparaged by Ms. Heard.

27.     Ms. Heard's violent domestic abuse did not end when her relationship with Ms. van Ree ended.  Ms. Heard committed multiple acts of domestic violence against Mr. Depp during their marriage.  Ms. Heard's physical abuse of Mr. Depp is documented by eyewitness accounts, photographs, and even Ms. Heard's own admissions under oath.

28.     In one particularly gruesome episode that occurred only one month into their marriage, Ms. Heard shattered the bones in the tip of Mr. Depp's right middle finger, almost completely cutting it off.  Ms. Heard threw a glass vodka bottle at Mr. Depp—one of many projectiles that she launched at him in this and other instances.  The bottle shattered as it came into contact with Mr. Depp's hand, and the broken glass and impact severed and shattered Mr.

Exhibit C - 013

Depp's finger. Mr. Depp's finger had to be surgically reattached. Ms. Heard then disseminated false accounts of this incident, casting Mr. Depp as the perpetrator of his own injury.

29.     Ms. Heard's domestic abuse of Mr. Depp continued unabated throughout their 15-month marriage. Ms. Heard threw dangerous objects at Mr. Depp, and also kicked and punched him with regularity.

30.     Shockingly, Ms. Heard even has used one of her attacks on Mr. Depp to push her false narrative that she is a domestic abuse victim. In her false affidavit to obtain a restraining order against Mr. Depp, Ms. Heard recounted a domestic violence incident that occurred between her and Mr. Depp on April 21, 2016 and reversed the roles, claiming that she was the victim when in truth she was the perpetrator. Ms. Heard falsely claimed that Mr. Depp physically attacked her, threw glasses at her, and broke a champagne bottle in their penthouse after her thirtieth birthday celebration on April 21, 2016. In truth, Ms. Heard—angry with Mr. Depp because he was late to her birthday celebration due to a business meeting — punched Mr. Depp twice in the face as he lay in bed reading, forcing him to flee their penthouse to avoid further domestic violence at the hands of Ms. Heard. Mr. Depp's security detail member, Sean Bett (an 18-year veteran of the Los Angeles County Sherriff's Department) picked up Mr. Depp immediately after Ms. Heard assaulted him and witnessed firsthand the aftermath and damage to Mr. Depp's face. On other occasions—after Ms. Heard violently attacked Mr. Depp in December 2015—Mr. Bett insisted on taking photographs to document the damage to Mr. Depp's face inflicted by Ms. Heard.

31.     Thus, contrary to the false and defamatory implication in her "Sexual Violence" op-ed, Ms. Heard was never a victim of domestic violence at the hands of Mr. Depp. Ms. Heard herself is a domestic abuser, who committed multiple acts of domestic violence against Mr. Depp

Exhibit C - 014

during their marriage, in addition to the domestic abuse that she perpetrated against her former partner.

### Ms. Heard's Domestic Abuse Allegations Against Mr. Depp Are False And Have Been Refuted Conclusively By Police, Neutral Third-Party Witnesses, and 87 Surveillance Videos

32.     Ms. Heard did not "[speak] up against sexual violence" as she claimed in her op-ed. She made false allegations of domestic abuse against Mr. Depp to execute her hoax.

33.     The centerpiece of Ms. Heard's false abuse allegations is an incident that she claimed took place around 7:15 pm on Saturday, May 21, 2016 at Mr. Depp's penthouse in the Eastern Columbia Building in downtown Los Angeles.  After Ms. Heard lured Mr. Depp to pick up personal items from his own penthouse, Ms. Heard, sitting on the sofa with her friend, Raquel Pennington, and talking on the phone with her friend, iO Tillett Wright, claimed that Mr. Depp "grabbed the cell phone, wound up his arm like a baseball pitcher and threw the cell phone at me striking my cheek and eye with great force."  Ms. Heard also claimed that Mr. Depp further battered her face with some "appendage of his body" and then used a magnum-sized bottle of wine to destroy the penthouse, spilling wine, broken glass, and other items around the penthouse. "Penthouse 3 was destroyed" by Mr. Depp's bottle swinging, claimed Ms. Heard in her sworn testimony. Her two friends testified accordingly.  Ms. Heard used these allegations to obtain a temporary restraining order against Mr. Depp on May 27, 2016, appearing in court six days after the alleged incident with the first appearance of a battered face, notwithstanding that a litany of people witnessed her throughout the week with no injury and building surveillance videos similarly showed her uninjured.

34.     Mr. Depp, it is worth noting, left Los Angeles for many weeks almost immediately after the alleged incident.  And it is also worth noting that building personnel

testified under oath that they again facilitated Elon Musk's nighttime visits to Mr. Depp's penthouse to visit Ms. Heard, key-fobbing him in and out of the building proximate to the time Ms. Heard presented her battered face to the public and the court on May 27, 2016.

35.    Mr. Depp has consistently and unequivocally denied Ms. Heard's domestic abuse allegations. They also have been refuted conclusively by multiple, neutral third-party witnesses.

36.    Ms. Heard's friend and neighbor, Isaac Baruch, gave a declaration that he repeatedly interacted with Ms. Heard, at close range, without makeup, and utterly unmarked and uninjured in the days between May 22 and May 27, 2016. He further stated in his declaration that on June 3, after confronting Ms. Heard about how upset he was at her false abuse allegations: "Amber then told me that she did not want anything from Johnny and that it was the lawyers who were doing all of this."

37.    Police went to Mr. Depp's penthouse on May 21, 2016, immediately after the incident was alleged to have occurred. They were dispatched after Ms. Heard's friend, Mr. Wright, called 911 to report what the police dispatch log describes as a "verbal argument only" between a husband and wife. Two officers, who are highly trained in domestic violence, arrived at the penthouse shortly after Ms. Heard later claimed that Mr. Depp struck her in the face with a cell phone, further hit her face, and then "destroyed" his own penthouse by swinging a magnum-sized bottle of wine into other objects throughout that penthouse. Officer Melissa Saenz is a veteran Los Angeles Police officer who is charged with training other police officers and personally has responded to "over a hundred" domestic violence calls. Officer Tyler Hadden is a junior police officer, but focused on domestic violence at the police academy and received extensive training in how to detect that particular crime.

Exhibit C - 016

38.     Both Officer Saenz and Officer Hadden testified under oath that they closely observed Ms. Heard's face in good light on May 21, 2016 and saw no signs of any injury.  In the police officers' face-to-face interactions with Ms. Heard immediately after she supposedly was struck in the face with a cell phone and then further beaten in the face by Mr. Depp, the police officers saw no red marks, no bruising, and no swelling anywhere on Ms. Heard's face.  Both Officer Saenz and Officer Hadden also testified under oath that, when they went room-to-room in the penthouses to investigate, they saw no broken glass, no spilled wine, and no vandalism or property damage of any kind.  This is in contrast to Ms. Heard's later claim that Mr. Depp "destroyed" penthouse 3 and caused serious, visible injuries to her face.  It also directly contradicts Ms. Heard's friend's testimony regarding what Ms. Heard's face looked like at that time: "Just the whole side of her face was like swolled up (sic) and red and puffy . . . and progressively getting worse."

39.     There was no probable cause to believe that a crime had been committed, according to Officer Saenz's testimony, because Ms. Heard had no injuries and claimed to have no injuries, and there was no property damage in the penthouse or signs of any altercation.

40.     Multiple people who work professionally in the Eastern Columbia Building where the penthouse is located, and who do not know Mr. Depp personally, also have unambiguously debunked Ms. Heard's claim that her face was injured on May 21, 2016 and that she had any sign of injury in the six days before May 27, 2016.  Three people, the building's concierge, head of front desk and head of security, profoundly testified under oath about their face-to-face interactions with Ms. Heard between May 22, 2016 (the day after Ms. Heard claims that Mr. Depp hit her and struck her in the eye and on the cheek with a cell phone) and May 27, 2016 (the day Ms. Heard appeared in public and went to court to get a restraining order against Mr. Depp

Exhibit C - 017

with what appeared to be a battered face). Every one of those three people testified under oath that they saw Ms. Heard up close in the days after the supposed attack and her face was not injured *before the day she obtained the restraining order against Mr. Depp*.

41.     Cornelius Harrell is a concierge at the Eastern Columbia Building and was working at the front desk at 1 pm on the afternoon of Sunday, May 22, 2016. Mr. Harrell saw Ms. Heard face-to-face that afternoon—less than 24 hours after she claims that she was struck in the face by a cell phone thrown by Mr. Depp and hit in the face by Mr. Depp.

42.     In an interaction that was also captured by the Eastern Columbia Building's surveillance cameras and saved, Ms. Heard approached Mr. Harrell to pick up a package that had been delivered to her. Ms. Heard accompanied Mr. Harrell to the package room to identify which package she wanted because more than one had been delivered to her. As they were looking through her packages, Mr. Harrell and Ms. Heard were inside the package room together. The package room at the Eastern Columbia Building is "no bigger than a walk-in closet," so Mr. Harrell had an opportunity to observe Ms. Heard's face up close, the day after she claimed she was battered by Mr. Depp in the face.

43.     Mr. Harrell testified under oath that, on May 22, 2016, Ms. Heard did not have any bruises, cuts, scratches, or swelling on her face and that "nothing appeared out of the ordinary about Ms. Heard's face on May 22, 2016." In fact, Mr. Harrell testified that he was struck by how "beautiful," "radiant," and "refreshed" Ms. Heard looked, noting that, if she was wearing any makeup at all, it was "minimal." Mr. Harrell unequivocally testified that when he was interacting one-on-one in close quarters with Ms. Heard on May 22, 2016 for about 8 minutes, that he did not see any evidence to suggest that she had been the victim of domestic violence the day before. Mr. Harrell does not know Mr. Depp personally.

Exhibit C - 018

44.     Alejandro Romero also works at the Eastern Columbia Building, manning the front desk and monitoring the security cameras from 4:00 pm to 1:00 am Monday-Friday.  Mr. Romero had "hundreds" of in-person interactions with Ms. Heard when she resided in the penthouse, in addition to observing her innumerable times on surveillance footage captured by the Eastern Columbia Building's security cameras.  Mr. Romero testified under oath about two specific face-to-face interactions that he had with Ms. Heard in the days after she claimed that Mr. Depp hit her in the face and struck her cheek and eye with a cell phone that he threw.

45.     Mr. Romero testified that on the "Monday or Tuesday" evening "after the police were called"—May 23 or 24, 2016—he was approached at the front desk by Ms. Heard and her friend, Ms. Pennington, who also resided in the penthouse.  Ms. Heard and Ms. Pennington asked Mr. Romero to accompany them to the penthouse because they were afraid that someone had tried to get inside the penthouse.  Mr. Romero discounted this concern because he had been monitoring security footage and saw no one trying to access the penthouse.  Nevertheless, Mr. Romero agreed to accompany Ms. Heard and Ms. Pennington to the penthouse and confirm that it was secure.  He left the front desk with Ms. Heard and Ms. Pennington, rode up to the 13th floor with them, and went inside the penthouse with them.  Throughout this interaction, Mr. Romero testified under oath that he had "a full shot" of Ms. Heard's face and "a good visual" of Ms. Heard's face and saw no bruises, cuts, swelling, or marks of any kind.

46.     Mr. Romero interacted with Ms. Heard again on the evening of May 25, 2016 when she came to the front desk to retrieve a key to the penthouse that she had left at the front desk.  Again, in this face-to-face interaction, Mr. Romero testified that he saw no bruises, cuts, swelling, or marks of any kind on Ms. Heard's face.

Exhibit C - 019

47.     Based on his in-person interactions with Ms. Heard, Mr. Romero, who does not know Mr. Depp personally, testified under oath that he "couldn't believe" Ms. Heard's domestic abuse allegations against Mr. Depp because:

> It was like — it was like I said, we watched the news and we saw the pictures. And I saw the pictures and the next day I saw her, I was like, come on, really? I couldn't believe it. It was — I saw her in person. . . . . The pictures I saw on the news, she got like a big mark on her — on her eyes and her cheek. And when I saw her in person, I didn't see anything.

48.     Trinity Esparza, the daytime concierge at the Eastern Columbia Building who works at the front desk from 8:00 am to 4:00 pm Monday-Friday, echoed Mr. Romero's disbelief at Ms. Heard's account. Ms. Esparza, who does not know Mr. Depp personally, testified under oath that she thought that Ms. Heard's allegation that she had been assaulted by Mr. Depp was "false" because "I saw her several times [in the days after the alleged attack] and I didn't see that [mark] on her face."

49.     Ms. Esparza had multiple face-to-face interactions with Ms. Heard in the days after Ms. Heard claimed that Mr. Depp hit her and struck her in the eye and cheek with a cell phone. Ms. Esparza saw Ms. Heard in-person on Monday, May 23, 2016; Tuesday, May 24, 2016; Wednesday, May 25, 2016; and Friday, May 27, 2016. Ms. Esparza testified under oath that, when she saw Ms. Heard on the Monday, Tuesday, and Wednesday after the alleged attack, Ms. Heard was not wearing makeup and that Ms. Heard had no facial injuries. There were no bruises or cuts on Ms. Heard's face, according to Ms. Esparza's testimony. Ms. Esparza testified under oath that she saw no indication that Ms. Heard had been hit or struck.

50.     Then, on Friday, May 27, 2016, Ms. Esparza testified under oath that Ms. Heard suddenly "had a red cut underneath her right eye and red marks by her eye." Then Ms. Esparza learned from media reports that Ms. Heard had obtained a domestic violence restraining order

Exhibit C - 020

against Mr. Depp on May 27, 2016. Because Ms. Esparza had seen Ms. Heard so many times that week without any marks on her face, Ms. Esparza thought "the time didn't add up and so I was questioning . . . the mark on her face and the allegations that were made."

51.     Ms. Esparza was so troubled by the sudden appearance of "a mark" on Ms. Heard's face on *the very day* that Ms. Heard obtained a restraining order against Mr. Depp—but *six days after* the alleged incident—that Ms. Esparza went back and looked at security video footage and talked to others who worked in the Eastern Columbia Building to see if the "mark" might have been on Ms. Heard's face earlier. It wasn't.

52.     Mr. Romero and Mr. Harrell confirmed to Ms. Esparza that Ms. Heard did not have any injuries on her face when they interacted with her.

53.     Ms. Esparza also did not see the "mark" on Ms. Heard's face when she went back and reviewed surveillance videos from the days after Ms. Heard claims that Mr. Depp hit her and struck her in the face with a cell phone that he threw.

54.     But Ms. Esparza did see something else on the surveillance video. On a video from the evening of May 24, 2016, three nights after Ms. Heard alleged that she was attacked by Mr. Depp, Ms. Esparza saw Ms. Heard, her sister, Whitney Heard, and Ms. Heard's friend and corroborating witness, Ms. Pennington, on the mezzanine level of the Eastern Columbia Building. In the surveillance video, Ms. Esparza testified under oath that she saw Whitney Heard pretend to punch her sister in the face. Then Ms. Heard, Ms. Pennington, and Whitney Heard all laughed. Ms. Esparza testified that she thought how Ms. Heard, Ms. Pennington, and Whitney Heard were acting on the surveillance video was "wrong," and it only made her question more how Ms. Heard ended up with a "mark" on her face three days later, on Friday, May 27. Ms. Esparza knew that Mr. Depp had left Los Angeles for work on the day of the

Exhibit C - 021

alleged incident "and he did not return and so I was questioning how those marks got on her face
on Friday." Ultimately, Ms. Esparza testified under oath that she was forced to conclude that
"whatever happened to [Ms. Heard's] face did not happen on Saturday [May 21]", as Ms. Heard
had alleged.

55.     Ms. Esparza is not the only professional employee of the Eastern Columbia
Building to witness the "fake punch" video.  Brandon Patterson, the General Manager of the
Eastern Columbia Building, provided a declaration about it:

> One of the surveillance videos, taken the evening of Tuesday, May 24, showed Amber
> Heard, her sister Whitney Heard, and her friend Raquel Pennington entering the
> building's mezzanine. Trinity Esparza showed me a video at the front desk with a pretend
> punch to the face from one of Miss Heard's two companions, and the three of them
> laughed hard. They then enter the penthouse elevator, where Ms. Heard's face was
> clearly visible, there were similarly no bruises, cuts, redness, swelling visible on Ms.
> Heard's face.

56.     Later, in the media firestorm concerning Ms. Heard's domestic abuse allegations
against Mr. Depp, Ms. Heard learned that there were media reports stating that people who
worked at the front desk of the Eastern Columbia Building had seen Ms. Heard without any
marks on her face, as indeed was their testimony.  Mr. Patterson, the General Manager of the
Eastern Columbia Building, summarized the testimony of building staff in his own declaration:

> Ms. Heard was repeatedly observed in the Eastern Columbia Building in the multiple
> days following the alleged assault without bruises, cuts, redness, swelling or any other
> injuries to her face. These observations were made by people working at the front desk at
> the Eastern Columbia Building who interacted with Ms. Heard in person and also saw
> images of her on the building surveillance cameras.

57.     Approximately a week after she made her domestic abuse allegations against Mr.
Depp, Ms. Heard approached Ms. Esparza and Mr. Patterson, and asked the two of them to give
a statement to Ms. Heard's "friend" at *People Magazine*.  Ms. Heard wanted Ms. Esparza and
Mr. Patterson "to help retract the statement that was given to the press stating that the front desk

Exhibit C - 022

had released this information [about seeing Ms. Heard with no injuries to her face] and [Ms. Heard] asked if we would clarify it and let them know that we, in fact, would never release that information on any resident." Mr. Patterson and Ms. Esparza refused to give the statement and directed Ms. Heard to the Eastern Columbia Building's lawyer.

58.    Ms. Esparza testified that she was "not comfortable" with "the statement that [Ms. Heard] was proposing that [the building] make to *People Magazine*, that the building would not have said they saw [Ms. Heard] without marks on her face" "because that would have been a lie" as "the front desk did, in fact, see [Ms. Heard] prior to Friday [May 27, 2016] without marks on her face."

59.    The people working at the front desk of the Eastern Columbia Building did not see any injuries to Ms. Heard's face because there were *no* injuries to Ms. Heard's face. Ms. Heard's allegations that Mr. Depp's battered her was a poorly executed hoax.

60.    The police officers, who responded to the penthouse on May 21, 2016 immediately after the alleged attack, saw no signs that Ms. Heard had been hit or struck by a cell phone or that a magnum-sized bottle of wine had "destroyed" the penthouse because *those things never happened.* There was no probable cause to believe a crime had been committed because *no crime had been committed* against Ms. Heard by Mr. Depp.

61.    Ms. Heard's domestic violence allegations against Mr. Depp were false, as is her portrayal of herself in her "Sexual Violence" op-ed as a domestic violence victim and her portrayal of Mr. Depp as a domestic violence perpetrator and "monster."

**Ms. Heard Acted With Actual Malice When She Implied In Her "Sexual Violence" Op-Ed That She Was A Victim Of Domestic Abuse At The Hands Of Mr. Depp**

19

Exhibit C - 023

62.     Ms. Heard acted with actual malice when she published her false and defamatory "Sexual Violence" op-ed and implied that she was a victim of domestic abuse at the hands of Mr. Depp.

63.     Ms. Heard knew that she was not the domestic abuse victim, but the domestic abuser.

64.     Ms. Heard knew that her domestic abuse allegations against Mr. Depp were false and that she leveled them and enlisted her friends to act as surrogates for her lies, as part of an elaborate hoax to generate positive publicity for herself.

65.     Ms. Heard also knew that her elaborate hoax worked: as a result of her false allegations against Mr. Depp, Ms. Heard became a darling of the #MeToo movement, was the first actress named a Human Rights Champion of the United Nations Human Rights Office, was appointed ambassador on women's rights at the American Civil Liberties Union, and was hired by L'Oréal Paris as its global spokesperson.

66.     Because of the past success that her false domestic abuse allegations against Mr. Depp had brought her, Ms. Heard revived the false allegations to promote her new movie.

67.     *Aquaman*, Ms. Heard's first leading role in a big-budget studio film, premiered in theatres across the United States (and in Virginia) on December 21, 2019. The movie ended up making over $1 billion at the box office globally.

68.     Tellingly, just days before the premiere, Heard published her "Sexual Violence" op-ed with its false implication that she was a domestic abuse victim at the hands of Mr. Depp on December 18, 2019 in the *Washington Post's* online edition and on December 19, 2019 in the *Washington Post's* hardcopy edition. The op-ed in the *Washington Post's* online edition was accompanied by a picture of Ms. Heard on the red carpet at *Aquaman's* Los Angeles premiere.

20

103

Exhibit C - 024

### Mr. Depp's Reputation And Career Suffer As A Result Of Ms. Heard's False And Defamatory Op-Ed

69.     As a result of Ms. Heard's false domestic abuse allegations, Mr. Depp's reputation and career sustained immense damage.

70.     Ms. Heard, an actress herself, is well aware of the negative effect that false domestic abuse allegations have on Mr. Depp's career.

71.     Mr. Depp lost roles in movies because of the false allegations that Ms. Heard made against him.   When Mr. Depp was cast in films, there were public outcries for the filmmakers to recast his roles.

72.     Mr. Depp endured the public scorn caused by Ms. Heard's false domestic abuse allegations for more than two years.   But he was weathering the storm and had a successful film release in November 2019.   In fact, that movie was still playing on screens across Virginia when Ms. Heard revived the false domestic abuse allegations by publishing her "Sexual Violence" op-ed in the *Washington Post*.

73.     The reaction to Ms. Heard's false and defamatory op-ed was swift and severe. Just two days after the op-ed appeared in the *Washington Post's* online edition, Disney publicly announced that Mr. Depp would no longer be a part of the *Pirates of the Caribbean* franchise. Mr. Depp's turn as Captain Jack Sparrow in the *Pirates of the Caribbean* films is one of Mr. Depp's most iconic roles, and generated billions of dollars for Disney.   Nevertheless, he was denied an opportunity to reprise that role immediately on the heels of Ms. Heard's false and defamatory op-ed.

### COUNT ONE—DEFAMATION FOR STATEMENTS IN MS. HEARD'S DECEMBER 18, 2018 OP-ED IN THE ONLINE EDITION OF THE *WASHINGTON POST*

Exhibit C - 025

74.     Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

75.     Ms. Heard published the "Sexual Violence" op-ed on the December 18, 2018. The article was published to a worldwide audience on the *Washington Post's* website. A true and correct copy of the online edition of the "Sexual Violence" op-ed is attached hereto and incorporated by reference as **Exhibit A.**

76.     The "Sexual Violence" op-ed contained the following false and defamatory statements concerning Mr. Depp:

- "Amber Heard: I spoke up against sexual violence — and faced our culture's wrath. That has to change."

- "Then two years ago, I became a public figure representing domestic abuse, and I felt the full force of our culture's wrath for women who speak out."

- "I had the rare vantage point of seeing, in real time, how institutions protect men accused of abuse."

- "I write this as a woman who had to change my phone number weekly because I was getting death threats. For months, I rarely left my apartment, and when I did, I was pursued by camera drones and photographers on foot, on motorcycles and in cars. Tabloid outlets that posted pictures of me spun them in a negative light. I felt as though I was on trial in the court of public opinion — and my life and livelihood depended on myriad judgments far beyond my control."

77.     These statements are of and concerning Mr. Depp, as he is Ms. Heard's former husband and she publicly (and falsely) accused him of domestic abuse in May 2016. Moreover, Ms. Heard intended to refer to Mr. Depp in these statements, and those who know Mr. Depp or who read the "Sexual Violence" op-ed understood these statements to be about Mr. Depp.

78.     These statements, which imply that Ms. Heard was the victim of domestic violence at the hands of Mr. Depp, are false:

22

Exhibit C - 026

    a.   Mr. Depp did not commit "domestic abuse" or "sexual violence" against Ms. Heard. Ms. Heard's allegation that Mr. Depp violently attacked her on May 21, 2016 has been refuted conclusively by police, neutral third-party witnesses, and 87 newly obtained surveillance camera videos.

    b.   Ms. Heard is not a victim of domestic violence; rather, she is a perpetrator. Ms. Heard was arrested for domestic violence against her former domestic partner in 2009. Ms. Heard also committed multiple acts of domestic violence against Mr. Depp, some of which she has confessed to under oath.

79.    The substantial danger of injury to Mr. Depp's reputation from Ms. Heard's false statements is readily apparent. Such statements would tend to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

80.    By publishing these false statements, Ms. Heard caused harm to Mr. Depp's reputation.

81.    At the time of publication, Ms. Heard knew these statements were false.

82.    Ms. Heard's false statements are defamatory *per se* because they impute to Mr. Depp the commission of a crime involving moral turpitude for which Mr. Depp, if the charge was true, could be indicted and punished. Moreover, Ms. Heard's false statements prejudice Mr. Depp in his profession as a film actor. Mr. Depp therefore is entitled to presumed damages.

83.    As a direct and proximate result of these false statements by Ms. Heard, Mr. Depp has suffered damages, including, *inter alia*, injury to his reputation, harm to his ability to carry on his profession, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

Exhibit C - 027

84.    Ms. Heard's actions were malicious, willful, and wanton, and evidence a conscious disregard for Mr. Depp's rights.  Accordingly, punitive damages are appropriate.

WHEREFORE, Plaintiff respectfully requests that the Court enter an award in Plaintiff's favor and against Defendant, as follows:

(1)    awarding Mr. Depp compensatory damages of not less than $ 50,000,000, or in such additional amount to be proven at trial;

(2)     awarding Mr. Depp punitive damages to the maximum extent permitted by the laws of this Commonwealth, but not less than $ 350,000;

(3)    awarding Mr. Depp all of his expenses and costs, including attorneys' fees; and

(4)    granting such other and further relief as the Court deems appropriate.

## COUNT TWO—DEFAMATION FOR STATEMENTS IN MS. HEARD'S DECEMBER 19, 2018 OP-ED IN THE PRINT EDITION OF THE *WASHINGTON POST*

85.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

86.    Ms. Heard published the "Sexual Violence" op-ed in the December 19, 2018 hardcopy edition of the *Washington Post*, which the *Washington Post* distributes to readers in Virginia, across the nation, and around the world.  A true and correct copy of the hardcopy edition of the "Sexual Violence" op-ed is attached hereto and incorporated by reference as **Exhibit B**.

87.    The "Sexual Violence" op-ed contained the following false and defamatory statements concerning Mr. Depp:

- "Amber Heard: I spoke up against sexual violence — and faced our culture's wrath. That has to change."

24

Exhibit C - 028

- "Then two years ago, I became a public figure representing domestic abuse, and I felt the full force of our culture's wrath for women who speak out."

- "I had the rare vantage point of seeing, in real time, how institutions protect men accused of abuse."

- "I write this as a woman who had to change my phone number weekly because I was getting death threats. For months, I rarely left my apartment, and when I did, I was pursued by camera drones and photographers on foot, on motorcycles and in cars. Tabloid outlets that posted pictures of me spun them in a negative light. I felt as though I was on trial in the court of public opinion — and my life and livelihood depended on myriad judgments far beyond my control."

88.     These statements are of and concerning Mr. Depp, as he is Ms. Heard's former husband and she publicly (and falsely) accused him of domestic abuse in May 2016. Moreover, Ms. Heard intended to refer to Mr. Depp in these statements, and those who know Mr. Depp or who read the "Sexual Violence" op-ed understood these statements to be about Mr. Depp.

89.     These statements, which imply that Ms. Heard was the victim of domestic violence at the hands of Mr. Depp, are false:

   a.   Mr. Depp did not commit "domestic abuse" or "sexual violence" against Ms. Heard. Ms. Heard's allegation that Mr. Depp violently attacked her on May 21, 2016 has been refuted conclusively by police, neutral third-party witnesses, and 87 newly obtained surveillance camera videos.

   b.   Ms. Heard is not a victim of domestic violence; rather, she is a perpetrator. Ms. Heard was arrested for domestic violence against her former partner in 2009. Ms. Heard also committed multiple acts of domestic violence against Mr. Depp.

90.     The substantial danger of injury to Mr. Depp's reputation from Ms. Heard's false statements is readily apparent. Such statements would tend to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

Exhibit C - 029

91.     By publishing these false statements, Ms. Heard caused harm to Mr. Depp's reputation.

92.     At the time of publication, Ms. Heard knew these statements were false.

93.     Ms. Heard's false statements are defamatory *per se* because they impute to Mr. Depp the commission of a crime involving moral turpitude for which Mr. Depp, if the charge was true, could be indicted and punished. Moreover, Ms. Heard's false statements prejudice Mr. Depp in his profession as a film actor. Mr. Depp therefore is entitled to presumed damages.

94.     As a direct and proximate result of these false statements by Ms. Heard, Mr. Depp has suffered damages, including, *inter alia*, injury to his reputation, harm to his ability to carry on his profession, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

95.     Ms. Heard's actions were malicious, willful, and wanton, and evidence a conscious disregard for Mr. Depp's rights. Accordingly, punitive damages are appropriate.

WHEREFORE, Plaintiff respectfully requests that the Court enter an award in Plaintiff's favor and against Defendant, as follows:

(1)     awarding Mr. Depp compensatory damages of not less than $ 50,000,000, or in such additional amount to be proven at trial;

(2)      awarding Mr. Depp punitive damages to the maximum extent permitted by the laws of this Commonwealth, but not less than $ 350,000;

(3)     awarding Mr. Depp all of his expenses and costs, including attorneys' fees; and

(4)     granting such other and further relief as the Court deems appropriate.

## COUNT THREE—DEFAMATION FOR STATEMENTS IN MS. HEARD'S OP-ED WHICH HEARD REPUBLISHED WHEN SHE TWEETED A LINK TO THE OP-ED ON DECEMBER 19, 2018

26

Exhibit C - 030

96.     Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

97.     Ms. Heard published the "Sexual Violence" op-ed in the December 18, 2018 online edition of the *Washington Post*. The following day, Ms. Heard tweeted a link to the op-ed. A true and correct copy of Ms. Heard's tweet of the link to the "Sexual Violence" op-ed is attached hereto and incorporated by reference as **Exhibit C**.

98.     The "Sexual Violence" op-ed contained the following false and defamatory statements concerning Mr. Depp:

- "Amber Heard: I spoke up against sexual violence — and faced our culture's wrath. That has to change."

- "Then two years ago, I became a public figure representing domestic abuse, and I felt the full force of our culture's wrath for women who speak out."

- "I had the rare vantage point of seeing, in real time, how institutions protect men accused of abuse."

- "I write this as a woman who had to change my phone number weekly because I was getting death threats. For months, I rarely left my apartment, and when I did, I was pursued by camera drones and photographers on foot, on motorcycles and in cars. Tabloid outlets that posted pictures of me spun them in a negative light. I felt as though I was on trial in the court of public opinion — and my life and livelihood depended on myriad judgments far beyond my control."

99.     These statements are of and concerning Mr. Depp, as he is Ms. Heard's former husband and she publicly (and falsely) accused him of domestic abuse in May 2016. Moreover, Ms. Heard intended to refer to Mr. Depp in these statements, and those who know Mr. Depp or who read the "Sexual Violence" op-ed understood these statements to be about Mr. Depp.

100.     These statements, which imply that Ms. Heard was the victim of domestic violence at the hands of Mr. Depp, are false:

Exhibit C - 031

    a.  Mr. Depp did not commit "domestic abuse" or "sexual violence" against Ms. Heard. Ms. Heard's allegation that Mr. Depp violently attacked her on May 21, 2016 has been refuted conclusively by police, multiple, neutral third-party witnesses, and 87 newly obtained surveillance camera videos.

    b.  Ms. Heard is not a victim of domestic violence; rather, she is a perpetrator. Ms. Heard was arrested for domestic violence against her former partner in 2009. Ms. Heard also committed multiple acts of domestic violence against Mr. Depp.

101.    The substantial danger of injury to Mr. Depp's reputation from Ms. Heard's false statements is readily apparent. Such statements would tend to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

102.    By publishing these false statements, Ms. Heard caused harm to Mr. Depp's reputation.

103.    At the time of publication, Ms. Heard knew these statements were false.

104.    Ms. Heard's false statements are defamatory *per se* because they impute to Mr. Depp the commission of a crime involving moral turpitude for which Mr. Depp, if the charge was true, could be indicted and punished. Moreover, Ms. Heard's false statements prejudice Mr. Depp in his profession as a film actor. Mr. Depp therefore is entitled to presumed damages.

105.    As a direct and proximate result of these false statements by Ms. Heard, Mr. Depp has suffered damages, including, *inter alia*, injury to his reputation, harm to his ability to carry on his profession, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

Exhibit C - 032

106.    Ms. Heard's actions were malicious, willful, and wanton, and evidence a conscious disregard for Mr. Depp's rights.  Accordingly, punitive damages are appropriate.

WHEREFORE, Plaintiff respectfully requests that the Court enter an award in Plaintiff's favor, and against Defendant, as follows:

(1)    awarding Mr. Depp compensatory damages of not less than $50,000,000, or in such additional amount to be proven at trial;

(2)    awarding Mr. Depp punitive damages to the maximum extent permitted by the laws of this Commonwealth, but no less than $350,000;

(3)    awarding Mr. Depp all expenses and costs, including attorneys' fees; and

(4)    such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiff John C. Depp, II hereby demands a jury trial on all issues so triable.

Dated: March 1, 2019

Brittany Whitesell Biles (*pro hac vice* application forthcoming)
STEIN MITCHELL BEATO & MISSNER LLP
901 Fifteenth Street, N.W.
Suite 700
Washington, D.C. 20005
Telephone: (202) 601-1602
Facsimile: (202) 296-8312
Email: bbiles@steinmitchell.com

29

Exhibit C - 033

Facsimile: (202) 296-8312
Email: bbiles@steinmitchell.com

Adam R. Waldman
THE ENDEAVOR LAW FIRM, P.C.
1775 Pennsylvania Avenue, N.W., Suite 350
Washington, DC 20006

Benjamin G. Chew (VSB # 29113)
Elliot J. Weingarten (*pro hac vice* application forthcoming)
BROWN RUDNICK LLP
601 Thirteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 536-1700
Facsimile: (202) 536-1701
Email: bchew@brownrudnick.com

Counsel for Plaintiff John C. Depp, II

Exhibit C - 034

# EXHIBIT A

Exhibit C - 035

Exhibit C - 036

Opinions

# Amber Heard: I spoke up against sexual violen faced our culture's wrath. That has to change.



Amber Heard arrives at the premiere of "Aquaman" on Dec. 12 in Los Angeles. (Jordan Strauss/Jordan Strauss/Invision/AP)

By **Amber Heard**
December 18, 2018

Then two years ago, I became a public figure representing domestic abuse, and I felt the full force of our culture's wrath for women who speak out.

Friends and advisers told me I would never again work as an actress — that I would be blacklisted. A movie I was attached to recast my role. I had just shot a two-year campaign as the face of a global fashion brand, and the company dropped me. Questions arose as to whether I would be able to keep my role of Mera in the movies "Justice League" and "Aquaman."

I had the rare vantage point of seeing, in real time, how institutions protect men accused of abuse.



Listen to broadcast journalist Connie Chung read a letter to Christine Blasey Ford, acknowledging publicly for the first time that she was sexually abused. (Kate Woodsome, Danielle Kunitz/The Washington Post)

Imagine a powerful man as a ship, like the Titanic. That ship is a huge enterprise. When it strikes an iceberg, there are a lot of people on board desperate to patch up holes — not because they believe in or even care about the ship, but because their own fates depend on the enterprise.

Exhibit C - 037

In recent years, the #MeToo movement has taught us about how power like this works, not just in Hollywood but in all kinds of institutions — workplaces, places of worship or simply in particular communities. In every walk of life, women are confronting these men who are buoyed by social, economic and cultural power. And these institutions are beginning to change.

We are in a transformative political moment. The president of our country has been accused by more than a dozen women of sexual misconduct, including assault and harassment. Outrage over his statements and behavior has energized a female-led opposition. #MeToo started a conversation about just how profoundly sexual violence affects women in every area of our lives. And last month, more women were elected to Congress than ever in our history, with a mandate to take women's issues seriously. Women's rage and determination to end sexual violence are turning into a political force.

We have an opening now to bolster and build institutions protective of women. For starters, Congress can reauthorize and strengthen the Violence Against Women Act. First passed in 1994, the act is one of the most effective pieces of legislation enacted to fight domestic violence and sexual assault. It creates support systems for people who report abuse, and provides funding for rape crisis centers, legal assistance programs and other critical services. It improves responses by law enforcement, and it prohibits discrimination against LGBTQ survivors. Funding for the act expired in September and has only been temporarily extended.

ADVERTISEMENT



Exhibit C - 038

complaints, and then only when they are made to designated officials. Women on campuses already have trouble coming forward about sexual violence. Why would we allow institutions to scale back supports?

I write this as a woman who had to change my phone number weekly because I was getting death threats. For months, I rarely left my apartment, and when I did, I was pursued by camera drones and photographers on foot, on motorcycles and in cars. Tabloid outlets that posted pictures of me spun them in a negative light. I felt as though I was on trial in the court of public opinion — and my life and livelihood depended on myriad judgments far beyond my control.

I want to ensure that women who come forward to talk about violence receive more support. We are electing representatives who know how deeply we care about these issues. We can work together to demand changes to laws and rules and social norms — and to right the imbalances that have shaped our lives.

**Read more:**

The Post's View: What Betsy DeVos's new Title IX changes get right — and wrong

Betsy DeVos: It's time we balance the scales of justice in our schools

Janet Napolitano: Don't let the Trump administration undermine Title IX

Mili Mitra: The most horrifying part of the Dartmouth sexual harassment case

💬 **710 Comments**



### Read These Comments newsletter

The best comments and conversations at The Washington Post, delivered every Friday. Join the conversation.

**Sign me up**

By signing up you agree to our Terms of Use and Privacy Policy.

Exhibit C - 039

# EXHIBIT B

Exhibit C - 040

# The Washington Post

WEDNESDAY, DECEMBER 19, 2018 · B5

Democracy Dies in Darkness

"I'm not hiding my disgust, my disdain, for this criminal offense."
U.S. District Judge Emmet G. Sullivan



Michael Flynn, who entered court seeking no time behind bars, left it needing to be of more help to prosecutors to stay out of prison.

## Judge excoriates Flynn, delays sentencing

Ex-Trump aide forced to reiterate his crimes, warned of prison time

BY SPENCER S. HSU, MATT ZAPOTOSKY AND CAROL D. LEONNIG

A federal judge on Tuesday postponed the sentencing for Michael Flynn after he lashed out at President Trump's former national security adviser for trying to undermine the country and warned he might not spare Flynn from prison.

The stunning development means that special counsel Robert S. Mueller III's engagement with Flynn will continue for some months, leaving Flynn to wonder whether he will lose his freedom. Flynn's attorney re-

quested the delay after the judge's opinion became apparent, hoping further cooperation with law enforcement would calm the court's fervor.

From the start, U.S. District Judge Emmet G. Sullivan made clear he was infuriated by Flynn's conduct — both in lying to the FBI while in the White House and in working to advance the interests of the Turkish government while he was a part of Trump's campaign.

The judge seemed to take particular umbrage at the suggestion made by Flynn and his lawyers, just before the sentencing, that he had been duped by the FBI. Early in the hearing, Sullivan forced Flynn to admit publicly that he knew lying to the bureau was illegal and that
FLYNN CONTINUED ON A5

### Jurist disappoints Mueller foes with a lecture on the rule of law

BY CAROL D. LEONNIG AND ROSALIND S. HELDERMAN

For a full eight minutes, U.S. District Judge Emmet G. Sullivan read aloud an inventory of Michael Flynn's lies — describing his "conduct" in the "highest" of betrayals while a top security adviser sought to deceive FBI agents while "on the premises of the White House."

Flynn, a retired general who is the highest-ranking Trump aide to plead guilty as part of the special counsel investigation, expectantly held his face tight, as the judge ticked through his misdeeds. This was not how Flynn sup-

porters or Trump diehards Tuesday's sentencing hearing would unfold. They had pitched their hopes on Sullivan, an independent-minded justice with a history of derelict prosecutorial misconduct, as the one who would reveal overreach by special counsel Robert S. Mueller III and the FBI. Some Flynn allies even questioned the judge might toss out Flynn's guilty plea and clear his name.

Instead, the 71-year-old was starstruck and his partisans to palpable consternation. Sullivan illustrated his sharpest critiques of the government to serve and
SULLIVAN CONTINUED ON A4

---

# Senate passes bill revamping criminal justice

### EASES 'THREE STRIKES,' CRACK DISPARITIES

Big pivot for GOP and a bipartisan victory for Trump

BY JOHN WAGNER AND KAROUN DEMIRJIAN

The Senate on Tuesday overwhelmingly passed a sweeping overhaul of the criminal justice system, after a remarkable political shift from Republicans who voted in large numbers to save money by reducing prison sentences, handing a rare bipartisan victory to President Trump.

The First Step Act passed on a vote of 87 to 12, with dozens of Republicans, including holdout Majority Leader Mitch McConnell (R-Ky.), joining all 49 members of the Democratic caucus to approve legislation that even some GOP supporters fear could leave them vulnerable to charges of being soft on crime.

Senate Judiciary Committee Chairman Sen. Charles E. Grassley (R-Iowa) tried to allay those concerns shortly before the final

vote, stressing that Trump "wants to be tough on crime, but fair on crime" — and had told him personally he'd be bad his "pen ready to sign this bill."

And minutes after the vote, Trump tweeted his congratulations to the Senate, stressing that his "job is to fight for ALL citizens, even those who have made mistakes."

"This will keep our communities safer and provide hope and a second chance, to those who earn it," he wrote on Twitter. "In addition to everything else, billions of dollars will be saved. I look forward to signing this into law!"

The final House vote, and final Senate passage, represents a major pivot for the GOP, which decades ago embraced a law-and-order subject my and was one of the drug-crippling state-federal level.
FLYNN CONTINUED ON A18

---

## President backs off demand for wall funds

Trump seeks to avoid shutdown; short-term funding bill seems likely

BY ERICA WERNER, DAMIAN PALETTA AND SEUNG MIN KIM

President Trump on Tuesday abandoned much of his demand for $5 billion for the border wall, opening the door for Congress to pass a short-term spending bill to keep the government open past Friday.

Instead, the Trump administration signaled it would sign off on a bill that would fund the government through February, officials said, representing a retreat for the president, who had insisted

leaders during a tense conversation earlier this month that he'd be "proud" to shut down the government to get funding. Instead, White House press secretary Sarah Sanders said Tuesday Trump does not want a shutdown and is willing to move forward by a variety of options and would work along the U.S.-Mexico border.

But the president's concession, which came a few lawmakers from both parties argued that his $5 billion wall plan wouldn't get through Congress, did not break the impasse that's overtaken Capitol Hill ahead of a Friday night deadline.

Blocked further: Money may be important to border wall A18

A GOP's deal for Democratic stance for steps and party concessions A3

---

## In light of allegations, president to shut charity

Foundation was used for personal and political benefit, lawsuit says

BY DAVID A. FAHRENTHOLD

President Trump has agreed to shut down his embattled personal charity and to give away to its remaining money amid allegations that he used the foundation for his personal and political benefit, New York Attorney General Barbara Underwood announced Tuesday.

Underwood said that the Donald J. Trump Foundation is dissolving as her office pursues its lawsuit, in which Trump began in April. Underwood is continuing to seek more than $2.8 million in restitution and has asked a judge to ban the Trumps temporarily from service on the boards of other New York nonprofit organizations.

Underwood said Tuesday that her investigation found "a shocking pattern of illegality" spanning
TRUMP CONTINUED ON A4

---

### FALLING OUT

## Inside America's other opioid epidemic

The nation's capital is ground zero for an explosion in African American overdose deaths



Kenneth Harwell, 59, tapes heroin onto her hand so she can't see it for former D.C. home. She began trying it 38-odd years ago.

BY PETER JAMISON

She took, whose product could be trusted, wasn't sure going by his phone. So just after 9 a.m. on a frigid August morning, Sam Rogers had trekked to a corner two miles east of the U.S. Capitol on Pennsylvania Avenue, hoping to find heroin that wouldn't kill him.

New Rogers, 53, was back in his bedroom of the box, each house on its front St. Eking in a worn swivel chair, he used a felt's Three crawl chair, he used a felt's Three crawl to an equip on his cellphone and beat an easy on his cellphone and beat

over his smoker and syringe. The heroin — a tan powder said for $10 a bag — glimmered into a cloudy liquid with the amber hue at glimp was up.

Palliative or poison: He would know soon enough.

"Come on," Rogers murmured, sliding a needle into his outer forearm between hosts of scar tissue. A pink plume of blood rose in the barrel of the syringe.
OPIOIDS CONTINUES ON A14

Millions of pills in Wash. by led to weigh led to crack in Pan. A12

---

## IN THE NEWS



A league of her own: Penny Marshall, who starred in "Laverne & Shirley," then became a groundbreaking director, died at 75. B5

**THE NATION**
President Trump's Federal Commission on School Safety recommended that school systems consider arming personnel and advised against increasing the minimum age required for gun purchases. A3

Backside by veterans has surged, but the Department of Veterans Affairs has spent less than 1 percent of its budget to advertise the crisis hotline. A16

**FIVE WORLD**
Pakistan is implementing a plan to provide free heres and a country in several millions poor families, hoping for health and wellness. B1

The Italian government backed down in its

The United States and Mexico announced an assistance program to curb migration from Central America. A3

Jordan's White House, a civil-liberties group, is the target of a Russian disinformation campaign, report A11

**THE ECONOMY**
Workers who quit their jobs without giving their two weeks' notice may be employers a two-week notice seem to be getting tiptoe out away with it. A6

With assets have been largely unaware that many have been and use

Fed announcement on interest rates. A11

**THE REGION**
Claude Moore Farm, the Colonial-era living farm in McLean, will close after rejecting an oversight deal. B1

The D.C. Council approved a hastily-assembled bill to a show oversight of the Anacostia River to continue. B1

The D.C. Council legal and penalties on gun sports, a bowing it in interest and private businesses and through

**INSIDE**



**FOOD**
Modern, Danish
A Danish-American Chef seeks to present out fresh traditional flavors. E1

**STYLE**
Being a boy
Three boundaries-up middle school's elbows and gender codes. C1



PostP_ints
DAILY CODE, DETAILS B7

Exhibit C - 041



Leslie Moonves in July 2013. The CBS chief executive resigned in September after multiple allegations of sexual misconduct surfaced.

JORDAN STRAUSS/INVISION/ASSOCIATED PRESS

# A transformative moment for women

### BY AMBER HEARD

I was exposed to abuse at a very young age. I knew certain things early on, without ever having to be told. I knew that men have the power — physically, socially and financially — and that a lot of institutions support that arrangement. I knew this long before I had the words to articulate it, and I bet you learned it young, too.

Like many women, I had been harassed and sexually assaulted by the time I was of college age. But I kept quiet — I did not expect filing complaints to bring justice. And I didn't see myself as a victim.

Then two years ago, I became a public figure representing domestic abuse, and I felt the full force of our culture's wrath for women who speak out.

Friends and advisers told me I would never again work as an actress — that I would be blacklisted. A movie I was attached to recast my role. I had just shot a two-year campaign as the face of a global fashion brand, and the company dropped me. Questions arose as to whether I would be able to keep my role of Mera in the movies "Justice League" and "Aquaman."

I had the rare vantage point of seeing, in real time, how institutions protect men accused of abuse.

Imagine a powerful man as a ship, like the Titanic. That ship is a huge enterprise. When it strikes an iceberg, there are a lot of people on board desperate to patch up holes — not because they believe in or even care about the ship, but because their own fates depend on the enterprise.

In recent years, the #MeToo movement has taught us about how power, like this works, not just in Hollywood but in all kinds of institutions — workplaces, places of worship or simply in particular communities. In every walk of life, women are confronting these men who are buoyed by social, economic and cultural power. And these institutions are beginning to change.

We are in a transformative political moment. The president of our country has been accused by more than a dozen women of sexual misconduct, including assault and harassment. Outrage over his statements and behavior has energized a female-led opposition. #MeToo started a conversation about just how profoundly sexual violence affects women in every area of our lives. And last month, more women were elected to Congress than ever in our history, with a mandate to take women's issues seriously. Women's rage and determination to end sexual violence are turning into a political force.

We have an opening now to bolster and build institutions protective of women. For starters, Congress can reauthorize and strengthen the Violence Against Women Act. First passed in 1994, the act is one of the most effective pieces of legislation enacted to fight domestic violence and sexual assault. It creates support systems for people who report abuse, and provides funding for rape crisis centers, legal assistance programs and other critical services. It improves responses by law enforcement, and it prohibits discrimination against LGBTQ survivors. Funding for the act expired in September and has only been temporarily extended.

We should continue to fight sexual assault on college campuses, while simultaneously insisting on fair processes for adjudicating complaints. Last month, Education Secretary Betsy DeVos proposed changes to Title IX rules governing the treatment of sexual harassment and assault in schools. While some changes would make the process for handling complaints more fair, others would weaken protections for sexual assault survivors. For example, the new rules would require schools to investigate only the most extreme complaints, and then only when they are made to designated officials. Women on campuses already have trouble coming forward about sexual violence — why would we allow institutions to scale back supports?

I write this as a woman who had to change my phone number weekly because I was getting death threats. For months, I rarely left my apartment, and when I did, I was pursued by camera drones and photographers on foot, on motorcycles and in cars. Tabloid outlets that posted pictures of me spun them in a negative light. I felt as though I was on trial in the court of public opinion — and my life and livelihood depended on myriad judgments far beyond my control.

I want to ensure that women who come forward to talk about violence receive more support. We are electing representatives who know how deeply we care about these issues. We can work together to demand changes to laws and rules and social norms — and to right the imbalances that have shaped our lives.

*The writer is an actress and an ambassador on women's rights at the American Civil Liberties Union.*

ALYSSA ROSENBERG

Excerpted from washingtonpost.com/people/alyssa-rosenberg

## Pay the women instead

If there is one tiny kernel of relief in the infuriating news cyclone that has been 2018, it is the report that CBS doesn't intend to pay disgraced and disgraceful former chairman and chief executive Leslie Moonves $120 million in severance. Of course, that relief is mitigated by the fact that Moonves may still end up incurring costs upfront in the form of lawyers' fees. It's a perverse incentive structure that gives companies millions of reasons not to deal aggressively with male stars who harass their co-workers.

Some companies have begun to write employment contracts specifying that employees who are axed because of sexual misconduct can't demand that

## Racism is a national security issue

### BY SHERRILYN IFILL

Two newly released reports from the Senate Intelligence Committee about Russian interference in the 2016 election have been nothing short of revelatory. Both studies — one produced by researchers at Oxford University, the other by the cybersecurity firm New Knowledge — describe in granular detail how the Russian government tried to sow discord and confusion among American voters. And both conclude that Russia's campaign included a massive effort to deceive and co-opt African Americans. We have unassailable confirmation that a foreign power sought to exploit racial tensions in the United States for its own gain.

Ever since U.S. intelligence agencies reported that the Russian government worked to sway the 2016 election, foreign election meddling has been one of our nation's top national security concerns. But our discussions about Russian interference rarely touch on the other major threat to our elections: the resurgence of state-sponsored voter suppression in the United States. In light of these disturbing new reports, it is clear we can no longer think of foreign election meddling as a phenomenon separate from attempts to disenfranchise Americans of color. Racial injustice remains a real vulnerability in our democracy, one that foreign powers are only too willing to attack.

How should we respond? First, we have to make it easier, not harder, for Americans to vote. In the wake of the Supreme Court's 2013 Shelby County decision, which severely weakened the Voting Rights Act, we've seen a resurgence of voter-suppression efforts across the nation. Congress has the power to fix the Voting Rights Act, but so far it has declined to do so. The revelations of Russia's racial targeting should serve as a wake-up call that domestic voter suppression, in addition to being unconstitutional, effectively aids foreign attacks on our democracy. Indeed, we should take seriously the danger that domestic and foreign groups may coordinate to suppress turnout in future elections, a possibility we can begin to forestall, first and foremost, by protecting the franchise here at home. Rep. Terri A. Sewell (D-Ala.) has already introduced a comprehensive new voting rights bill, and Congress should swiftly act upon it in the new year.

Second, these revelations only deepen the urgency of demanding more accountability from technology companies. The New Knowledge report criticizes social media companies such as Facebook for misleading Congress about the nature of Russian interference, noting that, one even denied that specific groups were targeted. This is just more evidence that Silicon Valley has yet to come to grips with the enormous influence it wields in our democracy, and the ways that foreign powers can use that influence to manipulate Americans. Congress should require greater transparency and responsibility from these corporations before the 2020 elections.

Finally, we have to accept that foreign powers seize upon these divisions because they are real — because racism remains in the United States' Achilles' heel. Indeed, it is, and always has been, a national security vulnerability — a fundamental and easily exploitable reality of American life that belies the image and narrative of equality and justice we project and export around the world. It may be especially difficult in our era of "fake news" and "alternative facts," but we must recognize that our failure to acknowledge hard truths, especially when it comes to race, is harder for foreign powers to turn us against one another. Russia did not conjure out of thin air the black community's legitimate grievances about racist policing. Nor did it invent racist and hateful conspiracy theories. Rather, Russian trolls seized upon these real problems as ready-made sources of discord. Moving forward, we need to recognize that our failure to honestly address issues of civil rights and racial justice makes all of us more susceptible to foreign interference.

This is hardly the first time our adversaries have identified race and racism as America's great vulnerability. During the Cold War, the Soviet Union frequently pointed to segregation and civil unrest as proof of American hypocrisy. This propaganda was sufficiently widespread, and contained enough truth, that leaders of both parties began arguing that segregation undermined the United States' position in the Cold War, helping to ease the passage of civil rights legislation in the 1950s and 1960s.

Today, we need a similar understanding that our failure to ensure equal justice for all has grave implications for U.S. national security. The upcoming House oversight committee hearings on Russian interference and voter suppression will be critical opportunities to educate the public on the threats to our democracy, and they deserve our close attention.

But we must be careful not to reduce the struggle for racial equality into a bloodless question of national interest. Civil rights are essential to our national security, but national security cannot be the chief rationale for pursuing civil rights. After all, racial injustice is not just another chink in our armor. It is the great flaw in our character. Our adversaries know that race makes us our own worst enemy. It is past time we learn this hard truth ourselves.

*The writer is president and director-counsel of the NAACP Legal Defense and Educational Fund.*

DAVID IGNATIUS

## A Russian spy's dream

I magine American politics for a moment as a laboratory experiment. A foreign adversary (let's call it "Russia") begins to play with the subjects, using agents and sticks to condition their behavior. The adversary develops tools to dial up anger and resentment inside the lab bubble, and even recruits unwitting accomplices to perform specific tasks.

This 21st-century political dystopia isn't drawn from a "spec script" that just landed in Hollywood. It's a summary of two reports on the Kremlin-linked Internet Research Agency published this week by the Senate Intelligence Committee. The studies describe a sophisticated, multilevel Russian effort to use every available tool of our open society to create resentment, mistrust and social disorder.

For a century, Russian intelligence agents have been brilliant at creating false fronts and manipulating opposition groups. Now, thanks to the Internet, they seem to be perfecting these dark arts.

Even as it meddles abroad, the Kremlin has just introduced new legislation to block its own information space from foreign penetration. Under the new law, reported this week, Russia could control all Internet and message traffic into the country, block any anonymous websites and, during a crisis, manage the Russian Web from a central command point.

Put the two halves of Russian behavior "Russia's IRA activities were designed to polarize the U.S. public and interfere in elections," the study says, by encouraging African American voters to boycott elections, pushing right-wing voters toward extremism, and "spreading sensationalist, conspiratorial and other forms of junk political news and misinformation."

The Russians pushed every button. They sought to tap African American anger with "Blacktivist" and "Black Matters" Facebook pages. They reached conservatives through pages called "Army of Jesus," "Heart of Texas" and "Secured Borders." The list of the IRA's top-20 Facebook pages is a catalogue of American rage.

The New Knowledge report blows the cover off these Internet operations. It shows how Hillary Clinton and vice-presidential nominee Tim Kaine were depicted as the "Satan Team," with Clinton wearing devil's horns and Kaine bearing a red mark on his forehead. The researchers found an image of Jesus wearing a red "Make America Great Again" hat.

Instagram provided a useful platform for manipulating younger Americans. The IRA's "Blackstagram" account had 303,663 followers; "American Veterans" had 215,680; "Sincerely Black" had 196,764; and "Rainbow Nation" had 156,465, to name the top four Instagram pages listed in the New Knowledge study.

Russia's Internet activity wasn't just

*The writer is president and director-counsel of the NAACP Legal Defense and Educational Fund.*

# EXHIBIT C

Exhibit C - 043

3/1/2019  Amber Heard on Twitter: "Today I published this op-ed in the Washington Post about the women who are channeling their rage about viole…

Case 2:21-cv-05852-GW-PD   Document 11-4   Filed 08/17/21   Page 123 of 161   Page ID #:200

✕

 **Amber Heard** ✔
@realamberheard

Follow ⌄

Today I published this op-ed in the Washington Post about the women who are channeling their rage about violence and inequality into political strength despite the price of coming forward.

From college campuses to Congress, we're balancing the scales.

**Opinion | Amber Heard: I spoke up against sexual violence — and fa...**
We have an opening now to bolster and build institutions protective of women. Let's not ignore it.
washingtonpost.com

1:28 PM · 19 Dec 2018

**1,292** Retweets **3,556** Likes

💬 128    🔁 1.3K    3.6K

 **Amber Heard** ✔ @realamberheard · 19 Dec 2018    ⌄
I'm honored to announce my role as an @ACLU ambassador on women's rights.
The ACLU is the organization that first inspired me to become an activist, so I

Exhibit C - 044

123

Fairfax Circuit Court

Circuit Court

Receipt No. 827293

Receipt Date: 03/01/2019 12:49 PM

Received of:   Benjamin G Chew,                                                         $    346.00

Three Hundred Forty Six and 00/100

John C Depp II   vs.   Amber Laura Heard

Filer(s): Depp, John C II

| Case | Amount |
|------|--------|
| CL-2019-0002911 | |
| Complaint ($500,000.01 and above) | 346.00 |
| | Total: 346.00 |

Balance due court:  $                                     0.00
Next fine/fee due date:
Next restitution due date:

Payment Method: Check (Number: 3472)

| | |
|---|---|
| Amount Tendered: | 346.00 |
| Overage: | 0.00 |
| Change Due: | 0.00 |

John T. Frey, Clerk of Circuit Court

By: _____

Deputy Clerk
Clerk: ACAST5

---

Exhibit C - 045

# Exhibit D

LEGAL ETHICS OPINION 598          HOUSE COUNSEL/REPRESENTATION
                                 OF INSUREDS – CONFLICT OF
                                 INTEREST – CONFIDENTIALITY.


The Virginia State Bar's Standing Committee on the Unauthorized Practice of Law has proposed its Opinion 60. The Virginia State Bar's Standing Committee on Legal Ethics has been asked to render its opinion on the applicability of the Virginia Code of Professional Responsibility to the facts upon which the proposed UPL Opinion 60 is based. The opinion of the Standing Committee on Legal Ethics is the following:

1. There is no provision of the Virginia Code of Professional Responsibility that expressly prohibits representation of an insured by a staff attorney for a liability insurance carrier.

2. However, there are provisions of the Code of Professional Responsibility which provide guidance in the conduct of that relationship, namely DR:4-101((C)(1), DR:5-101(A) and DR:6-101(D).

3. Canon 5 states "A lawyer shall exercise independent professional judgment on behalf of a client."

DR:5-101(A) states
Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment.

(A) A lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client may be affected by his own financial, business, property or personal interest, except with the consent of his client after full and adequate disclosure under the circumstances.

DR:5-106 states, in pertinent part,
Avoiding Influence by Others Than the Client.

(A) Except with the consent of his client after full and adequate disclosure under the circumstances, a lawyer shall not:

(1) accept compensation for his legal services from one other than his client.

(2) . . . .

(B) A lawyer shall not permit a person who recommends, employs or pays him to render legal services for another to direct or regulate his professional judgment in rendering such legal services.

Accordingly, it is imperative under the Virginia Code of Professional Responsibility that a liability insurer's staff attorney representing an insured must inform the insured of his employment and obtain the insured's consent "after full and adequate disclosure under the circumstances."

The Legal Ethics Committee of the American Bar Association stated the principle well in its Informal Opinion 282 (5/27/50) in concluding that "An attorney, employed by an

insurance company exclusively, upon a salary basis [may ethically] defend lawsuits against assureds on behalf of the insurance company . . . ." and added

> The essential point of ethics involved is that the lawyer so employed shall represent the insured as his client with undivided fidelity . . . .

The expressed, affirmative prohibitions of parts (A)(1) and (B) of DR:5-106(quoted above) amplify the essence of Canon 5 and the more specific statement in DR:5-101(A). See also EC:5-21, EC:5-22 and, particularly, EC:5-23.

   4. Canon 4 states "A Lawyer Should Preserve the Confidences and Secrets of a Client."

DR:4-101(B) prohibits the revelation of a confidence or secret (as defined in 4-101(A)), or the use of a confidence or a secret to the disadvantage of the client, or the use of a confidence or a secret of the client for the advantage of the attorney or a third person.

The client of an insurance carrier's employee attorney is the insured, not the insurance carrier. Accordingly, except with the consent of the client, the insurance carrier's employee attorney is barred from disclosing or using confidences and secrets as set out in 4-101(B) including, for example, any defense to policy coverage gained through the attorney/client relationship with the attorney's insurance carrier's insured. Informal Opinions 949 (8/8/66) and 1476 (8/11/81) of the ABA Legal Ethics Committee are in accord. See also EC:4-1, EC:4-2 and EC:4-5.

   5. DR:6-101(D) states "A Lawyer Shall Inform His Client of Facts Pertinent to the Matter and of Communications from Another Party That May Significantly Affect Settlement or Resolution of the Matter." Accordingly, the insurance carrier's employee attorney is required to keep his client advised of settlement and such information.

   6. Canon 6 requires that "A Lawyer Should Represent a Client Competently" and Canon 7 states that "A Lawyer Should Represent a Client Zealously Within the Bounds of the Law." We believe that it is implicit in those canons and related disciplinary rules that an insurance carrier's employee attorney make full and adequate disclosure to his client insured of any limitation of the scope of the representation.

   In summary, then, it is the opinion of the Legal Ethics Committee of the Virginia State Bar that it is not improper for an attorney who is an employee of an insurance carrier to represent a client who is insured by his employer.  We point out the provisions of DR:4-101(B), DR:5-101(A), DR:5-106(A)(1) and (B), and DR:6-101(D) and Canons 6 and 7 as guidance to an attorney in the maintenance of such a relationship.

Approved by the Supreme Court of Virginia
March 8, 1985
Effective June 1, 1985

Justices Stephenson and Russell would disapprove the opinion.

# Exhibit E

Committee Opinion
June 22, 1993

LEGAL ETHICS OPINION 1536          CONFLICT OF INTEREST -
                                   CONFIDENCES AND SECRETS –
                                   FORMER CLIENT: ATTORNEY'S
                                   FORMER FIRM REPRESENTS
                                   DEFENDANT IN PERSONAL INJURY
                                   CASE;  ATTORNEY'S SPOUSE
                                   EMPLOYED BY INSURANCE CARRIER.


   I am writing in response to your letter dated April 26, 1993, requesting an informal
advisory opinion from the Virginia State Bar Standing Committee on Legal Ethics
("committee").

   You have presented a hypothetical situation in which Attorney A was previously
employed by Law Firm B and handled insurance defense cases and coverage issues for
Law Firm's client, Insurance Company C. Attorney A later left Law Firm B and started
his own law practice.

   You indicate that Attorney A is now representing Client D in a personal injury action
against a defendant who is insured by Insurance Company C.  Law Firm B is defending
the case.

   You advise that Attorney A is familiar with the operation of Insurance Company C, not
only because of his past employment with Law Firm B but also because his wife was, and
is currently, a supervisor-employee of Insurance Company C with access to all claim files
involving the same claim of Client D that is the subject matter of the personal injury
action. Attorney A's spouse also has access to other claim files and information regarding
the defendant, who is the insured of Insurance Company C. This information would
include past claims, accident reports, and past repair estimates, as well as information and
opinions supplied by Law Firm B on the merits of all claims handled by that firm,
including the defense of the personal injury action in question.

   You have asked the committee to opine whether, under the facts of the inquiry, (1)
Attorney A may continue representation of Client D since he formerly represented
Insurance Company C while employed by Law Firm B; and (2) whether Attorney A may
continue to represent Client D, considering Attorney A's spouse's employment by
Insurance Company C.

   The appropriate and controlling Disciplinary Rules related to your inquiry are DR:4-
101(B) which provides that a lawyer shall not knowingly use or reveal a confidence or
secret of his client; and DR:5-105(D) which states that a lawyer who has represented a
client in a matter shall not thereafter represent another person in the same or substantially
related matter if the interest of that person is adverse in any material respect to the
interest of the former client unless the former client consents after disclosure.

Exhibit E - 002

Committee Opinion
June 22, 1993

The committee directs your attention to prior LE Op. 598, approved by the Virginia Supreme Court effective June 1, 1985, which concluded that "the client of an insurance carrier's [in-house] employee attorney is the insured, not the insurance carrier". The committee is of the view that such delineation of the client is equally applicable when the insurance company engages outside counsel to represent its insured. The committee is of the opinion that Attorney A's familiarity with the general operation of Insurance Company C does not constitute a confidence or secret as envisioned by DR:4-101 since there was no attorney-client relationship between Attorney A and Insurance Company C. Thus, the committee opines that, unless the current matter is the same or substantially related to specific matters in which Attorney A, while employed by Law Firm B, previously represented other insureds who are now adverse to Client D, there is no impropriety in Attorney A continuing to represent Client D.

As to your inquiry regarding A's spouse who, as employee of Insurance Company C, has access to all claim files involving both D's current claim and other claim files and information regarding the defendant, the committee opines that, assuming Attorney A had no knowledge of information his spouse may have learned as an employee of C, A would not be precluded from continuing his representation of D. See LE Op. 1481.

Exhibit E - 003

# Exhibit F

Exhibit F - 001



# Edward W. Cameron

**PARTNER**



📞 **(703) 460-9340**

**Email**
✉ (mailto:ecameron@cameronmcevoy.com)

//////////////////////////

**Recognition**







//////////////////////////

**Bar Admissions**

One of the firm's founders, Edward W. ("Sunny") Cameron has a large practice devoted primarily to civil litigation in state and federal courts. Mr. Cameron represents businesses and individuals in a wide range of complex matters, including commercial, construction, banking, real estate and employment disputes.

In addition to his extensive background in trial work, Mr. Cameron is experienced in the appellate arena at all levels. He has also handled alternative dispute resolution and has successfully resolved numerous labor and employment, commercial and construction disputes through arbitration and/or mediation.

Mr. Cameron has been selected for numerous honors, including an invitation to join as a *Senior Fellow*, *Litigation Counsel of America* for 2012. Membership in this prestigious honor society for trial and appellate attorneys is limited to one-half of one percent of all American lawyers. He has also been selected as one of the *Best Lawyers in America* each year since 2010, and he has been designated a *Virginia Super Lawyer* in the Business Litigation section by *Law & Politics* magazine. In addition, he has been identified as one of Virginia's *Legal Elite* by *Virginia Business* magazine. Lastly, in his first year of eligibility, Mr. Cameron received an AV Peer Review Rating from Martindale-Hubbell, which is recognized as one of the nation's leading rating services for attorneys.

### Practice Focus

> Commercial Litigation

> Corporate Litigation

> Real Estate Litigation

> Labor & Employment

> Local Government/ Municipal Litigation

- Supreme Court of the United States
- United States Court of Federal Claims
- Virginia
- United States Court of Appeals, Fourth Circuit
- United States District Court, Eastern District of Virginia
- United States Bankruptcy Court, Eastern District of Virginia
- United States Bankruptcy Court, Western District of Virginia
- Regularly admitted to practice in other courts throughout the U.S. on a *Pro Hac Vice* basis

////////////////////////

**Professional Activities**

- Virginia State Bar, Construction Law Section
- Fairfax Bar Association, Fairfax County Circuit Court Committee (1997-98)
- Fairfax Circuit Court Conciliator
- Virginia Trial Lawyers Association
- Member, Diversity Law Institute (2014)
- Member, The Trial Law Institute (2014)
- Barrister, Order of Centurions (Litigation Counsel of America)

////////////////////////

**Education**

- J.D., George Mason University School of Law
  – *George Mason University Law Review*
- B.A., Virginia Commonwealth University

- Construction Litigation
  – Mechanic's Liens
  – Claims on Public Projects
- Commercial Lease Litigation
- Banking & Debtor/Creditor Litigation

## Practice Notes

- Secured a judgment for $11 million for a commercial general contractor and its primary and excess carriers in a complex insurance coverage and indemnification dispute at the conclusion of a lengthy trial in the Circuit Court of Fairfax County.

- Secured the early dismissal of a $2.5 million claim against King George County, Virginia and the County's Service Authority involving a commercial real estate developer's construction of a waste water treatment facility.

- Secured the early dismissal of a wrongful discharge claim where the former employee was seeking $1.1 million in damages.

- Negotiated a favorable settlement resulting in a 15 year lease extension for a tenant at the end of the first week of a jury trial involving a complicated commercial lease dispute.

- Successfully represented a subsidiary of a national building material supply firm in a hotly contested construction dispute resulting in a substantial damage award from a Fairfax County jury.

- Secured a jury verdict for a large software consulting firm equal to the Plaintiff's ad damnum in a contract dispute with one of the nation's largest cosmetic manufacturers.

– Graduated top half of one
  percent of class



# Timothy J. McEvoy

**PARTNER**



📞 **(703) 460-9341**
**Email**
✉️ (mailto:tmcevoy@cameronmcevoy.com)

/////////////////////////

**Recognition**



(https://www.actl.com/)





/////////////////////////

**Bar Admissions**

❯ Virginia

Tim McEvoy is a Fellow of The American College of Trial Lawyers, the most prestigious, invitation-only society of senior trial counsel in the United States and Canada. A former state and federal prosecutor, he has been involved with matters as diverse as whether a sitting state Attorney General had to obey a sitting Governor, precedent-setting litigation in the Delaware Court of Chancery involving preferred shareholder rights and the duties of potentially conflicted venture capitalists in a merger, shareholder's agreement disputes, business "divorces," software development disputes, the Clean Water Act, pharmaceutical drug development, and other commercial litigation of all kinds. Mr. McEvoy has also appeared before the United States Supreme Court (where the lower courts were reversed by a 9-0 vote), has obtained and collected recoveries of more than $50,000,000 on behalf of his clients, and successfully defended liquidated commercial claims far exceeding that amount.

For years running, Mr. McEvoy has been A/V-rated by the Martindale-Hubbell peer rating service, the highest rating available for skill and ethics. He is also perennially listed in in publications such as Virginia Business Magazine's "Virginia Legal Elite," Thomson-Reuters' Virginia and D.C. "Super Lawyers" and the prestigious "Best Lawyers in America" list. He has won the Fairfax Bar Association's President's Award for Leadership and Service three times, and has served as President of the Fairfax Law Foundation, a 501(c)(3) entity that provides pro bono legal services and educates the public about the Rule of Law. He has represented both the Arlington County Bar Association and the Fairfax Bar Association in legal disputes with third parties, and has additionally represented two Virginia Commonwealth's Attorneys in civil rights disputes initiated against them in federal court. He also serves as a member of the Merit Selection Committee for

United States Magistrate Judges in the Eastern District of Virginia, Alexandria Division.

In his free time, Mr. McEvoy is a road bike and motorbike enthusiast, manager and supporter of youth sports teams, and an advocate and advisor for mental health issues.  He enjoys biography, history, traveling and people, and is a member of the Virginia Club of New York and the Virginia Historical Society.

> Maryland
> U. S. Supreme Court
> U. S. District Court for the Eastern and Western Districts of Virginia
> U. S. District Court for Maryland
> U. S. Court of Appeals for the Fourth Circuit

/////////////////////////

**Professional Activities**
> President, Fairfax Law Foundation (2009)
> Fairfax Bar Association
> Arlington Bar Association
> Federal Bar Association
> Member, George Mason Inn of Court

/////////////////////////

**Education**
> J.D., University of Virginia School of Law
> B.A., College of William and Mary *(Phi Beta Kappa)*

### Practice Focus

> **Corporate litigation,** including claims by and against shareholders, partners and members, breach of fiduciary duty claims, appraisals, business break-ups and claims against officers and directors.

> **Business torts,** including tortious interference with contract claims and business conspiracy claims.

> **Contract law,** including claims for breach of commercial contracts, leases, employment agreements and restrictive covenants (non-competition and non-solicitation agreements).

> **Estate and fiduciary litigation,** including trust and estate disputes, claims under the Uniform Trust Act, will contests and accountings.

> **Intellectual Property,** including software disputes, licensing issues, copyrights and trademarks.

### Practice Notes

> Regular participation in complex, multi-party litigation in federal court involving various subject matters, including the federal False Claims Act, the Fair Labor Standards Act, the Lanham Act,

the Copyright Act, the Clean Water Act and other federal statutes and regulations.

› The defense of a breach of contract claim by a pharmaceutical development company against a leading international pharmaceutical manufacturer where the damages sought were not less than $78,000,000. The case was resolved by confidential mediation.

› Routine handling of cases involving tens of millions of dollars in liquidated contract damages, including settlements on behalf of publicly-traded entities.

› Multiple False Claims Act defenses where his clients paid nothing or only a small fraction of the seven-figure demands made by the claimants.

› Recovery of millions of dollars for charitable organizations and individuals in trust and estate cases.

› Total exoneration for a client whose case went all the way to the United States Supreme Court and whose case was subsequently dismissed with prejudice on remand to the trial court.

› Defense of a FLSA class action in federal court, with client paying nothing.

› Participation as counsel in litigation and arbitration concerning book and movie rights to the life story of W. Mark Felt, the former FBI official who disclosed in May 2005 that he was the famed "Deep Throat" of the Watergate era. The case resolved in confidential arbitration and the award was enforced by the U.S. District Court for the District of Columbia.

› Won multiple summary judgments and injunctions for clients in all manner of civil litigations, including restrictive covenant cases and cases under employment discrimination laws, the Lanham Act and under various common law theories.

› Several cases have been featured on local and national news, including coverage by *The Wall Street Journal,* CNN, *The Washington Post*, *The Roanoke Times* and *The Boston Globe*.

Cameron / McEvoy PLLC

# Sean Patrick Roche

**PARTNER**



☏ **(703) 460-9343**

**Email**
✉ (mailto:sroche@cameronmcevoy.com)

////////////////////////

**Recognition**



> Super Lawyer – SuperLawyer.com (2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019)

> Martindale Hubbell AV-Rated – the highest rating available to lawyers

> DC Metro Area's Outstanding Young Lawyer – Washington Post Magazine

> Avvo.com 10.0-Rating – the highest rating available to lawyers

> Legal Elite – Virginia Business Magazine

Sean Patrick Roche is a business litigation attorney and a partner in the firm. His practice is devoted to complex civil litigation with expertise in matters generally revolving around a variety of forms of contract disputes, often including high stakes "bet-the-company" litigation. For example, Mr. Roche regularly handles contract litigation involving construction, real estate, trust and estates, labor and employment, commercial landlord-tenant, telecommunication, intellectual property, and various other forms of complex business disputes. Ultimately, Mr. Roche is a trial attorney though his expertise is in conflict resolution, whether by prevailing in court or negotiating the best possible resolution out of court. Mr. Roche is licensed to practice law in Virginia, Washington, D.C., and Maryland. He regularly handles litigation in the state and federal courts throughout all three jurisdictions and he is often specially admitted to appear on behalf of clients in various courts and arbitration proceedings throughout the United States and Canada.

Mr. Roche was born and raised in the Washington, D.C. area, where he continues to reside with his wife and two sons. He obtained two Bachelor of Arts degrees from Georgetown University, a Juris Doctorate from the University of Richmond School of Law (where he served on the *Law Review* as Allen Chair Editor), and a Master of Laws ("LL.M.") in Litigation and Dispute Resolution from The George Washington University Law School. Mr. Roche is also a graduate of the College of Trial Advocacy.

Mr. Roche has been named among *Virginia Business* magazine's "Legal Elite", the Washington Post Magazine's "Outstanding Young Lawyers," and he has been elected as a "Super Lawyer" in Virginia, Maryland, and D.C. In his first year of eligibility, he achieved an AV-rating by Martindale-Hubbell, the highest available rating from the premier attorney rating database. Inclusion on these various lists

means Mr. Roche is among those lawyers recognized by his peers as one of the best in the D.C. metropolitan region.

///////////////////////

**Bar Admissions**

Virginia

District of Columbia

Maryland

United States District Court,
> Eastern District of Virginia

United States District Court,
> Western District of Virginia

United States District Court,
> District of Columbia

United States District Court,
> District of Maryland

United States Bankruptcy Court,
> Eastern District of Virginia

United States Bankruptcy Court,
> Western District of Virginia

United States Bankruptcy Court,
> District of Columbia

United States Bankruptcy Court,
> District of Maryland

United States Court of Appeals,
> Fourth Circuit

United States Court of Appeals,
> District of Columbia Circuit

United States Court of Appeals,
> Federal Circuit

Supreme Court of the United States

///////////////////////

**Professional Activities**

> Virginia State Bar
> District of Columbia Bar
> Maryland State Bar
> Fairfax Bar Association
> Member, Circuit Court
  Committee
  – Contributing Editor, Fairfax
    County Bar Manual

> American Bar Association

## Practice Focus

A trial attorney's special expertise is in the area of courtroom practice and trial procedure. Mr. Roche applies that discipline regularly in the following types of business disputes:

> General Civil Litigation

> Business Litigation

> Business Torts

> Telecommunication
  Litigation

> Real Estate Litigation

> Local
  Government/Municipal
  Litigation

> Contract Disputes

> Corporate Litigation

> Trust & Estate Litigation

> Banking & Debtor/Creditor
  Litigation

> Construction Litigation

> Labor & Employment
  Litigation

> Alternative Dispute
  Resolution (Arbitration and
  Mediation)

> Commercial Landlord-
  Tenant Litigation

## Practice Notes

> Over $30 million dollars in total judgment amounts obtained through bench and jury trials.

> Cases featured on local and national news, including coverage by The Wall Street Journal, The Washington Post, The New York Times, The Los Angeles Times, CNN, Wired, Law360, NBC News, USA Today, BBC, Hollywood Reporter, Fox News, CBS News, ABC News, Variety, Rolling Stone, TMZ, and Fierce Wireless.

> Millions of dollars in confidential settlements, often including long-term business benefits in addition to immediate monetary

https://www.cameronmcevoy.com/attorneys/sean-patrick-roche/

Exhibit F - 009

Sean Patrick Roche | Cameron/McEvoy PLLC

Litigation Section

> Federal Bar Association Federal Litigation Section

> Virginia Trial Lawyers Association

> Member, George Mason American Inn of Court

> USA Triathlon Association

> Board of Directors, Council for Court Excellence

> Board of Directors, Lift Me Up! youth charitable organization

//////////////////////////

**Education**

> LL.M., Litigation & Dispute Resolution, The George Washington University Law School *(Summa Cum Laude)*

> College of Trial Advocacy, The George Washington University Law School

> J.D., University of Richmond School of Law
  – *University of Richmond Law Review* – Allen Chair Editor, Executive Board
  – *Richmond Journal of Law & Technology*
    – Associate Solicitations Editor
  Justice, Honor Council

> B.A., Government & History, Georgetown University

> Gonzaga College High School (Washington, D.C.)

---

payments.

> Numerous cases dismissed and/or resolved through motions to dismiss, demurrer, plea in bar, or other pretrial practice and procedure.

> Dismissal by jury of all claims in favor of client on business dissolution dispute.

> Dismissal in favor of client on motion to dismiss involving complex securities litigation.

> Dismissal in favor of client following trial of complex litigation involving multi-million dollar construction dispute.

> Dismissal by motion of complex construction dispute involving multiple millions of dollars in dispute in which the presiding judge described Mr. Roche's defense of his client as "first rate" and "a take no prisoner's defense." Mr. Roche's client was also awarded reimbursement of its fees and costs by way of a substantial sanction against the opposing party.

> Dismissal with prejudice by opposing party immediately following Mr. Roche's deposition of the Plaintiff.

> Dismissal in favor of client in subrogation dispute involving complex products liability and personal injury claims.

> Successful prosecution and defense of numerous injunctions (preliminary and permanent) in both state and federal courts involving complicated non-compete, non-solicitation, and/or estate claims.

> Representation of various Fortune 500 companies in contract and business disputes.

> Representation of municipal and governmental organizations in contract and business disputes.

> Regular representation of individuals and national/international entities as local counsel, often serving as lead counsel in dismissing claims on jurisdictional grounds.

> Resolution through arbitration of multi-million dollar claims in national/international arbitrations.

Sean Patrick Roche | Cameron McEvoy PLLC

## Publications

› Sean Roche, *et al.*, *Law 101: An Essential Reference for Your Everyday Legal Questions* (2d ed., Sphinx Publishing, 2009).

› Jonathan D. Frieden & Sean Patrick Roche, *E-Commerce: Legal Issues for the Online Retailer in Virginia*, 13 Rich. J.L. & Tech, 2006.

› University of Richmond Law Review, Allen Chair Symposium 2004: Federal Judicial Selection (Sean Roche ed., 2005)

› Sean Roche, *Advanced Issues in Virginia Employment Law: Legal Issues in Employee Privacy*, National Business Institute 1, 1-42 (2004).

## Representative/Published Cases

› *3M Co. v. Directi Internet Sols. Pvt. Ltd.*, No. 1:11CV627, 2012 WL 5527154 (E.D. Va. Nov. 13, 2012) (finding judgment in favor of Sean Roche's client in complex cybersquatting and trademark infringement litigation).

› *Boeman v. Reed*, No. 1:09 CV 848, 2009 WL 3698496 (N.D. Ohio Nov. 4, 2009) (granting motion to dismiss).

› *Zhou Jie Plant v. Merrifield Town Ctr. Ltd. P'ship*, 482 F. App'x 823 (4th Cir. 2012) (upholding trial court ruling and dismissing action as a result of discovery violations).

› *Roberts Welding, LLC v. Hanover Ins. Co.*, No. CIV.A. GLR-12-2838, 2012 WL 6698646 (D. Md. Dec. 21, 2012) (granting motion to dismiss).

› *Suntrust Inv. Servs., Inc. v. Cleary*, No. CIV. 09-01066RJL, 2009 WL 1651541 (D.D.C. June 12, 2009) (granting motion of Sean Roche and issuing an injunction upholding non-solicitation and non-compete contracts).

› *3M Co. v. Directi Internet Sols. Pvt. Ltd.*, No. 1:11CV627, 2012 WL 1579767 (E.D. Va. May 3, 2012) (finding judgment in favor of Sean Roche's client in complex cybersquatting and trademark infringement litigation).

› *Plant v. Merrifield Town Ctr. Ltd. P'ship*, No. 1:08CV374, 2012 WL 293221 (E.D. Va. Jan. 30, 2012) (denying motion of Plaintiff seeking

to overturn judgment obtained by Sean Roche in favor of the Defendants).

> *Lodal v. Verizon Virginia, Inc.*, 74 Va. Cir. 110, 2007 WL 5584179 (Fairfax County, Aug. 22, 2007) (dismissing claims based on pretrial motion of Sean Roche).

> *Murnan v. Stewart Title Guar. Co.*, 607 F. Supp. 2d 745 (E.D. Va. 2009) (obtaining reconsideration of prior order from trial court and granting motion of Sean Roche dismissing matter with prejudice).

> *In re Merrifield Town Ctr. Ltd. P'ship*, No. 09-18119-SSM, 2010 WL 5015006 (Bankr. E.D. Va. Dec. 3, 2010) (dismissing matter in favor of Sean Roche's clients and awarding them recovery of fees and costs while describing Mr. Roche's work in a published ruling as "first rate" and a "take no prisoners defense.").

> *Shay v. Sight & Sound Sys., Inc.*, 668 F. Supp. 2d 80 (D.D.C. 2009) (granting motion of Sean Roche and dismissing case on pretrial motions).

> *Am. Prop. Const. Co. v. Sprenger Lang Found.*, 768 F. Supp. 2d 198 (D.D.C. 2011) (denying motion for summary judgment and finding in favor of Sean Roche).

> *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 564 F. Supp. 2d 544 (E.D. Va. 2008), aff'd, 591 F.3d 250 (4th Cir. 2009) (dismissing matter in its entirety based upon a statutory argument raised by Sean Roche).

> *Chubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666 (D. Md. 2013) (dismissing claims of Plaintiffs on the motion to dismiss filed by Sean Roche).

> *Khatib v. All. Bankshares Corp.*, 846 F. Supp. 2d 18 (D.D.C. 2012) (denying Plaintiff's motion for preliminary injunction and proceeding to dismiss the case altogether on counter-motion to dismiss filed by Sean Roche).

> *A-J Marine, Inc. v. Corfu Contractors, Inc.*, 810 F. Supp. 2d 168 (D.D.C. 2011) (quashing subpoena issued against the client of Sean Roche and dismissing the litigation altogether).

> *Zhou Jie Plant v. Merrifield Town Ctr. Ltd. P'ship*, 751 F. Supp. 2d
> 857 (E.D. Va. 2010), aff'd, 482 F. App'x 823 (4th Cir. 2012) (granting
> motion for summary judgment of Sean Roche on multi-million
> dollar class action litigation).

> *3M Co. v. Thailand3M.net*, No. 1:11CV627, 2013 WL 2156322 (E.D. Va.
> Apr. 23, 2013) (granting judgment in favor of Sean Roche's client
> on complex cybersquatting and trademark infringement claims).

> *United States v. Preston*, 123 F. Supp. 3d 93 (D.D.C. 2015) (denying
> government's motion for seizure of client's assets resulting in a
> settlement that resolved all claims).

> *Plant v. Merrifield Town Ctr. Ltd. P'ship*, 711 F. Supp. 2d 576 (E.D.
> Va. 2010) (obtaining dismissal of multi-million dollar class action
> based on procedural and pretrial litigation strategy).

> *Tracfone Wireless, Inc. v. Simply Wireless, Inc.*, 229 F. Supp. 3d
> 1284, 1287 (S.D. Fla. 2017) (granting motion to dismiss).

> *Tracfone Wireless, Inc. v. Simply Wireless, Inc.*, 275 F. Supp. 3d
> 1332, 1336 (S.D. Fla. 2017) (granting motion to dismiss).

> *TracFone Wireless, Inc. v. Simply Wireless, Inc.*, No. 15-24565-CIV,
> 2017 WL 5636281, at *1 (S.D. Fla. Nov. 22, 2017) (granting motion to
> stay in favor of competing arbitration).

> *Armstrong v. Navient Sols., LLC*, 292 F. Supp. 3d 464, 475 (D.D.C.
> 2018) (granting motion to dismiss).

> *Cornelius v. Simply Wireless*, No. 3:17-CV-3392-CMC-PJG, 2018 WL
> 4356578, at *3 (D.S.C. Sept. 13, 2018) (granting motion to dismiss).

## Presentations

> Northern Virginia's Annual Seminar on Commercial Landlord-
> Tenant Law (2014, 2015, and 2016).

> George Mason American Inn of Court – Opening Statements and
> Closing Arguments: How to Reach a Jury and Close the Case (April
> 24, 2018).

https://www.cameronmcevoy.com/attorneys/sean-patrick-roche/

Exhibit F - 013

6/6



# Matthew H. Sorensen

**PARTNER**



📞 **(703) 460-9342**

**Email**

✉️ (mailto:msorensen@cameronmcevoy.com)

/////////////////////////

**Bar Admissions**

> Virginia
> District of Columbia
> U.S. District Court, Eastern District of Virginia
> U.S. District Court, District of Columbia
> U.S. Court of Appeals, Fourth Circuit
> U.S. Court of Appeals, District of Columbia Circuit
> U.S. Court of Appeals, Sixth Circuit
> U.S. Court of Appeals, Ninth Circuit

/////////////////////////

**Professional Activities**

> Virginia State Bar
> District of Columbia Bar

Matthew H. Sorensen focuses his practice on the areas of labor and employment law and commercial litigation. Mr. Sorensen has successfully defended businesses and executives in numerous employment-related disputes in state and federal courts throughout the United States. He has extensive experience defending individual and class lawsuits involving wage and hour, discrimination, retaliation, and "whistleblower" claims. He has also litigated numerous cases involving non-compete agreements and other employment-related contracts. In addition, Mr. Sorensen represents businesses and executives in employment-related investigations by state and federal agencies, including the Equal Employment Opportunity Commission ("EEOC"), the Office of Federal Contract Compliance Programs ("OFCCP"), the Department of Labor, and the National Labor Relations Board ("NLRB").

Mr. Sorensen is an experienced commercial litigator. He has successfully resolved numerous cases involving commercial contracts, misappropriation of trade secrets, unfair competition, defamation, fraud, and other business torts. He has also defended businesses (particularly those in the hospitality and retail industries) in a number of cases involving claims of discrimination and denial of access under Title III of the Americans With Disabilities Act.

In addition to his litigation practice, Mr. Sorensen works with companies to find practical, cost-effective strategies to their workforce problems. He routinely advises clients and conducts management training seminars on compliance with federal and state labor and employment laws, including the FLSA, Title VII, the ADEA, the ADA, the WARN Act, and the NLRA. He also prepares employment and non-compete agreements, develops personnel policies and employee handbooks, and advises clients on best practices for hiring, firing and managing employees. Additionally,

› Federal Bar Association

› American Staffing Association

› Virginia Hospitality and Travel Association

/////////////////////////

## Education

› J.D., University of Chicago Law School

 – *Edwin F. Mandel Legal Aid Clinic Employment Discrimination Project*— Student Attorney

› B.A., Haverford College

Mr. Sorensen conducts internal investigations on wage and hour issues as well as claims of sexual harassment, discrimination, retaliation and other misconduct.

## Practice Notes

› Successfully moved to dismiss multi-million dollar wage and hour collective action in the Eastern District of Virginia.

› Obtained dismissal by jury of multi-million dollar retaliatory discharge claim.

› Obtained dismissal of sexual harassment lawsuit against federal government contractor on demurrer.

› Obtained dismissal of retaliation and defamation claims against firearms manufacturer.

› Obtained summary judgment in favor of telecommunications company in wage and hour, discrimination and retaliation lawsuit brought by former executive.

› Obtained summary judgment in favor of homebuilding company in pregnancy discrimination lawsuit.

› Obtained favorable judgment following bench trial of ADA Title III lawsuit against a national restaurant chain.

› Numerous favorable settlements of disputes involving wage and hour claims, discrimination claims, commercial contracts, non-compete agreements, misappropriation of trade secrets, unfair competition and other business torts.

## Publications

› Matthew H. Sorensen, *Deadline for Compliance with New ADA Accessibility Rules Approaching*, Resort Hotel Association Newsletter.

› Matthew H. Sorensen, *Tennessee Appellate Court Holds Tips Are Not Earnings Subject to Garnishment*, Practical Law Company Legal Update (March 30, 2012).

Matthew H. Sorensen, et al., *Environmental Whistleblowers and the Eleventh Amendment: Employee Protection or State Immunity?* Tulane Environmental Law Journal (Winter 2001).

## Presentations

Speaker, *Hotels and Restaurants Targeted in Government and Private Enforcement Efforts*, Virginia Beach Hotel & Motel Association (May, 2012).

Speaker, *Don't Be Caught Unprepared: What Hospitality Businesses Need To Know About The 2010 ADA Standards and Effective Labor Relations*, Northern Virginia Hotel Council (April, 2012).

Speaker, *Navigating the Murky Waters of Wage and Hour Compliance*, Virginia Hospitality and Travel Association (Spring Meeting, 2012).

Speaker, *Avoiding Traps for the Unwary: Top Labor and Employment Law Issues for Hotel Managers to Watch in 2012*, Northern Virginia Hotel Council (February, 2012).



# Patrick J. McDonald
**PARTNER**



☎ **(703) 460-9344**

**Email**

✉ (mailto:pmcdonald@cameronmcevoy.com)

/////////////////////////

**Recognition**



❯ Super Lawyers – Rising Star
2019

/////////////////////////

**Bar Admissions**

❯ Virginia
❯ U.S. District Court, Eastern
District of Virginia

/////////////////////////

**Professional Activities**

❯ Virginia State Bar

Patrick J. McDonald is a partner in the firm whose practice is focused on complex commercial disputes, with expertise in matters involving contracts, construction, wills, trust and estates, labor and employment, real estate, commercial landlord-tenant, intellectual property, corporate governance and fiduciary disputes, "business divorces" and various other forms of complex business disputes.  Mr. McDonald has tried cases and regularly appears in both the federal and state courts in Virginia, and represents his clients in arbitration and mediation as well.  Mr. McDonald is dedicated to obtaining the best result for his clients, whether through court, alternative dispute resolution or informal negotiation.   Though his focus is on dispute resolution, Mr. McDonald also advises his clients on contract negotiation and in other business matters.

Mr. McDonald is admitted to practice in the state courts of the Commonwealth of Virginia as well as the United States District Court for the Eastern District of Virginia and the United States Court of Appeals for the Fourth Circuit.  He has been specially admitted in various cases in Maryland and the District of Columbia, including both federal and state courts.

Originally from the Philadelphia area, Mr. McDonald resides in Northern Virginia with his wife and two children.  He obtained his Bachelor of Arts degree in Politics from Princeton University and obtained his Juris Doctorate from the George Mason University School of Law, cum laude, where he served as the Senior Notes Editor for the George Mason Civil Rights Law Journal.  Before entering private practice, Mr. McDonald served as a judicial law clerk to the Honorable Judges of the Circuit Court of Arlington County, Virginia. He also served as a judicial intern to the Honorable Dennis J. Smith of the Fairfax County Circuit Court in Fairfax, Virginia.  He is a member of the Fairfax Bar Association

Exhibit F - 017

> Fairfax Bar Association

> Virginia Bar Association

//////////////////////////

**Education**

> J.D., George Mason University School of Law, Cum Laude

    – *George Mason University Civil Rights Law Journal* – Senior Notes Editor

> B.A., Princeton University

and the Arlington Bar Association, serving as a board member for the Arlington Bar's Young Lawyers Section. Mr. McDonald has been selected as "Rising Star" by Thomson-Reuters' SuperLawyers for 2019.

Away from the office, Mr. McDonald likes to spend his free time with his family and is an avid sports fan.

## Practice Focus

> Complex Commercial Litigation

> Employment Law

> Business Torts

> Congressional Hearings & Investigations

## Publications

> Patrick J. McDonald, *Cerqueira v. American Airlines: What are the Appropriate Limits of an Air Carrier's Permissive Refusal Power?*, 20 Geo. Mason U. Civ. Rts. L.J. 111 (2009)

Daniel E. Ingersoll Cameron McEvoy, PLLC



# Daniel E. Ingersoll
**PARTNER**



📞 **703-460-9356**

**Email**
✉ (mailto:dingersoll@cameronmcevoy.com)

///////////////////////

**Recognition**

> 2019, *Virginia Super Lawyers –* Rising Star – Mergers & Acquisitions
> 2019, *Washington D.C. Super Lawyers* – Rising Star – Mergers & Acquisitions
> 2015, 2016, 2019 *Virginia Business* magazine, "Legal Elite" – Corporate Counsel
> 2017, *Virginia Business* magazine, "Legal Elite" – Business Law

///////////////////////

**Bar Admissions**

> Virginia
> District of Columbia

///////////////////////

**Professional Activities**

Daniel Ingersoll is a corporate and transactional business law attorney. He represents businesses and the individuals behind those businesses in all aspects of planning and operations.

Specifically, his practice expertise focuses on mergers and acquisitions, capital raising (equity and debt structured transactions), executive equity incentive compensation, business entity formation and growth, business succession planning, corporate partnering transactions, and all nature of general corporate and tax law issues as arise in the operation of a business. He brings particular expertise in sectors such as government contracts, general and specialty trade construction, technology, commercial consulting services, hospitality, and more. Having worked with businesses of vastly disparate revenue sizes and in vastly different stages of the corporate life cycle, Mr. Ingersoll seeks to take a wholistic view of the business and work together with its owners to achieve profitable and successful outcomes.

Mr. Ingersoll has been named among Virginia's *Legal Elite* in the areas of Corporate Counsel and Business Law by Virginia Business Magazine and has been recognized by his peers as a *Super Lawyer* in Mergers and Acquisitions in Virginia and Washington, D.C.. He received a Securities and Financial Regulation LLM degree from Georgetown University, a Juris Doctorate legal degree from the University of Richmond, and a Bachelor of Arts degree in English at the University of Virginia.

**Practice Focus**

> Corporate Law

> Tax Law

American Bar Association

Virginia State Bar Association

Fairfax County Bar Association

//////////////////////

**Education**

LL.M., Securities Law, Georgetown University Law Center, 2014

J.D., *cum laude* , University of Richmond, 2009

B.A., University of Virginia, 2003

Mergers & Acquisitions

Securities

Tax & Finance: Business

## Publications

New Securities and Exchange Commission (SEC) Rules Open Up Crowdfunding Opportunities Amongst Accredited Investors ( July 24, 2013 )

Traps and Concerns in Using Intentionally Defective Grantor Trusts ( August 23, 2012 )

Eric S. Waldman - Cameron McEvoy PLLC



# Eric S. Waldman

**PARTNER**



☎ **(703) 460-9349**

**Email**
✉ (mailto:ewaldman@cameronmcevoy.com)

////////////////////////

**Recognition**



> Super Lawyers Rising Star 2019-2020, Virginia and Washington, D.C.
> Super Lawyers Rising Star 2013-2016, New York Metro

////////////////////////

**Bar Admissions**

> Virginia
> District of Columbia
> Maryland
> New Jersey
> New York

During law school, Mr. Waldman served as an executive editor of the Syracuse Science and Technology Law Reporter and judicial extern for Judge Eugene H. Austin of the New Jersey Superior Court in Bergen County.

### Practice Focus

> Commercial Litigation
> Banking & Debtor/Creditor Litigation
> Construction Litigation

> Corporate Litigation
> Real Estate Litigation
> Commercial Landlord-Tenant Litigation

## Practice Notes

> Secured numerous favorable outcomes and settlements for a client bank to recover amounts relating to delinquent loans through litigation and the exercise of the bank's security interests.

> Secured several favorable outcomes and settlements for a student loan servicer client in defending claims by borrowers.

> Successfully defended at trial a defamation lawsuit between members of a non-profit association.

> Successfully defended private bank against a customer's unauthorized trading claims in a federal court bench trial. Represented one of the largest financial institutions in the U.S. in dozens of banking and credit card disputes.

Exhibit F - 021

https://www.cameronmcevoy.com/attorneys/eric-waldman/ 1/2

› U.S. Court of Appeals, Fourth
Circuit

› U.S. Court of Appeals, Second
Circuit

› U.S. District Court, Eastern
District of Virginia

› U.S. District Court, District of
Maryland

› U.S. District Court, District of
Columbia

› U.S. District Court, Southern
District of New York

› U.S. District Court, Eastern
District of New York

› U.S. District Court, District of
New Jersey

///////////////////////////

**Professional Activities**

› Fairfax Bar Association

› Virginia Trial Lawyers
Association

///////////////////////////

**Education**

› J.D., Syracuse University
College of Law

– *Executive Editor, Syracuse
Science and Technology Law
Reporter*

› B.A., George Washington
University

› FINRA Arbitration award of $3.6 million to client investor relating
to options and swaps trading claims against broker-dealer.

› Successfully defended magazine publisher in suit by former
senior executive alleging breach of contract and demanding
payment of severance compensation.

› Secured favorable settlements for private bank in customer
arbitrations relating to trading losses incurred during the 2008
financial crisis.

› Represented individuals and corporations in 28 U.S.C. § 1782
applications to obtain discovery in aid of non-U.S. criminal and
civil proceedings.

## Publications

› Note, *Going Straight: Whether P2P Technology Can Be Legitimized
in the Wake of the Grokster Decision*, 15 SYRACUSE SCI. & TECH. L.
REP. 1 (2006).



# Richard G. Cole III

**ASSOCIATE**



📞 **703-460-9354**

**Email**

✉ (mailto:rcole@cameronmcevoy.com)

//////////////////////////

**Bar Admissions**

› Virginia
› Maryland
› District of Columbia
› United States Court of Appeals, Fourth Circuit
› United States District Court, Eastern District of Virginia
› United States District Court, District of Maryland
› United States District Court, District of Columbia

//////////////////////////

**Professional Activities**

//////////////////////////

**Education**

› J.D.,  Antonin Scalia Law School at George Mason

Rick Cole is an associate attorney, focusing his practice on the areas of commercial litigation and banking & debtor/creditor litigation.

Prior to joining Cameron/McEvoy, Rick served as a law clerk for the Honorable David A. Oblon of the Fairfax Circuit Court, Virginia's busiest trial court. He earned his Juris Doctor from Antonin Scalia Law School at George Mason University, where he was a member of the George Mason Law Review. While in law school, Rick worked for the U.S. Attorney's Office, the U.S. Securities & Exchange Commission, the Maryland Office of the Attorney General, the Alexandria Commonwealth's Attorney's Office, as well as for several private law firms specializing in business and real estate litigation, landlord-tenant disputes, appellate practice, and personal injury.

## Practice Focus

› Commercial Litigation

› Banking & Debtor/Creditor Litigation

## Publications

Comment, *The Constitutional Insecurity of Secured Smartphones*, 39 Univ. of La Verne Law Rev. 173 (Spring 2018)

Exhibit F - 023

› B.A., Dickinson College



# William E. Evans

**ASSOCIATE**



📞 **703-460-9358**

**Email**
✉ (mailto:wevans@cameronmcevoy.com)

///////////////////////////

**Bar Admissions**

> Virginia

> District of Columbia

> U.S. District Court, Eastern District of Virginia

> U.S. Bankruptcy Court, Eastern District of Virginia

> U.S. Court of Appeals, District of Columbia Circuit

> U.S. Court of Appeals, Second Circuit

> U.S. Court of Appeals, Fourth Circuit

///////////////////////////

**Professional Activities**

> Virginia State Bar Association

> Fairfax County Bar Association

///////////////////////////

William ("Will") Evans is a litigator and trial attorney who represents clients in a wide range of civil matters, both in and out of court.

Mr. Evans helps his clients protect their rights and find solutions in difficult situations. He regularly advises on and litigates disputes involving contracts, business torts (such as breach of fiduciary duty and fraud), real estate, commercial lending, creditors' rights (including adversary proceedings in bankruptcy), insurance coverage, and employment.

Mr. Evans represents clients in state and federal court, including bankruptcy court and appellate proceedings, as well as in alternative dispute resolution (such as mediation and arbitration). He has tried numerous civil cases, including both jury and bench trials.

Prior to joining Cameron McEvoy in October 2020, Mr. Evans was an attorney at an AmLaw 100 law firm, where he represented clients that included publicly-traded and Fortune 500 companies.

## Practice Focus

> Commercial Litigation

> Corporate Litigation

> Construction Litigation

> Banking & Debtor/Creditor Litigation

> Labor and Employment Disputes

## Practice Notes

Exhibit F - 025

**Education**

> J.D., Georgetown University Law Center
> - *The Tax Lawyer*, Executive Editor

> B.S., Duke University

> Represented businesses in a variety of commercial disputes, including breach of contract and business torts (such as breach of fiduciary duty and fraud), and obtained favorable verdicts and out-of-court settlements.

> Represented residential and commercial property owners in construction disputes with contractors and architects and in disputes over ownership rights to real properties.

> Represented banks in a variety of matters, including enforcing the bank's rights in collateral and defending against contract and tort claims asserted by borrowers.

> Represented employers in a variety of employment disputes including claims under the ADA, FLSA, FMLA, and state law.

> Defended and advanced claims arising in connection with corporate mergers.

> Represented investors, owners, and developers of Low Income Housing Tax Credit projects in a variety of disputes, including disputes related to financial misconduct, ownership rights to the projects, and contractual rights among the parties.

> Represented owners of a small business accused of misconduct by another owner and negotiated their departure from the company without litigation.

> Represented a local business in asserting claims under state law and ERISA against former corporate officers and ESOP trustees that resulted in a favorable settlement.

> Obtained settlement of a personal injury lawsuit against a local business and obtained substantial settlement contributions from an insurance company that repeatedly denied coverage and a property management company that denied responsibility.

> Represented the owner of a power plant in federal court and before FERC in connection with the failure of a state agency to act on permit requests for a natural gas pipeline, ultimately allowing construction of the pipeline to proceed. *Millennium Pipeline Co., LLC v. Seggos,* 860 F.3d 696 (D.C. Cir. 2017).

> Obtained judgment in favor of an investment bank for both its fees owed in connection with a commercial transaction and its

William E. Evans – Cameron McEvoy PLLC

attorneys' fees incurred in obtaining the judgment. *Seale & Associates, Inc. v. Ingersoll-Rand Co.*, 2016 WL 4435083 (E.D. Va. Aug. 16, 2016).

› Successfully defended a title insurer in state supreme court on an issue of first impression. *REVI, LLC v. Chicago Title Ins. Co.*, 290 Va. 203, 776 S.E.2d 808 (2015).

## Publications

› "Practitioners Beware: Pitfalls Created by Virginia's New Business Records Statute," Virginia Lawyer Magazine (the official publication of the Virginia State Bar), August 2015



# Kathryn G. Humphrey
**ASSOCIATE**



☎ **703-460-9359**
**Email**
✉ (mailto:khumphrey@cameronmcevoy.com)

///////////////////////

**Bar Admissions**
› Virginia
› Maryland

///////////////////////

**Professional Activities**
› Virginia State Bar Association
› Fairfax Bar Association

///////////////////////

**Education**
› JD, Washington & Lee
  University School of Law
› BA, Bucknell University

Kathryn Humphrey is a skilled and dedicated trial attorney. Kathryn has spent her career advocating for others in the courtroom. She brings her extensive courtroom and advocacy experience to Cameron/McEvoy's litigation practice.

Prior to joining the firm, Kathryn was a prosecutor in both Fairfax County, Virginia and Anne Arundel County, Maryland. Kathryn managed a high-volume felony caseload with a focus on adult and child sexual abuse. Kathryn's trial experience includes over two hundred bench trials and eighteen jury trials. Additionally, Kathryn served as a law clerk for the Honorable H. James West on the Circuit Court of Charles County, Maryland. While clerking, Kathryn learned how judges evaluate a case during motions and trial, a powerful strategic skill.

Kathryn attended Washington and Lee University, School of Law. While in law school, Kathryn clerked for the U.S. Attorney's Office for the Western District of Virginia and for the Honorable Shirley M. Watts, currently a justice on Maryland's highest court. Prior to law school, Kathryn graduated *cum laude* from Bucknell University with a double major in international relations and geography and a Spanish minor. She is admitted to practice in both Virginia and Maryland.

## Practice Focus

› Commercial Litigation

› Banking & Debtor/Creditor
  Litigation



# Ithi H. Joshi
**ASSOCIATE**



Ithi Joshi is an associate attorney with a specialization in corporate, transactional, and employment law. She represents and serves entrepreneurs and businesses in all phases of formation, operations, and growth. Prior to joining Cameron McEvoy, Ms. Joshi was an attorney with a national law firm specializing in M&A transactions. She is multilingual and a Northern Virginia native.

℡  **703-460-9357**

**Email**

✉  (mailto:ijoshi@cameronmcevoy.com)

///////////////////////

**Bar Admissions**

Virginia

///////////////////////

**Professional Activities**

› Virginia Bar Association, Development Editor of Opening Statement (YLD Newsletter)
› Fairfax Bar Assocation
› South Asian Bar Association – DC

///////////////////////

**Education**

› JD, Temple University
› BA, University of Virginia

## Practice Focus

› Corporate Law

› Mergers & Acquisitions

› Employment Law

Exhibit F - 029

John P. Dedon | Cameron McEvoy PLLC



# John P. Dedon

**OF COUNSEL**



☎ **703-460-9351**

**Email**
✉ (mailto:jdedon@cameronmcevoy.com)

////////////////////////

**Recognition**

Fellow of the American College of Trust and Estate Counsel (ACTEC)

Martindale-Hubbell AV Rating/Top Rated Estate and Taxation Lawyer

Consecutive years named Washingtonian Best Lawyers; Best Lawyers in America® for Trusts and Estates; Washingtonian Magazine's Top Wealth/Financial Advisor; Top Lawyer and Top Financial Professional by Northern Virginia Magazine



John P. Dedon is a tax lawyer with a talent for explaining the complexities of tax law in lay terms. Working in the estate planning, asset protection and business areas for more than 35 years, John helps clients preserve assets and plan for the future with traditional planning tools, including Trusts (dynasty trusts, intentionally defective trusts, grantor retained annuity trusts), LLC and partnership entities, and cutting- edge concepts such as cryonic preservation trusts. John also works extensively in the charitable area, creating public and private charities, remainder and lead trusts, supporting organizations, and churches.

John has been quoted extensively in newspapers throughout the country, including the Wall Street Journal, Washington Post, and Chicago Tribune. He has written numerous articles for professional journals and publications on tax issues and speaks on tax matters and wealth preservation issues for health care providers, certified public accountants, lawyers, financial planners, and the public. He is also the author of the blog, Dedon on Estate Planning, a regularly updated discussion of estate planning topics affecting Virginia residents and U.S. citizens.

Visit John's blog at DedonOnEstatePlanning.com (http://DedonOnEstatePlanning.com)
.

## Practice Focus

› Estate Planning

› Tax Planning and Controversy

› Wealth Preservation

› Asset Protection

› Corporate and Business Planning

160

Exhibit F - 030



**Bar Admissions**

> Virginia
> U.S. Tax Court
> U.S. Claims Court
> U.S. District Court, Eastern District of Virginia

///////////////////////

**Professional Activities**

> Fairfax Bar Association
> Virginia Bar Association
> Board, Member

///////////////////////

**Education**

> LL.M., Taxation, Georgetown University Law Center
> J.D., New England School of Law (*Cum Laude*)
> B.A., The George Washington University, *with Honors*

## Publications

> Preserving Assets in Trusts for Clients Considering Cyronics, Estate Planning magazine, August 2018

> The "Simple" Private Foundation – Changing One Life at a Time, Estate Planning magazine, May 2018

> Cautionary Guidance for Operating a Private Foundation, Estate Planning magazine (2016)

> Integrating Income Taxes in Modern Estate Planning Decisions—A Case Study, Tax Management Estate, Gifts and Trusts Journal (2016)

> Attorney Advises Medical Professionals on Estate Planning (2016)

## Presentations

> Essentials of Estate Planning: Is There a Paradigm Shift, Loudoun County Bar, Oct. 2017

> Which Dragon Do We Slay? The Interplay of Income Tax planning and Drafting Wills and Trusts, Virginia Bar Association, July 2017

> Estate Planning Issues and Concerns, Fairfax County Bar, May 2017

> Estate Planning Issues and Solutions, Cypress International, July 2016