**VIRGINIA:**

FILED
CIVIL INTAKE

**IN THE CIRCUIT COURT OF FAIRFAX COUNTY** 19 MAR -1  PM 12: 48

JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

|  |  |
|---|---|
| **John C. Depp, II,** | ) |
|  | ) |
| **Plaintiff,** | ) |
| v. | ) Civil Action No. 2019 02911 |
|  | ) |
| **Amber Laura Heard,** | ) |
|  | ) |
| **Defendant.** | ) |

### COMPLAINT

Plaintiff John C. Depp, II, a/k/a Johnny Depp, in support of his Complaint against Defendant Amber Laura Heard hereby states the following:

### NATURE OF THE ACTION

1.      This defamation action arises from an op-ed published in the *Washington Post* by actress Amber Heard ("Ms. Heard"). In the op-ed, Ms. Heard purported to write from the perspective of "a public figure representing domestic abuse" and claimed that she "felt the full force of our culture's wrath for women who speak out" when she "spoke up against sexual violence."

2.      Although she never identified him by name, the op-ed plainly was about (and other media consistently characterized it as being about) Ms. Heard's purported victimization after she publicly accused her former husband, Johnny Depp ("Mr. Depp"), of domestic abuse in 2016, when she appeared in court with an apparently battered face and obtained a temporary restraining order against Mr. Depp on May 27, 2016. The op-ed depended on the central premise that Ms. Heard was a domestic abuse victim and that Mr. Depp perpetrated domestic violence against her.

**Exhibit 1**

3.      The op-ed's clear implication that Mr. Depp is a domestic abuser is categorically and demonstrably false. Mr. Depp never abused Ms. Heard. Her allegations against him were false when they were made in 2016. They were part of an elaborate hoax to generate positive publicity for Ms. Heard and advance her career. Ms. Heard's false allegations against Mr. Depp have been conclusively refuted by two separate responding police officers, a litany of neutral third-party witnesses, and 87 newly obtained surveillance camera videos. With a prior arrest for violent domestic abuse and having confessed under oath to a series of violent attacks on Mr. Depp, Ms. Heard is not a victim of domestic abuse; she is a perpetrator. Ms. Heard violently abused Mr. Depp, just as she was caught and arrested for violently abusing her former domestic partner.

4.      Ms. Heard's implication in her op-ed that Mr. Depp is a domestic abuser is not only demonstrably false, it is defamatory *per se*. Ms. Heard falsely implied that Mr. Depp was guilty of domestic violence, which is a crime involving moral turpitude. Moreover, Ms. Heard's false implication prejudiced Mr. Depp in his career as a film actor and incalculably (and immediately) damaged his reputation as a public figure.

5.      Unsurprisingly, Mr. Depp's reputation and career were devastated when Ms. Heard first accused him of domestic violence on May 27, 2016. Ms. Heard's hoax allegations were timed to coincide with the day that Mr. Depp's film, *Alice Through the Looking Glass*, was released in theatres. Her op-ed, with its false implication that she was a victim of domestic violence at the hands of Mr. Depp, brought new damage to Mr. Depp's reputation and career. Mr. Depp lost movie roles and faced public scorn. Ms. Heard, an actress herself, knew precisely the effect that her op-ed would have on Mr. Depp. And indeed, just four days after Ms. Heard's op-ed was first published on December 18, 2018, Disney announced on December 22, 2018 that

2

**Exhibit 1**

it was dropping Mr. Depp from his leading role as Captain Jack Sparrow—a role that he created—in the multi-billion-dollar-earning *Pirates of the Caribbean* franchise.

6.     Ms. Heard published her op-ed with actual malice. She knew that Mr. Depp did not abuse her and that the domestic abuse allegations that she made against him in 2016 were false. She knew that the testimony and photographic "evidence" that she presented to the court and the supporting sworn testimony provided by her two friends were false and perjurious. Ms. Heard knew that the truth was that she violently abused Mr. Depp—just as she violently abused her prior domestic partner, which led to her arrest and booking for domestic violence, as well as a night in jail and a mug shot. Ms. Heard revived her false allegations against Mr. Depp in the op-ed to generate positive publicity for herself and to promote her new movie *Aquaman*, which premiered across the United States and in Virginia only three days after the op-ed was first published.

7.     Mr. Depp brings this defamation action to clear his name. By this civil lawsuit, Mr. Depp seeks to restore his reputation and establish Ms. Heard's legal liability for continuing her campaign to push a false narrative that he committed domestic violence against her. Mr. Depp seeks an award of compensatory damages for the reputational harm that he suffered as a result of Ms. Heard's op-ed, with its false and defamatory implication that Mr. Depp was a domestic abuser. Further, given the willfulness and maliciousness that Ms. Heard demonstrated when she knowingly published the op-ed with the false implication that Mr. Depp violently abused her, Mr. Depp also seeks an award of punitive damages.

## PARTIES

8.     Plaintiff John C. Depp is an individual and a resident of the State of California. For decades, he has been one of the most prominent actors in Hollywood. Mr. Depp was married

3

Exhibit 1

to Ms. Heard for approximately 15 months between February 1, 2015 and May 23, 2016. They had no children together. Mr. Depp was the target of Ms. Heard's false and defamatory op-ed in the *Washington Post*.

9.       Defendant Amber Laura Heard is an individual and a resident of the State of California. Ms. Heard is an actress and Mr. Depp's former wife. Ms. Heard authored and published the defamatory op-ed in the *Washington Post* that falsely implied that Mr. Depp abused her during their marriage.

## JURISDICTION AND VENUE

10.      This Court has specific personal jurisdiction over Defendant under Virginia's long-arm statute, Va. Code § 8.01-328.1, as well as under the Due Process Clause of the U.S. Constitution, because, among other things, the causes of action in this Complaint arise from Defendant transacting business in this Commonwealth and causing tortious injury by an act or omission in this Commonwealth. Moreover, exercising jurisdiction would not offend traditional notions of fair play and substantial justice because Defendant could have --- indeed should have --- reasonably foreseen being haled into a Virginia court to account for her false and defamatory op-ed which was published: in a newspaper that is printed in Springfield, Virginia; in an online edition of the newspaper that is created on a digital platform in Virginia and routed through servers in Virginia; in a newspaper that has wide circulation in Virginia and even publishes a Virginia local edition in which the false and defamatory op-ed appeared; and in a newspaper that maintains two physical offices in Virginia.   Further, Defendant published the false and defamatory op-ed to promote her new movie which was in Virginia theatres for viewing by Virginia audiences.

4

**Exhibit 1**

11.     Venue is proper in this circuit under Va. Code § 8.01-262 because the causes of action asserted herein arose in this Circuit.

## FACTS

### Ms. Heard Wrote An Op-Ed In The *Washington Post* That Implies That She Was A Victim Of Domestic Abuse At The Hands Of Mr. Depp

12.     Mr. Depp has appeared in more than 50 films over the last three decades. He has worldwide name recognition and has played a diverse array of iconic roles, including Edward Scissorhands, Willy Wonka, Captain Jack Sparrow, The Mad Hatter, Grindelwald, John Dellinger, and Whitey Bulger. His movies have grossed over $10 billion dollars in the United States and around the world. He has won the People's Choice Award 14 times.

13.     Mr. Depp married Ms. Heard on February 1, 2015. The two met when Ms. Heard was cast in Mr. Depp's film *The Rum Diary*.

14.     The marriage lasted only 15 months.

15.     Unbeknownst to Mr. Depp, no later than one month after his marriage to Ms. Heard, she was spending time in a new relationship with Tesla and Space-X founder, Elon Musk. Only one calendar month after Mr. Depp and Ms. Heard were married—while Mr. Depp was out of the country filming in March 2015—Eastern Columbia Building personnel testified that Ms. Heard received Musk "late at night" at Mr. Depp's penthouse. Specifically, Ms. Heard asked staff at the Eastern Columbia Building to give her "friend Elon" access to the building's parking garage and the penthouse elevator "late at night," and they testified that they did so. Building staff would then see Ms. Heard's "friend Elon" leaving the building the next morning. Musk's first appearance in Mr. Depp's penthouse occurred shortly after Ms. Heard threw a vodka bottle at Mr. Depp in Australia, when she learned that Mr. Depp wanted the couple to enter into a post-

**Exhibit 1**

nuptial agreement concerning assets in their marriage. Ms. Heard's violently aimed projectile virtually severed Mr. Depp's middle finger on his right hand and shattered the bones.

16. Mr. Depp's marriage to Ms. Heard came to an end in May 2016. After Mr. Depp indicated to Ms. Heard that he wanted to leave the marriage, Ms. Heard lured Mr. Depp to his penthouse to pick up his personal items. Unaware that members of Mr. Depp's security team (including an 18-year veteran of the Los Angeles County Sherriff's Department) were mere feet away, Ms. Heard falsely began yelling "stop hitting me Johnny." The interaction culminated with Ms. Heard making false allegations that Mr. Depp struck her with a cell phone, hit her, and destroyed the penthouse. There were multiple eyewitnesses to this hoax. Ms. Heard's friend then called the police, who arrived promptly. Upon their arrival, Ms. Heard refused to cooperate with police or make any claims that she had been injured or assaulted, and two domestic abuse trained police officers testified that after close inspection of Ms. Heard and the penthouses, they observed no injury to Ms. Heard or damage to the penthouses. But then, six days later, Ms. Heard presented herself to the world with a battered face as she publicly and falsely accused Mr. Depp of domestic violence and obtained a restraining order against him, based on false testimony that she and her friends provided.

17. Now there are newly obtained surveillance camera videos, depositions, and other evidence that conclusively disprove Ms. Heard's false allegations. Although much of this exculpatory evidence was collected by certain members Mr. Depp's then-legal team in 2016, it only recently came into Mr. Depp's possession, as it had been hidden from him for a period of years.

18. Ms. Heard later withdrew her false domestic violence allegations and dismissed the restraining order. She and Mr. Depp finalized their divorce in January 2017.

6

**Exhibit 1**

19.     Despite dismissing the restraining order and withdrawing the domestic abuse allegations, Ms. Heard (and her surrogates) have continuously and repeatedly referred to her in publications, public service announcements, social media postings, speeches, and interviews as a victim of domestic violence, and a "survivor," always with the clear implication that Mr. Depp was her supposed abuser.

20.     Most recently, in December 2018, Ms. Heard published an op-ed in the *Washington Post* that falsely implied that Ms. Heard was a victim of domestic violence at the hands of Mr. Depp. The op-ed was first published on the *Washington Post's* website on December 18, 2018 with the title, "Amber Heard: I spoke up against sexual violence — and faced our culture's wrath. This has to change." The op-ed appeared again on December 19, 2018 in the *Washington Post's* hardcopy edition under the title, "A Transformative Moment For Women." Except for their titles, the online and hard copy versions of the op-ed were substantively identical and are referred to collectively herein as the "Sexual Violence" op-ed.

21.     The "Sexual Violence" op-ed's central thesis was that Ms. Heard was a victim of domestic violence and faced personal and professional repercussions because she "spoke up" against "sexual violence" by "a powerful man."

22.     Although Mr. Depp was never identified by name in the "Sexual Violence" op-ed, Ms. Heard makes clear, based on the foundations of the false accusations that she made against Mr. Depp in court filings and subsequently reiterated in the press for years, that she was talking about Mr. Depp and the domestic abuse allegations that she made against him in May 2016. Ms. Heard wrote:

- "Amber Heard: I spoke up against sexual violence — and faced our culture's wrath. That has to change."

7

**Exhibit 1**

- "Then two years ago [the precise time frame of her allegations against and divorce from Mr. Depp], I became a public figure representing domestic abuse, and I felt the full force of our culture's wrath for women who speak out."

- "I had the rare vantage point of seeing, in real time, how institutions protect men accused of abuse."

- "I write this as a woman who had to change my phone number weekly because I was getting death threats. For months, I rarely left my apartment, and when I did, I was pursued by camera drones and photographers on foot, on motorcycles and in cars. Tabloid outlets that posted pictures of me spun them in a negative light. I felt as though I was on trial in the court of public opinion — and my life and livelihood depended on myriad judgments far beyond my control."

23.     As these statements reflect, the whole op-ed proceeds from the notion—presented as an unassailable truth—that Ms. Heard was the victim of domestic violence at the hands of Mr. Depp. She was not. Ms. Heard is not a victim of domestic violence, and Mr. Depp is not a perpetrator of domestic violence. And the centerpiece of Ms. Heard's attention-seeking hoax— her claim that Mr. Depp savagely injured her face by throwing her own iPhone at her from point blank range as hard as he could and then continued to beat her face with other "appendages of his body" on the evening of May 21, 2016, which caused her to have the battered face that she first presented to the court and the world on May 27, 2016—was a poorly executed lie that nevertheless has endured for nearly three years. The statements in her "Sexual Violence" op-ed that imply otherwise are false and defamatory.

**Ms. Heard Was Not A Victim Of Domestic Violence: She Was A Perpetrator**

24.     Long before Ms. Heard became a self-described "public figure representing domestic abuse" based on her false domestic violence allegations against Mr. Depp, Ms. Heard was in an abusive relationship. But Ms. Heard was not the victim in that relationship. She was the abuser.

8

**Exhibit 1**

25. On September 14, 2009, police officers at the Seattle-Tacoma International Airport witnessed Ms. Heard physically assault her then-domestic partner, Tasya van Ree. Ms. Heard grabbed Ms. van Ree by the arm, hit Ms. van Ree in the arm, and yanked Ms. van Ree's necklace off her neck. Ms. Heard was arrested. She was booked for misdemeanor domestic violence, a mug shot was taken of her, and she spent the night in jail. The following day, the Seattle-based prosecutor declined to press charges against Ms. Heard, but only because both she and her domestic abuse victim were California residents who were merely passing through Washington state.

26. Since casting herself as a domestic abuse victim, Ms. Heard has attempted to blame misogyny and homophobia for her domestic violence arrest—claiming that she was arrested "on a trumped up charge" because she was in a same-sex relationship. In truth, the police officer who arrested Ms. Heard for domestic violence was both a woman and a lesbian activist, who publicly said so after she was publicly disparaged by Ms. Heard.

27. Ms. Heard's violent domestic abuse did not end when her relationship with Ms. van Ree ended. Ms. Heard committed multiple acts of domestic violence against Mr. Depp during their marriage. Ms. Heard's physical abuse of Mr. Depp is documented by eyewitness accounts, photographs, and even Ms. Heard's own admissions under oath.

28. In one particularly gruesome episode that occurred only one month into their marriage, Ms. Heard shattered the bones in the tip of Mr. Depp's right middle finger, almost completely cutting it off. Ms. Heard threw a glass vodka bottle at Mr. Depp—one of many projectiles that she launched at him in this and other instances. The bottle shattered as it came into contact with Mr. Depp's hand, and the broken glass and impact severed and shattered Mr.

9

**Exhibit 1**

Depp's finger. Mr. Depp's finger had to be surgically reattached. Ms. Heard then disseminated false accounts of this incident, casting Mr. Depp as the perpetrator of his own injury.

29.     Ms. Heard's domestic abuse of Mr. Depp continued unabated throughout their 15-month marriage. Ms. Heard threw dangerous objects at Mr. Depp, and also kicked and punched him with regularity.

30.     Shockingly, Ms. Heard even has used one of her attacks on Mr. Depp to push her false narrative that she is a domestic abuse victim. In her false affidavit to obtain a restraining order against Mr. Depp, Ms. Heard recounted a domestic violence incident that occurred between her and Mr. Depp on April 21, 2016 and reversed the roles, claiming that she was the victim when in truth she was the perpetrator. Ms. Heard falsely claimed that Mr. Depp physically attacked her, threw glasses at her, and broke a champagne bottle in their penthouse after her thirtieth birthday celebration on April 21, 2016. In truth, Ms. Heard—angry with Mr. Depp because he was late to her birthday celebration due to a business meeting — punched Mr. Depp twice in the face as he lay in bed reading, forcing him to flee their penthouse to avoid further domestic violence at the hands of Ms. Heard. Mr. Depp's security detail member, Sean Bett (an 18-year veteran of the Los Angeles County Sherriff's Department) picked up Mr. Depp immediately after Ms. Heard assaulted him and witnessed firsthand the aftermath and damage to Mr. Depp's face. On other occasions—after Ms. Heard violently attacked Mr. Depp in December 2015—Mr. Bett insisted on taking photographs to document the damage to Mr. Depp's face inflicted by Ms. Heard.

31.     Thus, contrary to the false and defamatory implication in her "Sexual Violence" op-ed, Ms. Heard was never a victim of domestic violence at the hands of Mr. Depp. Ms. Heard herself is a domestic abuser, who committed multiple acts of domestic violence against Mr. Depp

10

Exhibit 1

during their marriage, in addition to the domestic abuse that she perpetrated against her former partner.

## Ms. Heard's Domestic Abuse Allegations Against Mr. Depp Are False And Have Been Refuted Conclusively By Police, Neutral Third-Party Witnesses, and 87 Surveillance Videos

32. Ms. Heard did not "[speak] up against sexual violence" as she claimed in her op-ed. She made false allegations of domestic abuse against Mr. Depp to execute her hoax.

33. The centerpiece of Ms. Heard's false abuse allegations is an incident that she claimed took place around 7:15 pm on Saturday, May 21, 2016 at Mr. Depp's penthouse in the Eastern Columbia Building in downtown Los Angeles. After Ms. Heard lured Mr. Depp to pick up personal items from his own penthouse, Ms. Heard, sitting on the sofa with her friend, Raquel Pennington, and talking on the phone with her friend, iO Tillett Wright, claimed that Mr. Depp "grabbed the cell phone, wound up his arm like a baseball pitcher and threw the cell phone at me striking my cheek and eye with great force." Ms. Heard also claimed that Mr. Depp further battered her face with some "appendage of his body" and then used a magnum-sized bottle of wine to destroy the penthouse, spilling wine, broken glass, and other items around the penthouse. "Penthouse 3 was destroyed" by Mr. Depp's bottle swinging, claimed Ms. Heard in her sworn testimony. Her two friends testified accordingly. Ms. Heard used these allegations to obtain a temporary restraining order against Mr. Depp on May 27, 2016, appearing in court six days after the alleged incident with the first appearance of a battered face, notwithstanding that a litany of people witnessed her throughout the week with no injury and building surveillance videos similarly showed her uninjured.

34. Mr. Depp, it is worth noting, left Los Angeles for many weeks almost immediately after the alleged incident. And it is also worth noting that building personnel

11

Exhibit 1

testified under oath that they again facilitated Elon Musk's nighttime visits to Mr. Depp's penthouse to visit Ms. Heard, key-fobbing him in and out of the building proximate to the time Ms. Heard presented her battered face to the public and the court on May 27, 2016.

35.     Mr. Depp has consistently and unequivocally denied Ms. Heard's domestic abuse allegations. They also have been refuted conclusively by multiple, neutral third-party witnesses.

36.     Ms. Heard's friend and neighbor, Isaac Baruch, gave a declaration that he repeatedly interacted with Ms. Heard, at close range, without makeup, and utterly unmarked and uninjured in the days between May 22 and May 27, 2016. He further stated in his declaration that on June 3, after confronting Ms. Heard about how upset he was at her false abuse allegations: "Amber then told me that she did not want anything from Johnny and that it was the lawyers who were doing all of this."

37.     Police went to Mr. Depp's penthouse on May 21, 2016, immediately after the incident was alleged to have occurred. They were dispatched after Ms. Heard's friend, Mr. Wright, called 911 to report what the police dispatch log describes as a "verbal argument only" between a husband and wife. Two officers, who are highly trained in domestic violence, arrived at the penthouse shortly after Ms. Heard later claimed that Mr. Depp struck her in the face with a cell phone, further hit her face, and then "destroyed" his own penthouse by swinging a magnum-sized bottle of wine into other objects throughout that penthouse. Officer Melissa Saenz is a veteran Los Angeles Police officer who is charged with training other police officers and personally has responded to "over a hundred" domestic violence calls. Officer Tyler Hadden is a junior police officer, but focused on domestic violence at the police academy and received extensive training in how to detect that particular crime.

12

**Exhibit 1**

38. Both Officer Saenz and Officer Hadden testified under oath that they closely observed Ms. Heard's face in good light on May 21, 2016 and saw no signs of any injury. In the police officers' face-to-face interactions with Ms. Heard immediately after she supposedly was struck in the face with a cell phone and then further beaten in the face by Mr. Depp, the police officers saw no red marks, no bruising, and no swelling anywhere on Ms. Heard's face. Both Officer Saenz and Officer Hadden also testified under oath that, when they went room-to-room in the penthouses to investigate, they saw no broken glass, no spilled wine, and no vandalism or property damage of any kind. This is in contrast to Ms. Heard's later claim that Mr. Depp "destroyed" penthouse 3 and caused serious, visible injuries to her face. It also directly contradicts Ms. Heard's friend's testimony regarding what Ms. Heard's face looked like at that time: "Just the whole side of her face was like swolled up (sic) and red and puffy . . . and progressively getting worse."

39. There was no probable cause to believe that a crime had been committed, according to Officer Saenz's testimony, because Ms. Heard had no injuries and claimed to have no injuries, and there was no property damage in the penthouse or signs of any altercation.

40. Multiple people who work professionally in the Eastern Columbia Building where the penthouse is located, and who do not know Mr. Depp personally, also have unambiguously debunked Ms. Heard's claim that her face was injured on May 21, 2016 and that she had any sign of injury in the six days before May 27, 2016. Three people, the building's concierge, head of front desk and head of security, profoundly testified under oath about their face-to-face interactions with Ms. Heard between May 22, 2016 (the day after Ms. Heard claims that Mr. Depp hit her and struck her in the eye and on the cheek with a cell phone) and May 27, 2016 (the day Ms. Heard appeared in public and went to court to get a restraining order against Mr. Depp

13

**Exhibit 1**

with what appeared to be a battered face). Every one of those three people testified under oath that they saw Ms. Heard up close in the days after the supposed attack and her face was not injured *before the day she obtained the restraining order against Mr. Depp*.

41. Cornelius Harrell is a concierge at the Eastern Columbia Building and was working at the front desk at 1 pm on the afternoon of Sunday, May 22, 2016. Mr. Harrell saw Ms. Heard face-to-face that afternoon—less than 24 hours after she claims that she was struck in the face by a cell phone thrown by Mr. Depp and hit in the face by Mr. Depp.

42. In an interaction that was also captured by the Eastern Columbia Building's surveillance cameras and saved, Ms. Heard approached Mr. Harrell to pick up a package that had been delivered to her. Ms. Heard accompanied Mr. Harrell to the package room to identify which package she wanted because more than one had been delivered to her. As they were looking through her packages, Mr. Harrell and Ms. Heard were inside the package room together. The package room at the Eastern Columbia Building is "no bigger than a walk-in closet," so Mr. Harrell had an opportunity to observe Ms. Heard's face up close, the day after she claimed she was battered by Mr. Depp in the face.

43. Mr. Harrell testified under oath that, on May 22, 2016, Ms. Heard did not have any bruises, cuts, scratches, or swelling on her face and that "nothing appeared out of the ordinary about Ms. Heard's face on May 22, 2016." In fact, Mr. Harrell testified that he was struck by how "beautiful," "radiant," and "refreshed" Ms. Heard looked, noting that, if she was wearing any makeup at all, it was "minimal." Mr. Harrell unequivocally testified that when he was interacting one-on-one in close quarters with Ms. Heard on May 22, 2016 for about 8 minutes, that he did not see any evidence to suggest that she had been the victim of domestic violence the day before. Mr. Harrell does not know Mr. Depp personally.

14

Exhibit 1

44.     Alejandro Romero also works at the Eastern Columbia Building, manning the front desk and monitoring the security cameras from 4:00 pm to 1:00 am Monday-Friday. Mr. Romero had "hundreds" of in-person interactions with Ms. Heard when she resided in the penthouse, in addition to observing her innumerable times on surveillance footage captured by the Eastern Columbia Building's security cameras. Mr. Romero testified under oath about two specific face-to-face interactions that he had with Ms. Heard in the days after she claimed that Mr. Depp hit her in the face and struck her cheek and eye with a cell phone that he threw.

45.     Mr. Romero testified that on the "Monday or Tuesday" evening "after the police were called"—May 23 or 24, 2016—he was approached at the front desk by Ms. Heard and her friend, Ms. Pennington, who also resided in the penthouse. Ms. Heard and Ms. Pennington asked Mr. Romero to accompany them to the penthouse because they were afraid that someone had tried to get inside the penthouse. Mr. Romero discounted this concern because he had been monitoring security footage and saw no one trying to access the penthouse. Nevertheless, Mr. Romero agreed to accompany Ms. Heard and Ms. Pennington to the penthouse and confirm that it was secure. He left the front desk with Ms. Heard and Ms. Pennington, rode up to the 13th floor with them, and went inside the penthouse with them. Throughout this interaction, Mr. Romero testified under oath that he had "a full shot" of Ms. Heard's face and "a good visual" of Ms. Heard's face and saw no bruises, cuts, swelling, or marks of any kind.

46.     Mr. Romero interacted with Ms. Heard again on the evening of May 25, 2016 when she came to the front desk to retrieve a key to the penthouse that she had left at the front desk. Again, in this face-to-face interaction, Mr. Romero testified that he saw no bruises, cuts, swelling, or marks of any kind on Ms. Heard's face.

15

Exhibit 1

47.     Based on his in-person interactions with Ms. Heard, Mr. Romero, who does not know Mr. Depp personally, testified under oath that he "couldn't believe" Ms. Heard's domestic abuse allegations against Mr. Depp because:

> It was like — it was like I said, we watched the news and we saw the pictures. And I saw the pictures and the next day I saw her, I was like, come on, really? I couldn't believe it. It was — I saw her in person. . . . . The pictures I saw on the news, she got like a big mark on her — on her eyes and her cheek. And when I saw her in person, I didn't see anything.

48.     Trinity Esparza, the daytime concierge at the Eastern Columbia Building who works at the front desk from 8:00 am to 4:00 pm Monday-Friday, echoed Mr. Romero's disbelief at Ms. Heard's account. Ms. Esparza, who does not know Mr. Depp personally, testified under oath that she thought that Ms. Heard's allegation that she had been assaulted by Mr. Depp was "false" because "I saw her several times [in the days after the alleged attack] and I didn't see that [mark] on her face."

49.     Ms. Esparza had multiple face-to-face interactions with Ms. Heard in the days after Ms. Heard claimed that Mr. Depp hit her and struck her in the eye and cheek with a cell phone. Ms. Esparza saw Ms. Heard in-person on Monday, May 23, 2016; Tuesday, May 24, 2016; Wednesday, May 25, 2016; and Friday, May 27, 2016. Ms. Esparza testified under oath that, when she saw Ms. Heard on the Monday, Tuesday, and Wednesday after the alleged attack, Ms. Heard was not wearing makeup and that Ms. Heard had no facial injuries. There were no bruises or cuts on Ms. Heard's face, according to Ms. Esparza's testimony. Ms. Esparza testified under oath that she saw no indication that Ms. Heard had been hit or struck.

50.     Then, on Friday, May 27, 2016, Ms. Esparza testified under oath that Ms. Heard suddenly "had a red cut underneath her right eye and red marks by her eye." Then Ms. Esparza learned from media reports that Ms. Heard had obtained a domestic violence restraining order

16

**Exhibit 1**

against Mr. Depp on May 27, 2016. Because Ms. Esparza had seen Ms. Heard so many times that week without any marks on her face, Ms. Esparza thought "the time didn't add up and so I was questioning . . . the mark on her face and the allegations that were made."

51.     Ms. Esparza was so troubled by the sudden appearance of "a mark" on Ms. Heard's face on *the very day* that Ms. Heard obtained a restraining order against Mr. Depp—but *six days after* the alleged incident—that Ms. Esparza went back and looked at security video footage and talked to others who worked in the Eastern Columbia Building to see if the "mark" might have been on Ms. Heard's face earlier. It wasn't.

52.     Mr. Romero and Mr. Harrell confirmed to Ms. Esparza that Ms. Heard did not have any injuries on her face when they interacted with her.

53.     Ms. Esparza also did not see the "mark" on Ms. Heard's face when she went back and reviewed surveillance videos from the days after Ms. Heard claims that Mr. Depp hit her and struck her in the face with a cell phone that he threw.

54.     But Ms. Esparza did see something else on the surveillance video. On a video from the evening of May 24, 2016, three nights after Ms. Heard alleged that she was attacked by Mr. Depp, Ms. Esparza saw Ms. Heard, her sister, Whitney Heard, and Ms. Heard's friend and corroborating witness, Ms. Pennington, on the mezzanine level of the Eastern Columbia Building. In the surveillance video, Ms. Esparza testified under oath that she saw Whitney Heard pretend to punch her sister in the face. Then Ms. Heard, Ms. Pennington, and Whitney Heard all laughed. Ms. Esparza testified that she thought how Ms. Heard, Ms. Pennington, and Whitney Heard were acting on the surveillance video was "wrong," and it only made her question more how Ms. Heard ended up with a "mark" on her face three days later, on Friday, May 27. Ms. Esparza knew that Mr. Depp had left Los Angeles for work on the day of the

17

**Exhibit 1**

alleged incident "and he did not return and so I was questioning how those marks got on her face on Friday." Ultimately, Ms. Esparza testified under oath that she was forced to conclude that "whatever happened to [Ms. Heard's] face did not happen on Saturday [May 21]", as Ms. Heard had alleged.

55.    Ms. Esparza is not the only professional employee of the Eastern Columbia Building to witness the "fake punch" video. Brandon Patterson, the General Manager of the Eastern Columbia Building, provided a declaration about it:

One of the surveillance videos, taken the evening of Tuesday, May 24, showed Amber Heard, her sister Whitney Heard, and her friend Raquel Pennington entering the building's mezzanine. Trinity Esparza showed me a video at the front desk with a pretend punch to the face from one of Miss Heard's two companions, and the three of them laughed hard. They then enter the penthouse elevator, where Ms. Heard's face was clearly visible, there were similarly no bruises, cuts, redness, swelling visible on Ms. Heard's face.

56.    Later, in the media firestorm concerning Ms. Heard's domestic abuse allegations against Mr. Depp, Ms. Heard learned that there were media reports stating that people who worked at the front desk of the Eastern Columbia Building had seen Ms. Heard without any marks on her face, as indeed was their testimony. Mr. Patterson, the General Manager of the Eastern Columbia Building, summarized the testimony of building staff in his own declaration:

Ms. Heard was repeatedly observed in the Eastern Columbia Building in the multiple days following the alleged assault without bruises, cuts, redness, swelling or any other injuries to her face. These observations were made by people working at the front desk at the Eastern Columbia Building who interacted with Ms. Heard in person and also saw images of her on the building surveillance cameras.

57.    Approximately a week after she made her domestic abuse allegations against Mr. Depp, Ms. Heard approached Ms. Esparza and Mr. Patterson, and asked the two of them to give a statement to Ms. Heard's "friend" at *People Magazine*. Ms. Heard wanted Ms. Esparza and Mr. Patterson "to help retract the statement that was given to the press stating that the front desk

18

**Exhibit 1**

had released this information [about seeing Ms. Heard with no injuries to her face] and [Ms. Heard] asked if we would clarify it and let them know that we, in fact, would never release that information on any resident." Mr. Patterson and Ms. Esparza refused to give the statement and directed Ms. Heard to the Eastern Columbia Building's lawyer.

58.     Ms. Esparza testified that she was "not comfortable" with "the statement that [Ms. Heard] was proposing that [the building] make to *People Magazine*, that the building would not have said they saw [Ms. Heard] without marks on her face" "because that would have been a lie" as "the front desk did, in fact, see [Ms. Heard] prior to Friday [May 27, 2016] without marks on her face."

59.     The people working at the front desk of the Eastern Columbia Building did not see any injuries to Ms. Heard's face because there were *no* injuries to Ms. Heard's face. Ms. Heard's allegations that Mr. Depp's battered her was a poorly executed hoax.

60.     The police officers, who responded to the penthouse on May 21, 2016 immediately after the alleged attack, saw no signs that Ms. Heard had been hit or struck by a cell phone or that a magnum-sized bottle of wine had "destroyed" the penthouse because *those things never happened*. There was no probable cause to believe a crime had been committed because *no crime had been committed* against Ms. Heard by Mr. Depp.

61.     Ms. Heard's domestic violence allegations against Mr. Depp were false, as is her portrayal of herself in her "Sexual Violence" op-ed as a domestic violence victim and her portrayal of Mr. Depp as a domestic violence perpetrator and "monster."

**Ms. Heard Acted With Actual Malice When She Implied In Her "Sexual Violence" Op-Ed That She Was A Victim Of Domestic Abuse At The Hands Of Mr. Depp**

19

**Exhibit 1**

62.     Ms. Heard acted with actual malice when she published her false and defamatory "Sexual Violence" op-ed and implied that she was a victim of domestic abuse at the hands of Mr. Depp.

63.     Ms. Heard knew that she was not the domestic abuse victim, but the domestic abuser.

64.     Ms. Heard knew that her domestic abuse allegations against Mr. Depp were false and that she leveled them and enlisted her friends to act as surrogates for her lies, as part of an elaborate hoax to generate positive publicity for herself.

65.     Ms. Heard also knew that her elaborate hoax worked: as a result of her false allegations against Mr. Depp, Ms. Heard became a darling of the #MeToo movement, was the first actress named a Human Rights Champion of the United Nations Human Rights Office, was appointed ambassador on women's rights at the American Civil Liberties Union, and was hired by L'Oréal Paris as its global spokesperson.

66.     Because of the past success that her false domestic abuse allegations against Mr. Depp had brought her, Ms. Heard revived the false allegations to promote her new movie.

67.     *Aquaman*, Ms. Heard's first leading role in a big-budget studio film, premiered in theatres across the United States (and in Virginia) on December 21, 2019. The movie ended up making over $1 billion at the box office globally.

68.     Tellingly, just days before the premiere, Heard published her "Sexual Violence" op-ed with its false implication that she was a domestic abuse victim at the hands of Mr. Depp on December 18, 2019 in the *Washington Post's* online edition and on December 19, 2019 in the *Washington Post's* hardcopy edition. The op-ed in the *Washington Post's* online edition was accompanied by a picture of Ms. Heard on the red carpet at *Aquaman's* Los Angeles premiere.

20

**Exhibit 1**

## Mr. Depp's Reputation And Career Suffer As A Result Of Ms. Heard's False And Defamatory Op-Ed

69.     As a result of Ms. Heard's false domestic abuse allegations, Mr. Depp's reputation and career sustained immense damage.

70.     Ms. Heard, an actress herself, is well aware of the negative effect that false domestic abuse allegations have on Mr. Depp's career.

71.     Mr. Depp lost roles in movies because of the false allegations that Ms. Heard made against him.   When Mr. Depp was cast in films, there were public outcries for the filmmakers to recast his roles.

72.     Mr. Depp endured the public scorn caused by Ms. Heard's false domestic abuse allegations for more than two years. But he was weathering the storm and had a successful film release in November 2019. In fact, that movie was still playing on screens across Virginia when Ms. Heard revived the false domestic abuse allegations by publishing her "Sexual Violence" op-ed in the *Washington Post*.

73.     The reaction to Ms. Heard's false and defamatory op-ed was swift and severe. Just two days after the op-ed appeared in the *Washington Post's* online edition, Disney publicly announced that Mr. Depp would no longer be a part of the *Pirates of the Caribbean* franchise. Mr. Depp's turn as Captain Jack Sparrow in the *Pirates of the Caribbean* films is one of Mr. Depp's most iconic roles, and generated billions of dollars for Disney.   Nevertheless, he was denied an opportunity to reprise that role immediately on the heels of Ms. Heard's false and defamatory op-ed.

## COUNT ONE—DEFAMATION FOR STATEMENTS IN MS. HEARD'S DECEMBER 18, 2018 OP-ED IN THE ONLINE EDITION OF THE *WASHINGTON POST*

21

Exhibit 1

74.     Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth
fully herein.

75.     Ms. Heard published the "Sexual Violence" op-ed on the December 18, 2018.
The article was published to a worldwide audience on the *Washington Post's* website. A true
and correct copy of the online edition of the "Sexual Violence" op-ed is attached hereto and
incorporated by reference as **Exhibit A.**

76.     The "Sexual Violence" op-ed contained the following false and defamatory
statements concerning Mr. Depp:

- "Amber Heard: I spoke up against sexual violence — and faced our culture's wrath. That has to change."

- "Then two years ago, I became a public figure representing domestic abuse, and I felt the full force of our culture's wrath for women who speak out."

- "I had the rare vantage point of seeing, in real time, how institutions protect men accused of abuse."

- "I write this as a woman who had to change my phone number weekly because I was getting death threats. For months, I rarely left my apartment, and when I did, I was pursued by camera drones and photographers on foot, on motorcycles and in cars. Tabloid outlets that posted pictures of me spun them in a negative light. I felt as though I was on trial in the court of public opinion — and my life and livelihood depended on myriad judgments far beyond my control."

77.     These statements are of and concerning Mr. Depp, as he is Ms. Heard's former
husband and she publicly (and falsely) accused him of domestic abuse in May 2016. Moreover,
Ms. Heard intended to refer to Mr. Depp in these statements, and those who know Mr. Depp or
who read the "Sexual Violence" op-ed understood these statements to be about Mr. Depp.

78.     These statements, which imply that Ms. Heard was the victim of domestic
violence at the hands of Mr. Depp, are false:

22

**Exhibit 1**

      a. Mr. Depp did not commit "domestic abuse" or "sexual violence" against Ms. Heard. Ms. Heard's allegation that Mr. Depp violently attacked her on May 21, 2016 has been refuted conclusively by police, neutral third-party witnesses, and 87 newly obtained surveillance camera videos.

      b. Ms. Heard is not a victim of domestic violence; rather, she is a perpetrator. Ms. Heard was arrested for domestic violence against her former domestic partner in 2009. Ms. Heard also committed multiple acts of domestic violence against Mr. Depp, some of which she has confessed to under oath.

79. The substantial danger of injury to Mr. Depp's reputation from Ms. Heard's false statements is readily apparent. Such statements would tend to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

80. By publishing these false statements, Ms. Heard caused harm to Mr. Depp's reputation.

81. At the time of publication, Ms. Heard knew these statements were false.

82. Ms. Heard's false statements are defamatory *per se* because they impute to Mr. Depp the commission of a crime involving moral turpitude for which Mr. Depp, if the charge was true, could be indicted and punished. Moreover, Ms. Heard's false statements prejudice Mr. Depp in his profession as a film actor. Mr. Depp therefore is entitled to presumed damages.

83. As a direct and proximate result of these false statements by Ms. Heard, Mr. Depp has suffered damages, including, *inter alia*, injury to his reputation, harm to his ability to carry on his profession, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

Exhibit 1

84.     Ms. Heard's actions were malicious, willful, and wanton, and evidence a conscious disregard for Mr. Depp's rights. Accordingly, punitive damages are appropriate.

WHEREFORE, Plaintiff respectfully requests that the Court enter an award in Plaintiff's favor and against Defendant, as follows:

(1)     awarding Mr. Depp compensatory damages of not less than $ 50,000,000, or in such additional amount to be proven at trial;

(2)     awarding Mr. Depp punitive damages to the maximum extent permitted by the laws of this Commonwealth, but not less than $ 350,000;

(3)     awarding Mr. Depp all of his expenses and costs, including attorneys' fees; and

(4)     granting such other and further relief as the Court deems appropriate.

## COUNT TWO—DEFAMATION FOR STATEMENTS IN MS. HEARD'S DECEMBER 19, 2018 OP-ED IN THE PRINT EDITION OF THE *WASHINGTON POST*

85.     Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

86.     Ms. Heard published the "Sexual Violence" op-ed in the December 19, 2018 hardcopy edition of the *Washington Post*, which the *Washington Post* distributes to readers in Virginia, across the nation, and around the world. A true and correct copy of the hardcopy edition of the "Sexual Violence" op-ed is attached hereto and incorporated by reference as **Exhibit B.**

87.     The "Sexual Violence" op-ed contained the following false and defamatory statements concerning Mr. Depp:

- "Amber Heard: I spoke up against sexual violence — and faced our culture's wrath. That has to change."

24

**Exhibit 1**

- "Then two years ago, I became a public figure representing domestic abuse, and I felt the full force of our culture's wrath for women who speak out."

- "I had the rare vantage point of seeing, in real time, how institutions protect men accused of abuse."

- "I write this as a woman who had to change my phone number weekly because I was getting death threats. For months, I rarely left my apartment, and when I did, I was pursued by camera drones and photographers on foot, on motorcycles and in cars. Tabloid outlets that posted pictures of me spun them in a negative light. I felt as though I was on trial in the court of public opinion — and my life and livelihood depended on myriad judgments far beyond my control."

88.     These statements are of and concerning Mr. Depp, as he is Ms. Heard's former husband and she publicly (and falsely) accused him of domestic abuse in May 2016. Moreover, Ms. Heard intended to refer to Mr. Depp in these statements, and those who know Mr. Depp or who read the "Sexual Violence" op-ed understood these statements to be about Mr. Depp.

89.     These statements, which imply that Ms. Heard was the victim of domestic violence at the hands of Mr. Depp, are false:

    a.  Mr. Depp did not commit "domestic abuse" or "sexual violence" against Ms. Heard. Ms. Heard's allegation that Mr. Depp violently attacked her on May 21, 2016 has been refuted conclusively by police, neutral third-party witnesses, and 87 newly obtained surveillance camera videos.

    b.  Ms. Heard is not a victim of domestic violence; rather, she is a perpetrator. Ms. Heard was arrested for domestic violence against her former partner in 2009. Ms. Heard also committed multiple acts of domestic violence against Mr. Depp.

90.     The substantial danger of injury to Mr. Depp's reputation from Ms. Heard's false statements is readily apparent. Such statements would tend to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

25

**Exhibit 1**

91. By publishing these false statements, Ms. Heard caused harm to Mr. Depp's reputation.

92. At the time of publication, Ms. Heard knew these statements were false.

93. Ms. Heard's false statements are defamatory *per se* because they impute to Mr. Depp the commission of a crime involving moral turpitude for which Mr. Depp, if the charge was true, could be indicted and punished. Moreover, Ms. Heard's false statements prejudice Mr. Depp in his profession as a film actor. Mr. Depp therefore is entitled to presumed damages.

94. As a direct and proximate result of these false statements by Ms. Heard, Mr. Depp has suffered damages, including, *inter alia,* injury to his reputation, harm to his ability to carry on his profession, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

95. Ms. Heard's actions were malicious, willful, and wanton, and evidence a conscious disregard for Mr. Depp's rights. Accordingly, punitive damages are appropriate.

WHEREFORE, Plaintiff respectfully requests that the Court enter an award in Plaintiff's favor and against Defendant, as follows:

(1) awarding Mr. Depp compensatory damages of not less than $ 50,000,000, or in such additional amount to be proven at trial;

(2) awarding Mr. Depp punitive damages to the maximum extent permitted by the laws of this Commonwealth, but not less than $ 350,000;

(3) awarding Mr. Depp all of his expenses and costs, including attorneys' fees; and

(4) granting such other and further relief as the Court deems appropriate.

## COUNT THREE—DEFAMATION FOR STATEMENTS IN MS. HEARD'S OP-ED WHICH HEARD REPUBLISHED WHEN SHE TWEETED A LINK TO THE OP-ED ON DECEMBER 19, 2018

26

**Exhibit 1**

96.   Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

97.   Ms. Heard published the "Sexual Violence" op-ed in the December 18, 2018 online edition of the *Washington Post*. The following day, Ms. Heard tweeted a link to the op-ed. A true and correct copy of Ms. Heard's tweet of the link to the "Sexual Violence" op-ed is attached hereto and incorporated by reference as **Exhibit C**.

98.   The "Sexual Violence" op-ed contained the following false and defamatory statements concerning Mr. Depp:

- "Amber Heard: I spoke up against sexual violence — and faced our culture's wrath. That has to change."

- "Then two years ago, I became a public figure representing domestic abuse, and I felt the full force of our culture's wrath for women who speak out."

- "I had the rare vantage point of seeing, in real time, how institutions protect men accused of abuse."

- "I write this as a woman who had to change my phone number weekly because I was getting death threats. For months, I rarely left my apartment, and when I did, I was pursued by camera drones and photographers on foot, on motorcycles and in cars. Tabloid outlets that posted pictures of me spun them in a negative light. I felt as though I was on trial in the court of public opinion — and my life and livelihood depended on myriad judgments far beyond my control."

99.   These statements are of and concerning Mr. Depp, as he is Ms. Heard's former husband and she publicly (and falsely) accused him of domestic abuse in May 2016. Moreover, Ms. Heard intended to refer to Mr. Depp in these statements, and those who know Mr. Depp or who read the "Sexual Violence" op-ed understood these statements to be about Mr. Depp.

100.  These statements, which imply that Ms. Heard was the victim of domestic violence at the hands of Mr. Depp, are false:

27

**Exhibit 1**

    a. Mr. Depp did not commit "domestic abuse" or "sexual violence" against Ms. Heard. Ms. Heard's allegation that Mr. Depp violently attacked her on May 21, 2016 has been refuted conclusively by police, multiple, neutral third-party witnesses, and 87 newly obtained surveillance camera videos.

    b. Ms. Heard is not a victim of domestic violence; rather, she is a perpetrator. Ms. Heard was arrested for domestic violence against her former partner in 2009. Ms. Heard also committed multiple acts of domestic violence against Mr. Depp.

101. The substantial danger of injury to Mr. Depp's reputation from Ms. Heard's false statements is readily apparent. Such statements would tend to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

102. By publishing these false statements, Ms. Heard caused harm to Mr. Depp's reputation.

103. At the time of publication, Ms. Heard knew these statements were false.

104. Ms. Heard's false statements are defamatory *per se* because they impute to Mr. Depp the commission of a crime involving moral turpitude for which Mr. Depp, if the charge was true, could be indicted and punished. Moreover, Ms. Heard's false statements prejudice Mr. Depp in his profession as a film actor. Mr. Depp therefore is entitled to presumed damages.

105. As a direct and proximate result of these false statements by Ms. Heard, Mr. Depp has suffered damages, including, *inter alia,* injury to his reputation, harm to his ability to carry on his profession, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

28

**Exhibit 1**

106. Ms. Heard's actions were malicious, willful, and wanton, and evidence a conscious disregard for Mr. Depp's rights. Accordingly, punitive damages are appropriate.

WHEREFORE, Plaintiff respectfully requests that the Court enter an award in Plaintiff's favor, and against Defendant, as follows:

(1) awarding Mr. Depp compensatory damages of not less than $50,000,000, or in such additional amount to be proven at trial;

(2) awarding Mr. Depp punitive damages to the maximum extent permitted by the laws of this Commonwealth, but no less than $350,000;

(3) awarding Mr. Depp all expenses and costs, including attorneys' fees; and

(4) such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiff John C. Depp, II hereby demands a jury trial on all issues so triable.

Dated: March 1, 2019

_____

Brittany Whitesell Biles (*pro hac vice* application forthcoming)
STEIN MITCHELL BEATO & MISSNER LLP
901 Fifteenth Street, N.W.
Suite 700
Washington, D.C. 20005
Telephone: (202) 601-1602
Facsimile: (202) 296-8312
Email: bbiles@steinmitchell.com

29

**Exhibit 1**

Facsimile: (202) 296-8312
Email: bbiles@steinmitchell.com

Adam R. Waldman
THE ENDEAVOR LAW FIRM, P.C.
1775 Pennsylvania Avenue, N.W., Suite 350
Washington, DC 20006

*Benjamin G. Chew (signature)*

Benjamin G. Chew (VSB # 29113)
Elliot J. Weingarten (*pro hac vice* application forthcoming)
BROWN RUDNICK LLP
601 Thirteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 536-1700
Facsimile: (202) 536-1701
Email: bchew@brownrudnick.com

Counsel for Plaintiff John C. Depp, II

30

**Exhibit 1**

# EXHIBIT A

**Exhibit 1**



**Opinions**

# Amber Heard: I spoke up against sexual violence — and faced our culture's wrath. That has to change.





Amber Heard arrives at the premiere of "Aquaman" on Dec. 12 in Los Angeles. (Jordan Strauss/Jordan Strauss/Invision/AP)

**By Amber Heard**
December 18, 2018

**Exhibit 1**






Amber Heard is an actress and ambassador on women's rights at the American Civil Liberties Union.

I was exposed to abuse at a very young age. I knew certain things early on, without ever having to be told. I knew that men have the power — physically, socially and financially — and that a lot of institutions support that arrangement. I knew this long before I had the words to articulate it, and I bet you learned it young, too.

Like many women, I had been harassed and sexually assaulted by the time I was of college age. But I kept quiet — I did not expect filing complaints to bring justice. And I didn't see myself as a victim.

Then two years ago, I became a public figure representing domestic abuse, and I felt the full force of our culture's wrath for women who speak out.

Friends and advisers told me I would never again work as an actress — that I would be blacklisted. A movie I was attached to recast my role. I had just shot a two-year campaign as the face of a global fashion brand, and the company dropped me. Questions arose as to whether I would be able to keep my role of Mera in the movies "Justice League" and "Aquaman."

I had the rare vantage point of seeing, in real time, how institutions protect men accused of abuse.



A letter to Christine Blasey F[ord]
From Connie Chung

Listen to broadcast journalist Connie Chung read a letter to Christine Blasey Ford, acknowledging publicly for the first time that she was sexually abused. (Kate Woodsome, Danielle Kunitz/The Washington Post)

Imagine a powerful man as a ship, like the Titanic. That ship is a huge enterprise. When it strikes an iceberg, there are a lot of people on board desperate to patch up holes — not because they believe in or even care about the ship, but because their own fates depend on the enterprise.

New Homes
All in One Place
See the bigger, better new home search experience on our new enhanced website
VISIT OUR SITE

**Most Read Opinions**

1 Opinion
The most revealing insight of Michael Cohen's testimony

2 Opinion
Trump's utterly unsurprising diplomatic debacle

3 Opinion
The case for getting Trump's tax returns just got stronger — and more urgent

4 Perspective
Yes, Michael Cohen's a liar and a criminal. So how come you believed him?

5 Opinion
The Republican Senate majority is imperiled

**Post Reports**

Latest episode
"I'm here to tell the truth about Mr. Trump."
▶ Listen 23:16

Unparalleled reporting. Expert insight. Clear analysis. Everything you've come to expect from the newsroom of The Post - for your ears.

Exhibit 1



Get the Mind Reads newsletter

The Washington Post

**Stories from The Lily**
The Lily, a publication of The Washington Post, elevates stories about women.

**Perspective**
The Standing Rock protests, a circus, and 'choosing to live': A poem in comic form

A landmark policy reversal in Congo will now allow pregnant women to receive the Ebola vaccine

As abortion restrictions increase, these 10 states are seeking a new route to access



In recent years, the #MeToo movement has taught us about how power like this works, not just in Hollywood but in all kinds of institutions — workplaces, places of worship or simply in particular communities. In every walk of life, women are confronting these men who are buoyed by social, economic and cultural power. And these institutions are beginning to change.

We are in a transformative political moment. The president of our country has been accused by more than a dozen women of sexual misconduct, including assault and harassment. Outrage over his statements and behavior has energized a female-led opposition. #MeToo started a conversation about just how profoundly sexual violence affects women in every area of our lives. And last month, more women were elected to Congress than ever in our history, with a mandate to take women's issues seriously. Women's rage and determination to end sexual violence are turning into a political force.

We have an opening now to bolster and build institutions protective of women. For starters, Congress can reauthorize and strengthen the Violence Against Women Act. First passed in 1994, the act is one of the most effective pieces of legislation enacted to fight domestic violence and sexual assault. It creates support systems for people who report abuse, and provides funding for rape crisis centers, legal assistance programs and other critical services. It improves responses by law enforcement, and it prohibits discrimination against LGBTQ survivors. Funding for the act expired in September and has only been temporarily extended.

ADVERTISEMENT



LEARN MORE

District, Maryland and Virginia headlines and alerts
Delivered FREE to your inbox as news happens.

SIGN UP NOW

The Washington Post

**Read These Comments newsletter**
The best comments and conversations at The Washington Post, delivered every Friday. Join the conversation.

**Exhibit 1**

We should continue to fight sexual assault on college campuses, while simultaneously insisting on fair processes for adjudicating complaints. Last month, Education Secretary Betsy DeVos proposed changes to Title IX rules governing the treatment of sexual harassment and assault in schools. While some changes would make the process for handling complaints more fair, others would weaken protections for sexual assault survivors. For example, the new rules would require schools to investigate only the most extreme complaints, and then only when they are made to designated officials. Women on campuses already have trouble coming forward about sexual violence — why would we allow institutions to scale back supports?

I write this as a woman who had to change my phone number weekly because I was getting death threats. For months, I rarely left my apartment, and when I did, I was pursued by camera drones and photographers on foot, on motorcycles and in cars. Tabloid outlets that posted pictures of me spun them in a negative light. I felt as though I was on trial in the court of public opinion — and my life and livelihood depended on myriad judgments far beyond my control.

I want to ensure that women who come forward to talk about violence receive more support. We are electing representatives who know how deeply we care about these issues. We can work together to demand changes to laws and rules and social norms — and to right the imbalances that have shaped our lives.

**Read more:**

The Post's View: What Betsy DeVos's new Title IX changes get right — and wrong

Betsy DeVos: It's time we balance the scales of justice in our schools

Janet Napolitano: Don't let the Trump administration undermine Title IX

Mili Mitra: The most horrifying part of the Dartmouth sexual harassment case

💬 710 Comments

✉️

**Read These Comments newsletter**

The best comments and conversations at The Washington Post, delivered every Friday. Join the conversation.

Sign me up

By signing up you agree to our Terms of Use and Privacy Policy

---

Sign me up

washingtonpost.com
© 1996-2019 The Washington Post

Help and Contact Us
Policies and Standards
Terms of Service
Privacy Policy
Print Products Terms of Sale
Digital Products Terms of Sale
Submissions and Discussion Policy
RSS Terms of Service
Ad Choices



NEW HOMES guide

The Best
New Homes.
All in One Place.

See the bigger, better new home search experience on our new enhanced website!

VISIT OUR SITE

**Exhibit 1**

# EXHIBIT B

**Exhibit 1**

# The Washington Post

WEDNESDAY, DECEMBER 19, 2018

"I'm not hiding my disgust, my disdain, for this criminal offense."
U.S. District Judge Emmet G. Sullivan



Michael Flynn, who entered court reaching an time behind him, left if needing to be of more help to prosecutors in stave out of prison.

# Senate passes bill revamping criminal justice

## EASES 'THREE STRIKES,' CRACK DISPARITIES

### Big pivot for GOP and a bipartisan victory for Trump

BY JOHN WAGNER AND KAROUN DEMIRJIAN

## Judge excoriates Flynn, delays sentencing

**Ex-Trump aide forced to reiterate his crimes, warned of prison time**

BY RENAE M. TRISI, MATT ZAPOTOSKY AND CAROL D. LEONNIG

**Jurist disappoints Mueller foes with a lecture on the rule of law**

BY CAROL D. LEONNIG AND ROSALIND S. HELDERMAN

## President backs off demand for wall funds

Trump seeks to avoid shutdown short-term funding bill seems likely

BY ERICA WERNER, DAMIAN PALETTA AND SEUNG MIN KIM

## In light of allegations, president to shut charity

**Foundation was used for personal and political benefit, lawsuit says**

BY DAVID A. FAHRENTHOLD

## Inside America's other opioid epidemic

**FALLING OUT**

The nation's capital is ground zero for an explosion in African American overdose deaths

BY PETER JAMISON



## IN THE NEWS



A league of her own: Penny Marshall, who starred in "Laverne & Shirley," then became a groundbreaking director, died at 75. B5

**THE NATION**

**THE WORLD**

**THE UNITED States and**

**THE REGION**

**THE ECONOMY**

**INSIDE**

FOOD

STYLE

**PostPoints**

DAILY CODE, DECEMBER 19

KER

## o un, but s the tuff

a go, it's hard to better fit to fill John Senate seat than the old female Air Force lot — Rep. Martha

org Ducey (R) ap- es, too. On Tuesday, ally to fill the seat a special election the remaining two term. Assuming she s run for reelection could conceivably art of the next four the seat she'll occu- , when she's due to

swiveling, it may be at last month that erace to Democrat- nema, when she was retiring Republican old on. Sen. Jon Kyl, bined in September ext, announced last d stay only until the bring someone else s ace for 2020.

ill become her mild- Senate colleague. al rise hasn't been including opposition om McCain's family. against Sinema on a amp platform (de- riticizing the presi- identified the family mory by failing to when touting legis- atically named for R. McCain National ation Act for Fiscal perceived as a low contrived to mimic withheld McCain's ation during com- signed the act into

recommendation, met with Cindy aptized for her over- eportedly accepted

ins may not be so those would largely to just rejected her i'll hold. But nearly on preferred McSal- its governor is re- ve to elect someone came party at the it has been vacated. Sally's appointment litical calculation — ed the most likely to nthat future challenge y was initially hesi- team reportedly were ally's post-election she blamed her loss ly rather than inter- itake.

biah-blah. Such nit- past if you're a politi- it talk show host, but ople are more inter- ns' human aspect — experiences — and to the table.

a quite a lot, includ- qualities in that town erence, she is almost rest social event we hich included a re- person to introduce a few autobiograph- y's introduction was s a pilot, and I like

does, as many will ovember concussion with McSally seated it her rescue golden g, who seemed most mbing on McSally's ido's steel all hearts, ly consolidated the

ux, McSally is the stereotypical fighter male sporting a Top

**BY AMBER HRARD**



Leslie Moonves in July 2013. The CBS chief executive resigned in September after multiple allegations of sexual misconduct surfaced.

# A transformative moment for women

was exposed to abuse at a very young age, I knew certain things early on, without ever having to be told. I knew that men have the power — physically, socially and fi- nancially — and that a lot of institu- tions support that arrangement. I knew this long before I had the words to articulate it, and I bet you learned it young, too.

Like many women, I had been harassed and sexually assaulted by the time I was of college age. But I kept quiet — I did not expect filing complaints to bring justice. And I didn't see myself as a victim.

Then two years ago, I became a public figure representing domestic abuse, and I felt the full force of our culture's wrath for women who speak out.

Friends and advisers told me I would never again work as an actress — that I would be blacklisted. A movie I was attached to recast my role. I had just shot a two-year cam- paign as the face of a global fashion brand, and the company dropped me. Questions arose as to whether I would be able to keep my role of Mera in the movies "Justice League" and "Aquaman."

I had the rare vantage point of seeing, in real time, how institutions protect men accused of abuse.

Imagine a powerful man as a ship, like the Titanic. That ship is a huge enterprise. When it strikes an ice- berg, there are a lot of people on board desperate to patch up holes — not because they believe in or even care about the ship, but because their own fates depend on the enterprise.

In recent years, the #MeToo move- ment has taught us about how power- like this works, not just in Hollywood but in all kinds of institutions — workplaces, places of worship or sim- ply in particular communities. In every walk of life, women are con- fronting these men who are buoyed by social, economic and cultural power. And these institutions are be- ginning to change.

We are in a transformative politi- cal moment. The president of our country has been accused by more than a dozen women of sexual mis- conduct, including assault and ha- rassment. Outrage over his state- ments and behavior has sparked a female-led opposition. #MeToo start- ed a conversation about just how profoundly sexual violence affects women in every area of our lives. And last month, more women were elect- ed to Congress than ever in our his-

tory, with a mandate to take women's issues seriously. Women's rage and determination to end sexual violence are turning into a political force.

We have an opening now to bolster and build institutions protective of women. For starters, Congress can reauthorize and strengthen the Vio- lence Against Women Act, first passed in 1994, the act is one of the most effective pieces of legislation enacted to fight domestic violence and sexual assault. It creates support systems for people who report abuse, and provides funding for rape crisis centers, legal assistance programs and other critical services. It im- proves responses by law enforce- ment, and it prohibits discrimination against LGBTQ survivors. Funding for the act expired in September and has only been temporarily extended.

We should continue to fight sexual assault on college campuses, while simultaneously insisting on fair pro- cesses for adjudicating complaints. Last month, Education Secretary Betsy DeVos proposed changes to Title IX rules governing the treat- ment of sexual harassment and as- sault in schools. While some changes would make the process for handling complaints more fair, others would weaken protections for sexual as- sault survivors. For example, the new rules would require schools to inves- tigate only the most extreme com- plaints, and then only when they are made to designated officials. Women on campuses already have trouble coming forward about sexual vio- lence — why would we allow institu- tions to scale back supports?

I write this as a woman who had to change my phone number weekly because I was getting death threats. For months, I rarely left my apart- ment, and when I did, I was pursued by camera drones and photographers on foot, on motorcycles and in cars. Tabloid outlets that posted pictures of me spun them in a negative light. I felt as though I was on trial in the court of public opinion — and my life and livelihood depended on my bad judgement far beyond my control.

I want to ensure that women who come forward to talk about violence receive more support. We are electing representatives who know how deep- ly we care about these issues. We can work together to demand changes to laws and rules and social norms — and to right the imbalances that have shaped our lives.

*The writer is an actress and ambassador on women's rights at the American Civil Liberties Union.*

---

**ALYSSA ROSENBERG**

Excerpted from washingtonpost.com/people/alyssa-rosenberg

## Pay the women instead

If there is one tiny kernel of relief in the infuriating saga cyclone that has been 2018, it is the report that CBS doesn't intend to pay disgraced and disgraced former chairman and chief executive Leslie Moonves $120 million in sever- ance. Of course, that relief is mitigated

incurring costs upfront in the form of lawyers' fees. It's a perverse incentive structure that gives companies millions of reasons not to deal aggressively with male stars who harass their co-workers.

Some companies have begun to write employment contracts specifying that employees who are and because of sexual misconduct can't demand that

# Racism is a national security issue

**BY SHERRILYN IFILL**

wo newly released reports from the Senate Intelligence Committee about Russian interference in the 2016 election have been nothing short of revelatory. Both studies — one produced by researchers at Oxford Univer- sity, the other by the cybersecurity firm New Knowledge — describe in granular detail how the Russian government tried to sow discord and confusion among American voters. And both conclude that Russia's campaign included a massive effort to de- ceive and co-opt African Americans. We now have unassailable confirmation that a foreign power sought to exploit racial ten- sions in the United States for its own gain.

Ever since U.S. intelligence agencies re- ported that the Russian government worked to sway the 2016 election, foreign election meddling has been one of our nation's top national security concerns. But our discussions about Russian interference rarely touch on the other major threat to our elections: the resurgence of state-spon- sored voter suppression in the United States. In light of these disturbing new reports, it is clear we can no longer think of foreign election meddling as a phenom- enon separate from attempts to disenfran- chise Americans of color. Racial injustice remains a real vulnerability in our democ- racy, one that foreign powers are only too willing to attack.

How should we respond? First, we have to make it easier, not harder, for Americans to vote. In the wake of the Supreme Court's 2013 Shelby County decision, which severe- ly weakened the Voting Rights Act, we've seen a resurgence of voter-suppression ef- forts across the nation. Congress has the power to fix the Voting Rights Act, but so far it has declined to do so. The revelations of Russia's racial targeting should serve as a wake-up call that domestic voter suppres- sion, in addition to being internationally, effectively aids foreign attacks on our de- mocracy. Indeed, we should take seriously the danger that domestic and foreign groups may coordinate to suppress turnout in future elections, a possibility we can begin to forestall, first and foremost, by protecting the franchise here at home. Rep. Terri A. Sewell (D-Ala.) has already introduced a comprehensive new voting rights bill, and Congress should swiftly act upon it in the new year.

Second, these revelations only deepen the urgency of demanding more account- ability from technology companies. The New Knowledge report criticizes social me- dia companies such as Facebook for en- abling Congress about the nature of Rus- sian interference, noting that one even denied that specific groups were targeted. This is just more evidence that Silicon

Valley has yet to come to grips with the enormous influence it wields in our democ- racy, and the ways that foreign powers can use that influence to manipulate Ameri- cans. Congress should require greater transparency and responsibility from these corporations before the 2020 elections.

Finally, we have to accept that foreign powers seize upon these divisions because they are real — because racism remains the United States' Achilles' heel. Indeed, it is, and always has been, a national security vulnerability — a fundamental and easily exploitable reality of American life that belies the image and narrative of equality and justice we project and export around the world. It may be especially difficult in our era of "fake news" and "alternative facts," but we must recognize that our failure to acknowledge hard truths, espe- cially when it comes to race, makes it easier for foreign powers to turn us against one another. Russia did not conjure out of thin air the black community's legitimate griev- ances about racist policing. Nor did it invent racist and hateful conspiracy theories. Rather, Russian trolls seized upon these real problems as ready-made sources of discord. Moving forward, we need to recognize that our failure to honestly address issues of civil rights and racial justice makes all of us more susceptible to foreign interference.

This is hardly the first time our adverse- ies have identified racial wounds as Ameri- ca's great vulnerability. During the Cold War, the Soviet Union frequently pointed to segregation and civil unrest as proof of American hypocrisy. This propaganda was sufficiently widespread, and sustained enough truth, that leaders of both parties began arguing that segregation under- mined the United States' position in the Cold War, helping to ease the passage of civil rights legislation in the 1950s and 1960s.

Today, we need a similar understanding that our failure to ensure equal justice for all has grave implications for U.S. national security. The upcoming House oversight committee hearings on Russian interfer- ence and voter suppression will be critical opportunities to educate the public on the threats to our democracy, and they deserve our close attention.

But we must be careful not to reduce the struggle for racial equality into a bloodless question of national interest. Civil rights are essential to our national security, but na- tional security cannot be the chief rationale for pursuing civil rights. After all, racial injustice is not just another chink in our armor. It is the great flaw in our character. Our adversaries know that race makes us our own worst enemy. It is past time we learn this hard truth ourselves.

*The writer is president and director-counsel of the NAACP Legal Defense and Educational Fund.*

---

**DAVID IGNATIUS**

## A Russian spy's dream

magine American politics for a moment as a laboratory experiment. A foreign adversary (let's call it "Russia") begins to play with the subjects, using carrots and sticks to condition their behavior. The adversary develops tools to ridd up anger and resentment inside the lab bubble, and even recruits unwitting accomplices to per- form specific tasks.

This 21st-century political dystopia isn't drawn from a "spec script" that just landed in Hollywood. It's a summary of two reports on the Kremlin-linked Internet Research Agency published this week by the Senate Intelligence Committee. The studies de- scribe a sophisticated, multilevel Russian effort to use every available tool of our open society to create resentment, mistrust and social disorder.

For a century, Russian intelligence agents have been brilliant at creating false fronts and manipulating opposition groups. Now, thanks to the Internet, they seem to be perfecting these dark arts.

Even as it meddles abroad, the Kremlin has just introduced new legislation to block its own information space from foreign penetration. Under the new law, reported this week, Russia could control all Internet and message traffic into the country, block any anonymous websites and, during a crisis, manage the Russian Web from a central command point.

Put the two halves of Russian behavior together and you have a portrait of the

"Russia's IRA activities were designed to polarize the U.S. public and interfere in elections," the study says, by encouraging African American voters to boycott elec- tions, pushing right-wing voters toward extremism, and "spreading sensationalist, conspiratorial and other forms of junk political news and misinformation."

The Russians pushed every button. They sought to tap African American anger with "Blacktivist" and "Black Matters" Facebook pages. They reached conservatives through pages called "Army of Jesus," "Heart of Texas" and "Secured Borders." The list of the IRA's top-20 Facebook pages is a catalogue of American rage.

The New Knowledge report blows the cover off three Internet operations. It shows how Hillary Clinton and vice-presidential nominee Tim Kaine were depicted as the "Satan Team," with Clinton wearing devil's horns and Kaine bearing a red horn on his forehead. The researchers found an image of Jesus wearing a red "Make America Great Again" hat.

Instagram provided a useful platform for manipulating younger Americans. The IRA's "Blackstagram" account had 303,668 followers; "American Veterans" had 215,680; "Sincerely Black" had 196,764; and "Rainbow Nation" had 166,466, to name the top four Instagram pages cited in the New Knowledge study.

Russia's Internet activity wasn't just

**Exhibit 1**

# EXHIBIT C

Exhibit 1

✕



**Amber Heard** ✔
@realamberheard



Today I published this op-ed in the
Washington Post about the women who
are channeling their rage about violence
and inequality into political strength
despite the price of coming forward.

From college campuses to Congress,
we're balancing the scales.



**Opinion | Amber Heard: I spoke up against sexual violence — and fa...**
We have an opening now to bolster and build institutions protective of
women. Let's not ignore it.
washingtonpost.com

1:28 PM - 19 Dec 2018

**1,292** Retweets **3,556** Likes    🐾 👤 🎉 🐱 🎨 🎃 🌀 🐱 👤

♡ **128**    ⇄ **1.3K**    **3.6K**



**Amber Heard** ✔ @realamberheard · 19 Dec 2018    ˅
I'm honored to announce my role as an @ACLU ambassador on women's rights.
The ACLU is the organization that first inspired me to become an activist, so I

**Exhibit 1**    1/1

**V I R G I N I A :**

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

JOHN C. DEPP, II

Plaintiff,

v.

AMBER LAURA HEARD

Defendant.

Civil Action No.: CL-2019-0002911

## STIPULATED AMENDED PROTECTIVE ORDER

This amendment (the "Amendment") to the Protective Order entered in the above-captioned action on September 25, 2019 (the "Protective Order") is made and entered into by and among Plaintiff John C. Depp, II ("Mr. Depp") and Defendant Amber Laura Heard ("Ms. Heard") (collectively, the "Parties" and each a "Party").

## RECITALS

The Protective Order was entered in the above-captioned action (the "Action") on September 25, 2019.

The Parties anticipate that the Action will be tried in April 2022 (the "Virginia Trial").

In May 2018, Mr. Depp initiated a libel suit against News Group Newspapers Ltd and Dan Wootton (the "UK Defendants") in the United Kingdom over an article published by the UK Defendants entitled "GONE POTTY How can JK Rowling be 'genuinely happy' casting wife beater Johnny Depp in the new Fantastic Beasts film?" The libel suit contended the article falsely claimed that Mr. Depp committed serious domestic violence against Amber Heard, causing significant injury and leading to her fearing for her life. (the "UK Action").

1

**Exhibit 2**

Among others, Mr. Depp and Ms. Heard each submitted multiple witness statements in the UK Action.

A sixteen-day trial of the UK Action was conducted between July 7, 2020 and July 28, 2020. Among others, Mr. Depp and Ms. Heard each provided live testimony at the trial of the UK Action.

On November 2, 2020, Justice Nicol handed down a judgment in the UK Action (the "UK Judgment"), dismissing Mr. Depp's libel action and finding that the statements in the article were true. Mr. Depp petitioned Justice Nicol for permission to appeal, which petition was denied on November 16, 2020.

Mr. Depp applied to the Court of Appeal (Civil Division) in the United Kingdom ("UK Court of Appeal"), to request permission to appeal the UK Judgment. Mr. Depp later applied for permission to adduce and submit new evidence in support of his appeal ("UK Appeal").

Following a hearing held on March 18, 2021, the Court of Appeal (Civil Division) in the United Kingdom handed down a judgment on March 25, 2021 denying Mr. Depp's application for permission to appeal and to adduce the new evidence (the "Judgment on Permission to Appeal").

In the course of the UK Action, certain pleadings and witness evidence contained information, within confidential schedules, that was deemed confidential by way of an Order of Justice Nicol dated April 8, 2020 and sealed on April 9, 2020. The terms of this Order extended to the parts of the trial that were held in private and the transcripts thereof. The UK Judgment and Judgment on Appeal also contained confidential schedules dealing with such underlying confidential information.

Ms. Heard seeks to produce and file in this Action the Confidential Judgments and related confidential schedules described in Section 3(a)(vi), and is applying to the UK High Court for

**Exhibit 2**

permission to release the documents. The Parties therefore are entering into this Stipulated Amendment to Protective Order to govern the treatment of this, and other related, confidential information.

Having found that the Parties, by, between, and among their respective counsel, have agreed to the terms set forth herein, and good cause having been shown,

IT IS STIPULATED AND ORDERED that:

1.      This Amendment is being entered into to facilitate the production, exchange, and discovery of documents and information that the Parties agree merit confidential treatment. This Amendment shall govern the handling of documents, deposition testimony, deposition exhibits, interrogatory responses, admissions, electronically stored information ("ESI") and any other information or material produced, given or exchanged by and among the Parties and any non-parties to the above-captioned action (the "Litigation") in connection with discovery in the Litigation (such information or material hereinafter referred to as "Discovery Material.").

2.      Either Party may designate Discovery Material in connection with this Litigation as "Confidential" either by notation on the document, statement on the record of the deposition, written notice to counsel for the Parties hereto, or by other appropriate means. In the case of documents produced in native, electronic form, the confidentiality can be designated on the placeholder sheet produced along with that document, or in a confidentiality metadata field. Such designations shall constitute a representation to the Court that such Discovery Material is not reasonably believed to be already in the public domain.

3.  As used herein:

a.  "Confidential Information" shall mean all Discovery Material, and all information contained therein, and other information designated as

3

**Exhibit 2**

"Confidential," that the Producing Party (as defined below) reasonably and in good faith believes constitutes and/or contains:

    i.   personally identifying information, including but not limited to contact information, addresses, phone numbers, email addresses, social security numbers, identification card numbers, driver's license numbers, passport numbers, or other government identification numbers, and any other similar information, but excluding Financial Information (as defined below);

    ii.   Medical records, including documents containing medical and/or psychological conditions, diagnoses, or treatment, communications with health care providers and their staff (including any doctor, surgeon, psychiatrist, dentist, nurse, psychologist, therapist, counselor, medical advisor, mental health provider, or specialist), and any information that would be protected under the Health Insurance Portability and Accountability Act of 1996 (HIPAA);

    iii.  Information in the nature of private journals or journal entries;

    iv.  Any documents or testimony having the same general subject matter as the documents described in Section 3(a)(vi);

    v.   Any other documents or information the Parties agree in writing or otherwise permitted by the Court should be treated as Confidential; and

    vi.  The following documents from the UK Action and UK Appeal:

          1.  All Confidential Schedules;

**Exhibit 2**

2.  The Confidential Judgment of Justice Nicol, dated November 2, 2020;

3.  the Confidential Judgment of the Court of Appeal, dated March 25, 2021;

4.  Confidential trial transcripts, including any evidence adduced during the portions of the trial of the UK Action held in private on the 4th, 12th, and 14th days of trial, which are reflected in the separate confidential trial transcripts from those three trial dates;

5.  The following sections of the transcript of the deposition of Kristina Sexton, dated December 18, 2019, which was included in the trial bundle for the UK Action as document F106: pages 98-104, pages 112-18, page 180-84;

6.  Text messages between Ms. Heard and Danie Streisand on November 16, 2018, which was included in the trial bundle for the UK Action as document H56.

b.  Nothing in this Amendment shall be construed to limit or restrict the Parties' right to apply, to vary, change, amend, or terminate the confidential status of the documents in Section 3(a)(vi) by written agreement or application to the U.S. Court.

c.  "Protected Information" shall mean Confidential Information.

d.  Should Protected Information become part of the public domain, without any violation of this Order, such Protected Information will no longer be subject to

5

**Exhibit 2**

the protections of this Amendment. Should some, but not all, Protected Information become part of the public domain, without any violation of this Order, and either Party believes that additional information should be disclosed, the Parties may agree in writing or any Party may petition this Court for further relief.

e.  "Producing Party" shall mean the Party to this Litigation and/or any non-party producing Protected Information in connection with discovery in this Litigation, or the Party asserting the confidentiality designation, as the case may be.

f.  "Receiving Party" shall mean the Party to this Litigation and/or any non-party receiving Protected Information in connection with discovery in this Litigation.

4.    ESI designated as "Confidential" shall be so designated by including a "Confidential" in the body of the electronic document or by affixing a stamp with such notice to the medium (including, but not limited to, tapes, CDs, DVDs, and flash drives) on which the ESI is stored before copies are delivered to a Receiving Party.  Printouts of any such ESI designated as Confidential Discovery Material shall be treated in accordance with the terms of this Amendment.  Notwithstanding the foregoing, Excel documents or any other type of electronically stored information produced in native format (together, "Natively Produced ESI") need not be produced using a means sufficient to ensure that every page of such document, when printed, contains the appropriate mark or stamp.  Instead, the Disclosing Party shall use reasonable means to designate "Confidential" as appropriate, by (a) producing a TIFF placeholder image corresponding to the Natively Produced ESI that includes a "Confidential" mark; and (b) including

6

**Exhibit 2**

"Confidential" as appropriate, on the label of the media or in the transmittal e-mail containing the Natively Produced ESI.

5.     The designation of any Discovery Material as "Confidential" is not intended to, and shall not be construed as, an admission that the Discovery Material is relevant, not subject to an applicable privilege or protection, admissible, or reasonably calculated to lead to the discovery of admissible evidence.  The Receiving Party may, at any time, notify the Producing Party that the Receiving Party does not concur in the designation of Discovery Material as "Confidential".  The Parties shall confer in good faith regarding any such disagreement over the classification of Discovery Material and if the Producing Party does not agree to change the designation of such Discovery Material, the Receiving Party may move the Court for an order removing the designation of such Discovery Material as Protected Information.  Upon such a motion, the Producing Party shall bear the burden to prove that the Discovery Material in question is Protected Information.  If such a motion is filed, the Discovery Material shall be deemed Protected Information, with the same confidentiality designation as asserted by the Producing Party, unless and until the Court rules otherwise.

6.     In order to expedite the production of voluminous materials, a Producing Party may, but is not required to, produce materials without a detailed review for confidentiality designation and may designate collections of documents that, by their nature, contain Confidential Information as "Confidential," notwithstanding that some of the documents within the collection may not qualify for such designation.  A Party's "bulk" designation of documents shall not constitute waiver of any Party's rights set forth in Paragraph 17 of this Amendment. Notwithstanding the foregoing, a Receiving Party may at any time challenge the designation of

**Exhibit 2**

one or more particular documents on the grounds that the document(s) do not qualify for protection, including as provided in Paragraphs 5 and 25 of this Amendment.

7.      A Producing Party must redact unique identifiers pertaining to financial records, including bank account numbers, credit card numbers, usernames and passwords ("Financial Information"). Documents containing Financial Information shall be redacted but shall not be designated as "Confidential" in full solely on the grounds that they contain Financial Information.

8.      Except with the prior written consent of the Producing Party or by Order of the Court, Confidential Information shall not be furnished, shown or disclosed to any person or entity except to:

    a.  the Parties themselves;

    b.  counsel of record for the Parties to this Litigation and their associated attorneys, including Adam Waldman, who has already seen the documents deemed Confidential by the UK Courts prior to the date of this Amendment and who shall sign Exhibit A before being provided any additional information, paralegals and other professional personnel (including support staff) who are directly assisting such counsel in the preparation of this Litigation for trial or other proceeding herein, are under the supervision or control of such counsel, and who have been advised of their obligations hereunder;

    c.  expert witnesses and members of the expert witnesses' staff working under the expert witnesses' supervision, provided, however, that such Confidential Information is furnished, shown or disclosed to them in accordance with Paragraph 10 hereof;

**Exhibit 2**

    d.   third-party vendors or consultants retained by the Parties or their counsel to furnish technical services in connection with this Litigation and who have been advised of their obligations hereunder;

    e.   the Court and court personnel, if filed in accordance with Paragraph 16 hereof;

    f.   a person before whom a deposition is taken, including stenographic reporters, videographers and any necessary secretarial, clerical or other personnel of such person, if furnished, shown or disclosed in accordance with Paragraph 14 hereof;

    g.   trial and deposition witnesses, if furnished, shown or disclosed in accordance with Paragraphs 12 and 13, respectively, hereof;

    h.   any other person agreed to by the Parties.

9.    Before any disclosure of Protected Information is made pursuant to Paragraph8(b) hereof, counsel for the Receiving Party shall obtain from the intended recipient of the Protected Information such person's written undertaking, in the form of Exhibit A attached hereto, to comply with and be bound by its terms.

10.    Protected Information shall be utilized by the Receiving Party only for purposes of this Litigation, and for no other purposes.

11.    Any Party may designate as Confidential Information all or portions of transcripts of depositions, or exhibits thereto, containing Confidential Information, by making such designation either by statement of Counsel on the record at the deposition itself or by written notice, sent by Counsel to all Parties within twenty (20) days after receipt of the deposition transcript or other pretrial testimony and, provided that only those portions of the transcripts designated as "Confidential" shall be deemed Confidential Information. The transcripts of any

**Exhibit 2**

such deposition or exhibit shall be marked by the court reporter as "Confidential." Prior to the expiration of twenty (20) days after the date of the deposition or pretrial testimony, either Party may seek written consent from the other Party or relief from the Court to use the deposition transcript or other pretrial testimony not designated "Confidential" at any hearing.

12.     The Parties may in good faith disclose Protected Information at any hearing if it relates directly to the subject matter of the hearing, and after prior notice to the Court and counsel and an opportunity to object to its use.  Subject to any rulings by the Court, the Parties may disclose Protected Information at trial, including through argument or the presentation of evidence.  Any transcripts of testimony or exhibits intended to be used at trial must comply with the terms of the Scheduling Order and the Rules of the Court.

13.     This Amendment shall not preclude counsel for the Parties from using Protected Information during any deposition in this Litigation, provided that prior to any such use, the Party intending to use Protected Information shall: (a) provide a copy of this Amendment to the witness, and others to whom disclosure is intended to be made; (b) explain the Amendment to said persons and/or cause them to read the Amendment; and (c) request that said persons execute the undertaking attached hereto as Exhibit A, if such persons are not covered by Paragraph 8 of this Amendment.  The time it takes to make this request described in this Paragraph shall not be used against any time limits a Party has in the deposition where the request is being made.  Should any said person refuse to execute the undertaking, counsel for the Parties may still use the Protected Information during the deposition and the Parties agree that the use of such Protected Information during the deposition shall not negate its treatment as Protected Information pursuant to this Amendment.

**Exhibit 2**

14.     A Party may designate as Confidential Information any Discovery Material produced or given by any non-party to this case, or any portion thereof.  In the case of documents, designation shall be made by notifying all counsel, in writing, of those documents that are to be stamped and treated as Confidential Information at any time up to thirty (30) days after actual receipt of copies of those documents by counsel for the Party asserting the confidentiality designation.  Prior to the expiration of such thirty (30) day period (or until a designation is made by counsel, if such a designation is made in a shorter period of time),  either party may seek written consent from the other party or relief from the Court to use Discovery Material not marked as "Confidential" at any hearing.  In the case of testimony, designation shall be made by notifying all counsel, in writing, of those portions of a transcript which are to be stamped or otherwise treated as Confidential Information at any time up to thirty (30) days after the final transcript is received by counsel for the Party asserting the confidentiality designation.

15.     As to the filing with the Court of Discovery Material that has previously been designated as  "Confidential" or containing Protected Information:

      a.   Any Receiving Party who seeks to file with the Court any Discovery Material that has previously been designated by any Producing Party as  "Confidential" or containing Protected Information, and any pleading, brief or memorandum which reproduces, paraphrases or discloses Protected Information shall file this material under seal and, in doing so, shall take care such that only that portion of a filing that contains the Protected Information is filed under seal.  Nothing in this paragraph shall apply to the designation of and use of Protected Information at trial, on which the parties may reach a separate agreement prior to the trial.

11

**Exhibit 2**

     b.  All pleadings, briefs or memoranda which reproduce, paraphrase or disclose any documents which have previously been designated by a Party as "Confidential" or containing Protected Information, shall identify such documents by the production number ascribed to them at the time of production.

16.    Any person receiving Protected Information shall not reveal or discuss such information with any person not entitled to receive such information under the terms hereof.

17.    Any Discovery Material that may contain Protected Information that has been inadvertently produced without identification as to its protected nature as provided in Paragraphs 2 and/or 14 of this Amendment, may be so designated by the Party asserting the confidentiality designation by written notice to the undersigned counsel for the Receiving Party identifying the Discovery Material as "Confidential" within a reasonable time following the discovery that the document or information has been produced without such designation.

18.    Extracts and summaries of Protected Information shall also be treated as Confidential in accordance with the provisions of this Amendment.

19.    The production or disclosure of Protected Information shall in no way constitute a waiver of each Party's right to object to the production or disclosure of other information in this Litigation or in any other action.

20.    A Producing Party's inadvertent disclosure in connection with this Litigation of one or more documents that such Producing Party believes constitute, contain or reflect information otherwise protected by the attorney-client privilege, the common interest privilege, the work product doctrine or any other privilege or immunity from discovery ("Privileged Documents"), shall not constitute a waiver with respect to such Privileged Documents or generally of such privilege or immunity. If a Receiving Party receives materials that appear to be subject to an

**Exhibit 2**

attorney-client privilege, the common interest privilege, or otherwise protected by a discovery privilege or immunity, the Receiving Party must refrain from further use or examination of the materials that may be privileged, and shall immediately notify the Producing Party, in writing, that he or she possesses material that appears to be privileged. In the event a Producing Party discovers it has inadvertently disclosed Privileged Documents, the Producing Party may provide notice to the other Parties advising of the disclosure and requesting return or destruction of the Privileged Documents. Upon such notice, the Receiving Party shall make no further use or examination of the Privileged Documents and shall immediately segregate them in a manner that will prevent further disclosure or dissemination of their contents, and, within ten (10) days of receiving such notice of inadvertent production of Privileged Documents, the Receiving Party shall destroy or return all original documents identified by the Producing Party in such notice (whether electronic or hard copy), shall destroy or delete any and all copies (whether electronic or hard copy), and shall expunge from any other document, information or material derived from the inadvertently produced Privileged Documents. The party clawing back the inadvertently produced documents will provide the Receiving Party with a privilege log that reasonably identifies the basis for the assertion of privilege.

21.    If, based on (1) the privilege log entries provided to the Receiving Party by the Producing Party, or (2) the Receiving Party's review of documents that occurred prior to the assertion of privilege and claw-back, there is a dispute over whether the clawed back documents at issue are protected from disclosure by virtue of a privilege or immunity from discovery, the original documents shall nevertheless be immediately destroyed or returned to the Producing Party along with all copies (whether electronic or hard copy) thereof. All counsel shall undertake reasonable efforts to resolve the issue of whether the documents are privileged without court

**Exhibit 2**

intervention.  To the extent counsel cannot resolve the issue, the Receiving Party may bring a motion to compel production of the Privileged Documents but may not assert as a ground for compelling production the fact or circumstance that the Privileged Documents had already been produced.  In conjunction with such a motion, the Receiving Party may request that the Court review *in-camera* the clawed back documents at issue, and, if the Court so orders, the Producing Party shall provide the Privileged Documents under seal to the Court for *in-camera* review.  In the event of a motion to compel production of the Privileged Documents, the burden is on the Producing Party to provide, in its opposition to the motion to compel, information regarding the content and context of the Privileged Documents sufficient to establish the applicability of any asserted privilege or immunity from discovery.

22.     If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Information it has received from a Producing Party to any person or in any circumstance not authorized under this Order, the Receiving Party must promptly, after discovery of the disclosure, (a) notify the relevant Producing Party of the unauthorized disclosure(s) in writing, (b) make reasonable efforts to retrieve all copies of the Discovery Material containing Protected Information from the person or persons to whom unauthorized disclosures were made (the "Unauthorized Recipient(s)"), (c) inform the Unauthorized Recipient(s) of all the terms of this Amendment, and (d) request the Unauthorized Recipient(s) to execute the undertaking attached hereto as Exhibit A.

23.     The Parties agree that they may not have an adequate remedy at law in the event that a court of competent jurisdiction determines that there is an actual or threatened breach of this Amendment by either Party and agree that, under such circumstances, the Parties may be entitled

**Exhibit 2**

to specific performance and/or injunctive relief to enforce the terms hereof, in addition to any remedy to which they may be entitled at law or in equity.

24.     The provisions of this Amendment shall be binding upon the Parties.   All modifications of, waivers of and amendments to this Amendment must be in writing and signed by, or on behalf of, the Parties.

25.     This Amendment is entered into without prejudice to the right of either Party to seek relief from, or modification of, this Amendment or any provisions thereof by properly noticed motion to the Court or to challenge any designation of confidentiality as inappropriate under the Rules of the Supreme Court of Virginia or other applicable law.

26.     This Amendment may be changed by further order of this Court, and without prejudice to the rights of a Party to move for relief from any of its provisions, or to seek or agree to different or additional protection for any particular material or information.

27.     In the event that additional Parties join or are joined in this Litigation, they shall not have access to Protected Information until the newly joined Party, by its counsel, has executed and filed with the Court its agreement to be fully bound by this Amendment.

28.     The Parties agree to be bound by the terms of this Amendment pending the entry by the Court of this Amendment, and any violation of its terms shall be subject to the same penalties and sanctions, as if this Amendment had been entered by the Court.

29.     If any Receiving Party is subpoenaed in any other action or proceeding, is served with a document demand or is otherwise compelled by law to produce documents (collectively, a "Demand"), and such Demand seeks Discovery Material that was produced or designated as Protected Information, or that reflects or contains Protected Information, by someone other than the Receiving Party, the Receiving Party shall give prompt written notice by hand or electronic or

15

**Exhibit 2**

facsimile transmission, within five (5) business days of receipt of such Demand, to the Party or its counsel who produced or designated the material as Protected Information. The Receiving Party shall not produce any of the Producing Party's Protected Information, unless court-ordered or otherwise required by law, for a period of at least ten (10) business days after providing the required notice to the Producing Party. If, within ten (10) business days of receiving such notice, the Producing Party gives notice to the Receiving Party that the Producing Party opposes production of its Protected Information, the Receiving Party shall object, citing this Amendment, and not thereafter produce such Protected Information, except as required by law. The Producing Party shall be solely responsible for pursuing any objection to the requested production. Nothing herein shall be construed as requiring the Receiving Party or anyone else covered by this Amendment to challenge or appeal any order requiring production of Protected Information covered by this Amendment, or to subject itself to any penalties for non-compliance with any legal process or order, or to seek any relief from this Court. In the event that Protected Information is produced to a non-party to this Amendment in response to a Demand, such Discovery Material shall continue to be treated in accordance with the designation as Confidential Information by the Parties to this Amendment.

30.     For the avoidance of doubt, nothing herein shall preclude counsel from giving advice to his or her client in this Litigation that includes a general evaluation of Protected Information, provided that counsel shall not disclose the contents of any Protected Information in violation of the terms of this Amendment.

31.     Any Party, in conducting discovery from non-parties in connection with the Litigation, shall provide any non-party from which it seeks discovery with a copy of this Order so as to inform each such non-party of his, her, or its rights herein. If a non-party provides discovery

**Exhibit 2**

to any Party in connection with the Litigation, the provisions of this Order shall apply to such discovery as if such discovery were being provided by a Party. Under such circumstances, the non-party shall have the same rights and obligations under the Order as held by the Parties. For the avoidance of doubt, non-parties may designate Discovery Material as Confidential Information pursuant to Paragraphs 3(a) and 3(b) as set forth herein.

32.     This Amendment shall continue to be binding after the conclusion of this Litigation except (a) that there shall be no restriction on documents that are used as exhibits in Court (unless such exhibits were filed under seal and never unsealed); and (b) that a Party may seek the written permission of the Producing Party or further order of the Court with respect to dissolution or modification of the Amendment.

33.     Nothing herein shall be deemed to waive any privilege recognized by law, or shall be deemed an admission as to the admissibility in evidence of any facts or documents revealed in the course of disclosure.

34.     Within one hundred eighty (180) days after the final termination of this Litigation by settlement (including, to the extent applicable, final court approval of such settlement) or exhaustion of all appeals, all Protected Information produced or designated and all reproductions thereof, shall be returned to the Producing Party or shall be destroyed, at the option of the Producing Party, which option shall be communicated in writing to the Receiving Party promptly. In the event that any Producing Party opts for destruction of its Protected Information, the Receiving Party shall certify, in writing, within one hundred eighty (180) days of the final termination of this Litigation that it has undertaken its best efforts to destroy such physical objects and documents, and that such physical objects and documents have been destroyed to the best of its knowledge. These best efforts need not include destroying Protected Information residing on

**Exhibit 2**

back-up tapes or other disaster recovery systems. Notwithstanding anything to the contrary, lead

counsel of record for the Parties may retain copies of documents constituting work product,

reports, pleadings, motion papers, discovery responses, deposition and trial transcripts and

deposition and trial exhibits. This Amendment shall not be interpreted in a manner that would

violate any applicable canons of ethics or codes of professional responsibility. For the avoidance

of doubt, experts, third-party vendors and consultants who have received Protected Information

shall also be required to return or destroy such Protected Information pursuant to the terms of this

paragraph.

35.     The Amendment constitutes the entire agreement between the Parties with respect

to the subject matter hereof and supersedes all prior agreements and understandings relating to

the subject matter hereof.

36.     The Amendment shall be effective as of the date upon which both Parties have

executed the Amendment.


**AGREED, STIPULATED, AND ACCEPTED:**


By: _____
Benjamin G. Chew, Esq.
Andrew C. Crawford, Esq.
BROWN RUDNICK LLP
601 Thirteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 536-1700
Facsimile: (202) 536-1701
bchew@brownrudnick.com
acrawford@brownrudnick.com

By: _____
Elaine Charlson Bredehoft (VSB No. 23766)
Adam S. Nadelhaft (VSB No. 91717)
Clarissa K. Pintado (VSB No. 86882)
David E. Murphy (VSB No. 90938)
CHARLSON BREDEHOFT COHEN & BROWN,
P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
Telephone: (703) 318-6800
ebredehoft@cbcblaw.com
anadelhaft@cbcblaw.com

**Exhibit 2**

cpintado@cbcblaw.com
dmurphy@cbcblaw.com

Camille M. Vasquez, Esq.
BROWN RUDNICK LLP
2211 Michelson Drive
Irvine, CA 92612
Telephone: (949) 752-7100
Facsimile: (949) 252-1514
cvasquez@brownrudnick.com
*Counsel for Plaintiff and Counter-Defendant*
*John C. Depp, II*

J. Benjamin Rottenbom (VSB No. 84796)
Joshua R. Treece (VSB No. 79149)
WOODS ROGERS PLC
10 S. Jefferson Street, Suite 1400
P.O. Box 14125
Roanoke, Virginia 24011
Telephone: (540) 983-7540
brottenbom@woodsrogers.com
jtreeceamoodsrogers.com
*Counsel for Defendant and Counter-Plaintiff*
*Amber Laura Heard*

**SO ORDERED** THIS **2** DAY OF JUNE, 2021:

The Honorable Penney S. Azcarate
CHIEF JUDGE, FAIRFAX COUNTY
CIRCUIT COURT

19

**Exhibit 2**

## EXHIBIT A

**V I R G I N I A:**

### IN THE CIRCUIT COURT OF FAIRFAX COUNTY

JOHN C. DEPP, II                            |
                                            |
Plaintiff,                                  |     Civil Action No.: CL-2019-0002911
                                            |
v.                                          |
                                            |
AMBER LAURA HEARD                           |
                                            |
Defendant.                                  |
                                            |

### CONSENT TO DISCOVERY PROTECTIVE ORDER

I, the undersigned, hereby certify that I have been provided with a copy of the Agreed Protective Order for the production and exchange of Protected Material entered in the above-captioned action and hereby agree to be bound by the terms and conditions thereof.

Signature: _____

Name: _____

Business Affiliation: _____

Address: _____

Date: _____

**Exhibit 2**

McCormick, Barstow, Sheppard,
Wayte & Carruth LLP
James P. Wagoner, #58553
  *jim.wagoner@mccormickbarstow.com*
Nicholas H. Rasmussen, #285736
  *nrasmussen@mccormickbarstow.com*
Alexander R. Morrow, #341052
  *Alexander.morrow@mccormickbarstow.com*
7647 North Fresno Street
Fresno, California 93720
Telephone:  (559) 433-1300
Facsimile:   (559) 433-2300

Attorneys for Defendant New York
Marine and General Insurance Company

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| Travelers Commercial Insurance Company, a Connecticut Corporation,<br><br>Plaintiff,<br><br>v.<br><br>New York Marine and General Insurance Company, a Delaware Corporation,<br><br>Defendant. | Case No. 2:21-cv-5832-GW (PDx)<br><br>**DEFENDANT NEW YORK MARINE AND GENERAL INSURANCE COMPANY'S REQUESTS FOR PRODUCTION, SET ONE**<br><br>Hon. George H. Wu |

PROPOUNDING PARTY:   NEW YORK MARINE AND GENERAL
                                            INSURANCE COMPANY

RESPONDING PARTY:   TRAVELERS COMMERCIAL INSURANCE
                                         COMPANY

SET NO.:                        ONE (1)

## <u>INTRODUCTION AND INSTRUCTIONS</u>

PLEASE TAKE NOTICE that, pursuant to the provisions of Federal Rule of Civil Procedure 34, Defendant New York Marine And General Insurance Company ("NEW YORK MARINE"), hereby demands that the following documents and

**Exhibit 3**

tangible things in the possession, custody, or control of Travelers Commercial Insurance Company ("TRAVELERS") be made available for inspection and copying as set forth below. This demand is made on the grounds that all of the below-specified documents are in the possession, custody, or control of the responding party, that they are not privileged or protected matter, that they are relevant to the subject matter involved in this action, and that they are either admissible in evidence or reasonably calculated to lead to the discovery of admissible evidence.

Words and phrases with all capital letters have a specific meaning expressly assigned to them in the below "DEFINITIONS" section. The singular shall always include the plural, and vice versa, and verb tenses include the past, present and future tenses. The words "and" and "or" are to be construed disjunctively or conjunctively as necessary to bring within these Request for Production of Documents all DOCUMENTS that might otherwise be construed to be outside its scope.

The requested DOCUMENTS shall include all attachments, enclosures, explanatory notes or memoranda, and any other material that accompanied the requested materials. If a specific DOCUMENT elicited a response, then that response is to also be identified and produced. If the DOCUMENT(s) itself was a response, then the DOCUMENT(s) to which is it responding is/are also to be identified and produced.

When YOU assert that any of these Requests for Production of Documents is objectionable, state the objection with regards to the particular portion(s) of the Request which is/are deemed objectionable. Unless the objection is directed to the entire Request, and each and every DOCUMENT requested therein, please provide all DOCUMENTS and things responsive to all portions of the Request which are not deemed objectionable.

For any information that has been redacted from any DOCUMENT produced pursuant to these Requests for Production of Documents, YOU must identify that YOU have redacted information and the basis or bases upon which such information

was redacted.   If YOU assert a claim of privilege for any of the requested DOCUMENTS or withhold any of the requested DOCUMENTS for another reason, please provide for each such DOCUMENT, with the specificity that YOU would request in a motion to compel discovery:  (a) A statement that sets forth the identity of the author thereof, the parties thereto, all PERSONS or entities who received copies thereof or have seen, read or heard of the DOCUMENT or a duplicate thereof, and all PERSONS or entities who helped in its preparation; the title or other identifying data; the type of DOCUMENT; the date of the DOCUMENT or, if no date is listed on the DOCUMENT, the approximate date; in summary, its subject matter; the recipients of the DOCUMENT; its addressee; its current location; the name and address of its custodian and every other PERSON having or last having possession, care, custody or control of the original and each of any duplicates thereof; and (b) A specific statement of the ground(s) on which YOU rely on withholding production, and the basis and authority for asserting the applicability of such ground(s).

In responding to these Requests for Production, YOU must make a diligent search of YOUR records and of other papers and materials in YOUR possession or available to YOU or YOUR representatives.  If these Requests for Production of Documents cannot be complied with in full, then comply to the maximum extent possible and specify the reason for YOUR inability to comply with the remainder.  If YOU are aware of any DOCUMENT(S) otherwise responsive to these Requests for Production of Documents that is/are no longer in YOUR possession, custody or control, then identify the name and title of the author; the name and title of the addressee; the date of the DOCUMENT; the title and subject matter of the DOCUMENT; and the PERSON(S), if any, now in control of the DOCUMENT.

YOU must either produce the DOCUMENTS as they are kept in the usual course of business or organize and label the DOCUMENTS to correspond with the categories in these Requests for Production of Documents.  If YOU produce the DOCUMENTS as they are kept in the usual course of business, then the

DOCUMENTS so produced must include any files, file envelopes, file folders, file separators, file boxes, file tabs, labels and/or any other form of organizational or descriptive device or indicator that relates to the manner in which the DOCUMENTS are kept in the usual course of business (the "Filing Materials"). If YOU produce the DOCUMENTS to correspond with the categories in these Requests for Production, then YOU also must produce the aforementioned Filing Materials and provide sufficient descriptions of them to permit the determination of which DOCUMENTS would, in the usual course of business, be filed with or in such specific Filing Material(s).

YOUR responses shall be served within thirty (30) days of the date of the demand in accordance with the provisions of Federal Rule of Civil Procedure 34(b)(2)(A). Inspection will take place at the law offices of McCormick, Barstow, Sheppard, Wayte & Carruth LLP, 7647 N. Fresno Street, Fresno, CA 93720 on or before thirty (30) days from the date of service of these Requests for Production, Set One. However, YOU may comply with this production request by mailing copies of the items demanded herein to counsel for NEW YORK MARINE, McCormick, Barstow, Sheppard, Wayte & Carruth LLP, 7647 N. Fresno Street, Fresno, CA 93720, on or before thirty (30) days from the date of service of these Requests for Production, along with a verification declaring that the copies of the items produced are true and correct copies of the items in YOUR possession, custody, or control that are responsive to these requests.

## **DEFINITIONS**

Words in capital are defined as follows:

1.     The term "CAMERON MCEVOY" means the law firm Cameron McEvoy PLLC.

2.     The term "CHARLESON BREDEHOFT" means the law firm Charlson Bredehoft Cohen Brown & Nadelhaft P.C.

3.     The term "CLAIM FILE" means the complete file kept by an insurance

company regarding a tender under one of its policies.  The "CLAIM FILE" contains all DOCUMENTS and COMMUNICATIONS within the insurer's possession regarding the file including, but not limited to electronic notes, work papers, and memoranda, electronic or otherwise, as is maintained in compliance with California Insurance Code section 2695.3.

4. The terms "COMMUNICATION" or "COMMUNICATED" means any exchange of information, statement, or discussion between or among two or more PERSONS, including but not limited to, face-to-face conversation, telephone conversations, video conversations, correspondence, memoranda, emails, telegrams, telexes, facsimiles, meetings, discussions, releases, statements, publications, or any recordings or reproductions.

5. The term "DOCUMENTS" means all materials within the full scope of Rule 34 of the Federal Rules of Civil Procedure including but not limited to:  all writings and recordings, including the originals and all non-identical copies, whether different from the original by reason of any notation made on such copies or otherwise (including but without limitation to, email and attachments, correspondence, memoranda, notes, diaries, minutes, statistics, letters, telegrams, minutes, contracts, reports, studies, checks, statements, tags, labels, invoices, brochures, periodicals, telegrams, receipts, returns, summaries, pamphlets, books, interoffice and intraoffice communications, offers, notations of any sort of conversations, working papers, applications, permits, file wrappers, indices, telephone calls, meetings or printouts, teletypes, telefax, invoices, worksheets, and all drafts, alterations, modifications, changes and amendments of any of the foregoing), graphic or aural representations of any kind (including without limitation, photographs, charts, microfiche, videotape, recordings, motion pictures, plans, drawings, surveys), and electronic, mechanical, magnetic, optical, or electric records or representations of any kind (including without limitation, computer files and programs, tapes, cassettes, discs, recordings) including metadata.

**Exhibit 3**

6.    The term "INDEPENDENT COUNSEL" means counsel retained by the insured and funded by TRAVELERS, including but not limited to the CHARLSON BREDEHOFT and/or KAPLAN law firms.

7.    The term "INSURED" means and refers to the defendant in the UNDERLYING ACTION, Amber Heard, to whom both TRAVELERS and NEW YORK MARINE issued insurance policies.

8.    The term "KAPLAN" means the law firm Kaplan Hecker & Fink.

9.    The term "NEW YORK MARINE" means and refers to New York Marine and General Insurance Company and includes anyone acting on New York Marine and General Insurance Company's behalf, such as all agents, representatives, attorneys and/or other person acting or purporting to act on behalf of New York Marine and General Insurance Company for any purpose.  "NEW YORK MARINE" also means and refers to ProSight Specialty Management Company, Inc. and includes anyone acting on ProSight Specialty Management Company, Inc.'s behalf, such as all agents, representatives, attorneys and/or other person acting or purporting to act on behalf of ProSight Specialty Management Company, Inc. for any purpose.

10.    The term "PERSON" means a natural person, firm, association, organization, partnership, business trust, corporation, public entity or any other entity.

11.    The term "UNDERLYING ACTION" means and refers to the action entitled *John C. Depp, II v. Amber Laura Heard*, which was filed on January 4, 2017 in Fairfax County, Virginia Circuit Court and bears case number CL-2019-0002911.

12.    The terms "YOU," "YOUR," and "TRAVELERS" mean and refer to Travelers Commercial Insurance Company and includes anyone acting on Travelers Commercial Insurance Company's behalf, such as all agents, representatives, attorneys, and/or other persons acting or purporting to act on behalf of Travelers Commercial Insurance Company for any purpose.

///

///

**REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1:**

Produce YOUR complete CLAIM FILE for the UNDERLYING ACTION.

**REQUEST FOR PRODUCTION NO. 2:**

Produce any and all COMMUNICATIONS between TRAVELERS and NEW YORK MARINE regarding the UNDERLYING ACTION, including but not limited to any COMMUNICATIONS with Steven Battaglia, Ellen Fine, Tom Jambor, Leon Gladstone, James Wagoner, and/or Nicholas Rasmussen.

**REQUEST FOR PRODUCTION NO. 3:**

Produce any and all COMMUNICATIONS between TRAVELERS and Cameron McEvoy, PLLC and/or its owners, members, partners, agents, employees, or counsel regarding the UNDERLYING ACTION, including but not limited to any COMMUNICATIONS with Sean Roche, Edward "Sunny" Cameron, and/or Tim McEvoy.

**REQUEST FOR PRODUCTION NO. 4:**

Produce any and all COMMUNICATIONS between TRAVELERS and Kaplan, Hecker & Fink LLP and/or its owners, members, partners, agents, employees, or counsel regarding the UNDERLYING ACTION, including but not limited to any COMMUNICATIONS with Roberta A. Kaplan, Julie E. Fink, John C. Quinn, and/or Joshua Matz.

**REQUEST FOR PRODUCTION NO. 5:**

Produce any and all COMMUNICATIONS between TRAVELERS and INDEPENDENT COUNSEL regarding the UNDERLYING ACTION.

**REQUEST FOR PRODUCTION NO. 6:**

Produce any and all DOCUMENTS in support of TRAVELERS' contention in paragraph 18 of the First Amended Complaint that NEW YORK MARINE "compounded its breach of the duty to defend by having its appointed counsel do next to nothing and 'piggy-back' on the work of the mutual insured's independent defense

1  counsel, paid for by" TRAVELERS.

2  **REQUEST FOR PRODUCTION NO. 7:**

3       Produce any and all DOCUMENTS in support of YOUR contention in

4  paragraph 31 of the First Amended Complaint that "even if the court determines that

5  [NEW YORK MARINE] was not obligated to defend the [INSURED] with

6  independent defense counsel of the [INSURED]'s choosing, either because California

7  law does not apply or for some other reason, [NEW YORK MARINE] still breached

8  its duty to defend the [INSURED] by failing to provide it an adequate defense."

9  **REQUEST FOR PRODUCTION NO. 8:**

10      Produce any and all DOCUMENTS in support of YOUR contention in

11 paragraph 18 of the First Amended Complaint that NEW YORK MARINE "ha[d] its

12 appointed defense counsel do next to nothing."

13 **REQUEST FOR PRODUCTION NO. 9:**

14      Produce any and all DOCUMENTS in support of YOUR contention in

15 paragraph 31 of the First Amended Complaint that NEW YORK MARINE should be

16 responsible for 50 percent of all fees and costs incurred by the INSURED's

17 independent counsel.

18 **REQUEST FOR PRODUCTION NO. 10:**

19      Produce any and all DOCUMENTS in support of YOUR contention in

20 paragraph 31 of the First Amended Complaint that the Cameron McEvoy, PLLC law

21 firm did not provide an "adequate defense" to the INSURED in the UNDERLYING

22 ACTION.

23 **REQUEST FOR PRODUCTION NO. 11:**

24      Produce any and all bills, invoices, and related DOCUMENTS reflecting sums

25 paid by TRAVELERS in connection with the INSURED's defense in the

26 UNDERLYING ACTION as to which TRAVELERS claims it is entitled to

27 reimbursement from NEW YORK MARINE.

28

**Exhibit 3**

**REQUEST FOR PRODUCTION NO. 12:**

Produce any and all bill reviews, audits, and related DOCUMENTS reflecting sums paid by TRAVELERS in connection with the INSURED's defense in the UNDERLYING ACTION as to which TRAVELERS claims it is entitled to reimbursement from NEW YORK MARINE.

**REQUEST FOR PRODUCTION NO. 13:**

Produce any and all cancelled checks, wire transfers, or other DOCUMENTS reflecting proof of payments made by TRAVELERS in connection with the INSURED's defense in the UNDERLYING ACTION as to which TRAVELERS claims it is entitled to reimbursement from NEW YORK MARINE.

**REQUEST FOR PRODUCTION NO. 14:**

Produce any and all DOCUMENTS on which TRAVELERS will rely in its prosecution of the above-captioned action.

Dated: March 19, 2022

McCORMICK, BARSTOW, SHEPPARD,
WAYTE & CARRUTH LLP

_____
James P. Wagoner
Nicholas H. Rasmussen
Alexander R. Morrow
Attorneys for Defendant New York Marine and
General Insurance Company

8257226.1

DEFENDANT'S REQUESTS FOR PRODUCTION, SET ONE

**Exhibit 3**

## PROOF OF SERVICE

**Travelers Commercial Insurance Company v. New York Marine and General Insurance Company**

**STATE OF CALIFORNIA, COUNTY OF FRESNO**

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Fresno, State of California. My business address is 7647 North Fresno Street, Fresno, CA 93720.

On March 19, 2022, I served true copies of the following document(s) described as **DEFENDANT NEW YORK MARINE AND GENERAL INSURANCE COMPANY'S REQUESTS FOR PRODUCTION, SET ONE** on the interested parties in this action as follows:

Mark D. Peterson
Kathleen O. Peterson
Amy Howse
Cates Peterson LLP
4100 Newport Place, Suite 230
Newport Beach, CA 92660
Telephone: (949) 724-1180
Email: markpeterson@catespeterson.com
kpeterson@catespeterson.com
ahowse@catespeterson.com

*Attorneys for Plaintiff Travelers Commercial Insurance Company*

**BY ELECTRONIC SERVICE (E-MAIL):** Based on a court order or an agreement of the parties to accept electronic service, my electronic service address is marisela.taylor@mccormickbarstow.com, and I caused the document(s) to be sent to the persons at the electronic service address(es) listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on March 19, 2022, at Fresno, California.

Marisela Taylor

**Exhibit 3**

1    McCormick, Barstow, Sheppard,
Wayte & Carruth LLP
2    James P. Wagoner, #58553
     *jim.wagoner@mccormickbarstow.com*
3    Nicholas H. Rasmussen, #285736
     *nrasmussen@mccormickbarstow.com*
4    Alexander R. Morrow, #341052
     *Alexander.morrow@mccormickbarstow.com*
5    7647 North Fresno Street
Fresno, California 93720
6    Telephone: (559) 433-1300
Facsimile: (559) 433-2300
7

8    Attorneys for Defendant New York
Marine and General Insurance Company

9            UNITED STATES DISTRICT COURT

10      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

11

12    Travelers Commercial Insurance      Case No. 2:21-cv-5832-GW (PDx)
Company, a Connecticut Corporation,
13                               **DEFENDANT NEW YORK**
          Plaintiff,             **MARINE AND GENERAL**
14                               **INSURANCE COMPANY'S**
      v.                          **REQUESTS FOR ADMISSION, SET**
15                               **ONE**
   New York Marine and General
16    Insurance Company, a Delaware    Hon. George H. Wu
Corporation,
17

          Defendant.
18

19    PROPOUNDING PARTY:    NEW YORK MARINE AND GENERAL
                               INSURANCE COMPANY
20

21    RESPONDING PARTY:      TRAVELERS COMMERCIAL INSURANCE
                               COMPANY
22

23    SET NO.:                  ONE (1)

24

25                 **<u>INTRODUCTION AND INSTRUCTIONS</u>**

26        PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 36,

27    Defendant, Defendant New York Marine And General Insurance Company ("NEW

28    YORK MARINE"), hereby requests that Travelers Commercial Insurance Company

("TRAVELERS") admit within thirty (30) days after service of these Requests for Admission, Set One that each matter listed below is true or that the documents identified are genuine, genuine, true, correct, and/or authentic.

If you fail to comply with the provisions of Federal Rule of Civil Procedure 36, with respect to these Requests for Admission, Set One each of the matters on which an admission is requested will be automatically deemed admitted pursuant to Rule 36(a)(3). Denial of any matter later proven may form the basis of a motion to assert costs under Federal Rule of Civil Procedure 37(c)(2).

## DEFINITIONS

Words in capital are defined as follows:

1.     The term "CAMERON MCEVOY" means the law firm Cameron McEvoy PLLC.

2.     The term "CHARLESON BREDEHOFT" means the law firm Charlson Bredehoft Cohen Brown & Nadelhaft P.C.

3.     The term "COMMUNICATION" or "COMMUNICATED" means any exchange of information, statement, or discussion between or among two or more PERSONS, including but not limited to, face-to-face conversation, telephone conversations, video conversations, correspondence, memoranda, emails, telegrams, telexes, facsimiles, meetings, discussions, releases, statements, publications, or any recordings or reproductions.

4.     The term "DOCUMENTS" means all materials within the full scope of Rule 34 of the Federal Rules of Civil Procedure including but not limited to: all writings and recordings, including the originals and all non-identical copies, whether different from the original by reason of any notation made on such copies or otherwise (including but without limitation to, email and attachments, correspondence, memoranda, notes, diaries, minutes, statistics, letters, telegrams, minutes, contracts, reports, studies, checks, statements, tags, labels, invoices, brochures, periodicals, telegrams, receipts, returns, summaries, pamphlets, books, interoffice and intraoffice

communications, offers, notations of any sort of conversations, working papers, applications, permits, file wrappers, indices, telephone calls, meetings or printouts, teletypes, telefax, invoices, worksheets, and all drafts, alterations, modifications, changes and amendments of any of the foregoing), graphic or aural representations of any kind (including without limitation, photographs, charts, microfiche, videotape, recordings, motion pictures, plans, drawings, surveys), and electronic, mechanical, magnetic, optical, or electric records or representations of any kind (including without limitation, computer files and programs, tapes, cassettes, discs, recordings) including metadata.

5.    The term "INDEPENDENT COUNSEL" means counsel retained by the insured and funded by TRAVELERS, including but not limited to the CHARLSON BREDEHOFT and/or KAPLAN law firms.

6.    The term "INSURED" means and refers to the defendant in the UNDERLYING ACTION, Amber Laura Heard, to whom both TRAVELERS and NEW YORK MARINE issued insurance policies.

7.    The term "KAPLAN" means the law firm Kaplan Hecker & Fink.

8.    The term "PERSON" means a natural person, firm, association, organization, partnership, business trust, corporation, public entity or any other entity.

9.    "NEW YORK MARINE" means and refers to New York Marine and General Insurance Company and includes anyone acting on New York Marine and General Insurance Company's behalf, such as all agents, representatives, attorneys and/or other person acting or purporting to act on behalf of New York Marine and General Insurance Company for any purpose. "NEW YORK MARINE" also means and refers to ProSight Specialty Management Company, Inc. and includes anyone acting on ProSight Specialty Management Company, Inc.'s behalf, such as all agents, representatives, attorneys and/or other person acting or purporting to act on behalf of ProSight Specialty Management Company, Inc. for any purpose.

10.    The term "UNDERLYING ACTION" means and refers to the action

**Exhibit 4**

1  entitled *John C. Depp, II v. Amber Laura Heard*, which was filed on January 4, 2017

2  in Fairfax County, Virginia Circuit Court and bears case number CL-2019-0002911.

3        11.    The term "WOODS ROGERS" means the law firm Woods Rogers PLC.

4        12.    The term "YOU," "YOUR," and "TRAVELERS" mean and refer to

5  Travelers Commercial Insurance Company and includes anyone acting on Travelers

6  Commercial Insurance Company's behalf, such as all agents, representatives,

7  attorneys, and/or other persons acting or purporting to act on behalf of Travelers

8  Commercial Insurance Company for any purpose.

9  **REQUESTS FOR ADMISSION**

10  **REQUEST FOR ADMISSION NO. 1:**

11      Admit that the INSURED tendered the defense of the UNDERLYING

12  ACTION to TRAVELERS on or about September 1, 2019.

13  **REQUEST FOR ADMISSION NO. 2:**

14      Admit that the DOCUMENT attached hereto as Exhibit 1 is a genuine, true and

15  correct copy of the copy of the October 7, 2019 reservation of rights letter which was

16  issued by TRAVELERS to the INSURED pursuant to which TRAVELERS agreed to

17  provide the insured with a defense in the UNDERLYING ACTION.

18  **REQUEST FOR ADMISSION NO. 3:**

19      Admit that following its acceptance of the INSURED's defense, TRAVELERS

20  agreed to the retention of KAPLAN as INDEPENDENT COUNSEL.

21  **REQUEST FOR ADMISSION NO. 4:**

22      Admit that KAPLAN was not licensed to practice in the Virginia Circuit Court,

23  Fairfax County, Virginia.

24  **REQUEST FOR ADMISSION NO. 5:**

25      Admit that following its acceptance of the INSURED's defense, the INSURED

26  and/or KAPLAN requested approval to retain WOODS ROGERS.

27  **REQUEST FOR ADMISSION NO. 6:**

28      Admit that TRAVELERS agreed to the retention of WOODS ROGERS by the

4

**Exhibit 4**

1  INSURED.

2  **REQUEST FOR ADMISSION NO. 7:**

3       Admit that WOODS ROGERS was retained to serve as "local counsel" because

4  KAPLAN was not licensed to practice in the Virginia Circuit Court, Fairfax County,

5  Virginia.

6  **REQUEST FOR ADMISSION NO. 8:**

7       Admit that the INSURED tendered the defense of the UNDERLYING

8  ACTION to NEW YORK MARINE on or about September 3, 2019.

9  **REQUEST FOR ADMISSION NO. 9:**

10       Admit that the DOCUMENT attached hereto as Exhibit 2 is a genuine, true,

11  and correct copy of a September 19, 2019 email from Pamela Johnson to Sean Roche

12  and Tim McEvoy.

13  **REQUEST FOR ADMISSION NO. 10:**

14       Admit that in Exhibit 2, Pamela Johnson of TRAVELERS emailed Sean Roche

15  and Tim McEvoy of CAMERON MCEVOY to ensure that they were aware that there

16  had been a change to the trial date in the UNDERLYING ACTION.

17  **REQUEST FOR ADMISSION NO. 11:**

18       Admit that NEW YORK MARINE appointed CAMERON MCEVOY to

19  represent the INSURED as defense counsel in the UNDERLYING ACTION.

20  **REQUEST FOR ADMISSION NO. 12:**

21       Admit that prior to its appointment as defense counsel by NEW YORK

22  MARINE, CAMERON MCEVOY had been retained by and was already representing

23  the INSURED in the UNDERLYING ACTION.

24  **REQUEST FOR ADMISSION NO. 13:**

25       Admit that CAMERON MCEVOY was not included on the signature block or

26  service list for the INSURED's Demurrer and Plea in Bar filed by INDEPENDENT

27  COUNSEL in the UNDERLYING ACTION on DECEMBER 13, 2019.

28  /

DEFENDANT'S REQUEST FOR ADMISSION, SET ONE          **Exhibit 4**

**REQUEST FOR ADMISSION NO. 14:**

Admit that CAMERON MCEVOY was not included on the signature block or service list for the INSURED's Answer filed by INDEPENDENT COUNSEL in the UNDERLYING ACTION on August 10, 2020 .

**REQUEST FOR ADMISSION NO. 15:**

Admit that CAMERON MCEVOY was not included on the signature block or service list for the INSURED's Counterclaim filed by INDEPENDENT COUNSEL in the UNDERLYING ACTION on August 10, 2020.

**REQUEST FOR ADMISSION NO. 16:**

Admit that at least as early as March 2020, CAMERON MCEVOY had COMMUNICATED to TRAVELERS its inability to gain the cooperation of INDEPENDENT COUNSEL in connection with the defense of the INSURED in the UNDERLYING ACTION.

**REQUEST FOR ADMISSION NO. 17:**

Admit that at least as early as March 2020, CAMERON MCEVOY had actively sought assistance from TRAVELERS to obtain INDEPENDENT COUNSEL's cooperation with it in connection with the defense of the INSURED in the UNDERLYING ACTION.

**REQUEST FOR ADMISSION NO. 18:**

Admit that on or before March 21, 2020, TRAVELERS knew that INDEPENDENT COUNSEL's conduct was preventing CAMERON MCEVOY from fully and actively participating in the defense of the INSURED in the UNDERLYING ACTION.

**REQUEST FOR ADMISSION NO. 19:**

Admit that on or before March 21, 2020, CAMERON MCEVOY COMMUNICATED to TRAVELERS that INDEPENDENT COUNSEL was not cooperating with it in connection with the defense of the INSURED in the UNDERLYING ACTION.

DEFENDANT'S REQUEST FOR ADMISSION, SET ONE     **Exhibit 4**

**REQUEST FOR ADMISSION NO. 20:**

Admit that on or before March 21, 2020, CAMERON MCEVOY COMMUNICATED to TRAVELERS that INDEPENDENT COUNSEL failed to include CAMERON MCEVOY on emails, pleadings, and certificates of service.

**REQUEST FOR ADMISSION NO. 21:**

Admit that on or before March 21, 2020, CAMERON MCEVOY COMMUNICATED to TRAVELERS that INDEPENDENT COUNSEL failed to consult with CAMERON MCEVOY in connection with case strategy and management.

**REQUEST FOR ADMISSION NO. 22:**

Admit that on or before March 21, 2020, CAMERON MCEVOY actively sought assistance from TRAVELERS to obtain INDEPENDENT COUNSEL'S cooperation with its defense of the INSURED.

**REQUEST FOR ADMISSION NO. 23:**

Admit that on or about March 21, 2020, TRAVELERS COMMUNICATED with INDEPENDENT COUNSEL regarding CAMERON MCEVOY's complaints that INDEPENDENT COUNSEL was refusing to cooperate with CAMERON MCEVOY in the defense of the insured in the UNDERLYING ACTION.

**REQUEST FOR ADMISSION NO. 24:**

Admit that on or about March 21, 2020, TRAVELERS COMMUNICATED with INDEPENDENT COUNSEL to discuss issues including billing and sharing work with CAMERON MCEVOY in the defense of the INSURED in the UNDERLYING ACTION.

**REQUEST FOR ADMISSION NO. 25:**

Admit that on or about March 21, 2020, TRAVELERS COMMUNICATED with INDEPENDENT COUNSEL and requested that INDEPENDENT COUNSEL facilitate CAMERON MCEVOY's full and active participation in the defense of the INSURED in the UNDERLYING ACTION.

DEFENDANT'S REQUEST FOR ADMISSION, SET ONE

**Exhibit 4**

**REQUEST FOR ADMISSION NO. 26:**

Admit that on or about March 21, 2020, INDEPENDENT COUNSEL COMMUNICATED to TRAVELERS that it was unwilling to cooperate with CAMERON MCEVOY in connection with the defense of the INSURED in the UNDERLYING ACTION.

**REQUEST FOR ADMISSION NO. 27:**

Admit that on March 21, 2020, TRAVELERS COMMUNICATED to CAMERON MCEVOY and NEW YORK MARINE that TRAVELERS' discussion with INDEPENDENT COUNSEL regarding billing and sharing work with CAMERON MCEVOY "did not go well."

**REQUEST FOR ADMISSION NO. 28:**

Admit that the DOCUMENT attached hereto as Exhibit 3 is a genuine, true, and correct copy of a March 21, 2020 email from Pamela Johnson to Sean Roche.

**REQUEST FOR ADMISSION NO. 29:**

Admit that in Exhibit 3, Pamela Johnson on behalf of TRAVELERS stated she "spoke with the Kaplan firm last week about billing, sharing the work, etc." and that "[i]t did not go well."

**REQUEST FOR ADMISSION NO. 30:**

Admit that after March 21, 2020, TRAVELERS took no other steps to require INDEPENDENT COUNSEL to cooperate with, share work with, and facilitate CAMERON MCEVOY's full and active participate in the defense of the INSURED in the UNDERLYING ACTION.

**REQUEST FOR ADMISSION NO. 31:**

Admit that TRAVELERS never brought an action for either declaratory relief, injunctive relief, or both against INDEPENDENT COUNSEL pursuant to Civil Code § 2860(f), to require INDEPENDENT COUNSEL to cooperate with, share work with, and facilitate CAMERON MCEVOY's full and active participate in the defense of the INSURED in the UNDERLYING ACTION.

**REQUEST FOR ADMISSION NO. 32:**

Admit that TRAVELERS contends that California law, including Civil Code section 2860, applies to TRAVELERS' provision of a defense to the INSURED in the UNDERLYING ACTION.

**REQUEST FOR ADMISSION NO. 33:**

Admit that TRAVELERS had the right under California law, including pursuant to Civil Code 2860(f), to require INDEPENDENT COUNSEL to cooperate with and share work with counsel appointed by NEW YORK MARINE and INDEPENDENT COUNSEL appointed by TRAVELERS.

**REQUEST FOR ADMISSION NO. 34:**

Admit that TRAVELERS never refused to pay or delayed payment of any of INDEPENDENT COUNSEL's bills pending INDEPENDENT COUNSEL's agreement to fulfill its obligation under Civil Code § 2860 to cooperate with, share work with, and facilitate CAMERON MCEVOY's full and active participation in the defense of the INSURED in the UNDERLYING ACTION.

**REQUEST FOR ADMISSION NO. 35:**

Admit that the DOCUMENT attached hereto as Exhibit 4 is a genuine, true, and correct copy of a May 28, 2020 email from Pamela Johnson to Steven Battaglia.

**REQUEST FOR ADMISSION NO. 36:**

Admit that in Exhibit 4, Pamela Johnson of TRAVELERS asked to set up a call with Steven Battaglia of NEW YORK MARINE because "[t]here have been some significant events in the [UNDERLYING ACTION]."

**REQUEST FOR ADMISSION NO. 37:**

Admit that the DOCUMENT attached hereto as Exhibit 5 is a genuine, true, and correct copy of a June 10, 2020 letter from Pamela Johnson to Elaine Bredehoft.

**REQUEST FOR ADMISSION NO. 38:**

Admit that Exhibit 5 is the executed "capped fee" agreement for representation of the INSURED between TRAVELERS and CHARLSON BREDEHOFT, signed by

1 | Pamela Johnson to Elaine Bredehoft.

2 | **REQUEST FOR ADMISSION NO. 39:**

3 |     Admit that the DOCUMENT attached hereto as Exhibit 6 is a genuine, true,

4 | and correct copy of an August 4, 2020 email from Pamela Johnson to Sean Roche,

5 | Tim McEvoy, and Steven Battaglia.

6 | **REQUEST FOR ADMISSION NO. 40:**

7 |     Admit that in Exhibit 6 Pamela Johnson of TRAVELERS forwarded an status

8 | update from Elaine Bredehoft which did not include NEW YORK MARINE or

9 | CAMERON MCEVOY,

10 | **REQUEST FOR ADMISSION NO. 41:**

11 |     Admit that the DOCUMENT attached hereto as Exhibit 7 is a genuine, true,

12 | and correct copy of an August 7, 2020 email from Elaine Bredehoft.

13 | **REQUEST FOR ADMISSION NO. 42:**

14 |     Admit that in Exhibit 7, Elaine Bredehoft provided an update in the

15 | UNDERLYING ACTION to the INSURED, the INSURED's personal counsel,

16 | TRAVELERS, and WOODS ROGERS, but did not copy NEW YORK MARINE or

17 | CAMERON MCEVOY.

18 | **REQUEST FOR ADMISSION NO. 43:**

19 |     Admit that the DOCUMENT attached hereto as Exhibit 8 is a genuine, true,

20 | and correct copy of an August 21, 2020 email from Pamela Johnson to Steven

21 | Battaglia.

22 | **REQUEST FOR ADMISSION NO. 44:**

23 |     Admit that in Exhibit 8, Pamela Johnson of TRAVELERS forwarded an update

24 | from Elaine Bredehoft which did not include NEW YORK MARINE or CAMERON

25 | MCEVOY, stating "I wanted to make you aware of these developments.  Please let

26 | me know if you need further information."

27 | **REQUEST FOR ADMISSION NO. 45:**

28 |     Admit that in Exhibit 8, Elaine Bradehoft provided an update in the

DEFENDANT'S REQUEST FOR ADMISSION, SET ONE                **Exhibit 4**

1  UNDERLYING ACTION to the INSURED, the INSURED's personal counsel, and

2  TRAVELERS, but did not copy NEW YORK MARINE or CAMERON MCEVOY.

3  **REQUEST FOR ADMISSION NO. 46:**

4      Admit that CAMERON MCEVOY withdrew from representing the INSURED

5  on November 6, 2020.

6  **REQUEST FOR ADMISSION NO. 47:**

7      Admit that CAMERON MCEVOY's withdrawal from the INSURED's

8  defense in the UNDERLYING ACTION was caused in whole or in part by

9  INDEPENDENT  COUNSEL's  conduct,  including  but  not  limited  to

10 INDEPENDENT COUNSEL's failure and refusal to cooperate with CAMERON

11 MCEVOY and its failure and refusal to facilitate CAMERON MCEVOY's active and

12 effective participation in the defense of the INSURED in the UNDERLYING

13 ACTION.

14 **REQUEST FOR ADMISSION NO. 48:**

15     Admit that the DOCUMENT attached hereto as Exhibit 9 is a genuine, true,

16 and correct copy of a December 30, 2020 email from Steven Battaglia to Pamela

17 Johnson.

18 **REQUEST FOR ADMISSION NO. 49:**

19     Admit that the DOCUMENT attached hereto as Exhibit 10 is a genuine, true,

20 and correct copy of a February 22, 2021 email from Pamela Johnson to Steven

21 Battaglia.

22 **REQUEST FOR ADMISSION NO. 50:**

23     Admit that in Exhibit 10 Pamela Johnson of TRAVELERS acknowledged that

24 NEW YORK MARINE did not have a "reporting arrangement with Elaine

25 [Bredehoft]" and that it should not have been her "responsibility" do provide NEW

26 YORK MARINE with updates in the UNDERLYING ACTION.

27 **REQUEST FOR ADMISSION NO. 51:**

28     Admit that the DOCUMENT attached hereto as Exhibit 11 is a genuine, true,

1 and correct copy of a February 24, 2021 email from Pamela Johnson to Steven

2 Battaglia.

3 **REQUEST FOR ADMISSION NO. 52:**

4     Admit that in Exhibit 11 Pamela Johnson of TRAVELERS acknowledged that

5 NEW YORK MARINE did not have its "own communication channel with [the

6 INSURED's independent] counsel" and that TRAVELERS should not "be

7 responsible for keeping [NEW YORK MARINE] up to date."

8 **REQUEST FOR ADMISSION NO. 53:**

9     Admit that the DOCUMENT attached hereto as Exhibit 12 is a genuine, true,

10 and correct copy of a May 18, 2021 letter from Pamela Johnson to Elaine Bredehoft.

11 **REQUEST FOR ADMISSION NO. 54:**

12     Admit that Exhibit 12 is the executed amended "capped fee" agreement for

13 representation of the INSURED between TRAVELERS and CHARLSON

14 BREDEHOFT, signed by Pamela Johnson to Elaine Bredehoft.

15 **REQUEST FOR ADMISSION NO. 55:**

16     Admit that on January 19, 2022 NEW YORK MARINE paid TRAVELERS

17 $621,693.43 in reimbursement for sums incurred by INDEPENDENT COUNSEL in

18 the INSURED's defense in the UNDERLYING ACTION following the November 6,

19 2020 withdrawal of CAMERON MCEVOY.

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

1  **REQUEST FOR ADMISSION NO. 56:**

2      Admit that the DOCUMENT attached hereto as Exhibit 13 is a genuine, true,

3  and correct copy of the October 1, 2019 reservation of rights letter which was issued

4  by NEW YORK MARINE to the INSURED, pursuant to which NEW YORK

5  MARINE agreed to provide the insured with a defense in the UNDERLYING

6  ACTION.

7

8  Dated:  March 19, 2022

McCORMICK, BARSTOW, SHEPPARD,
WAYTE & CARRUTH LLP

9

10  By: _____

11  James P. Wagoner

12  Nicholas H. Rasmussen

13  Alexander R. Morrow

Attorneys for Defendant New York Marine and

14  General Insurance Company

15  8257239.4

16

17

18

19

20

21

22

23

24

25

26

27

28

13

1   McCormick, Barstow, Sheppard,
    Wayte & Carruth LLP
2   James P. Wagoner, #58553
      *jim.wagoner@mccormickbarstow.com*
3   Nicholas H. Rasmussen, #285736
      *nrasmussen@mccormickbarstow.com*
4   Alexander R. Morrow, #341052
      *Alexander.morrow@mccormickbarstow.com*
5   7647 North Fresno Street
    Fresno, California 93720
6   Telephone:   (559) 433-1300
    Facsimile:    (559) 433-2300
7
    Attorneys for Defendant New York
8   Marine and General Insurance Company

9               UNITED STATES DISTRICT COURT

10       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

11

12  Travelers Commercial Insurance          Case No. 2:21-cv-5832-GW (PDx)
    Company, a Connecticut Corporation,
13                                          **DEFENDANT NEW YORK
            Plaintiff,                       MARINE AND GENERAL
14                                           INSURANCE COMPANY'S
        v.                                   INTERROGATORIES, SET ONE**
15
    New York Marine and General            Hon. George H. Wu
16  Insurance Company, a Delaware
    Corporation,
17
            Defendant.
18

19  PROPOUNDING PARTY:   NEW YORK MARINE AND GENERAL
20                        INSURANCE COMPANY

21  RESPONDING PARTY:    TRAVELERS COMMERCIAL INSURANCE
22                        COMPANY

23  SET NO.:             ONE (1)

24

25          <u>**INTRODUCTION AND INSTRUCTIONS**</u>

26          PLEASE TAKE NOTICE that, pursuant to the provisions of Federal Rules of

27  Civil Procedure 33, Defendant New York Marine And General Insurance Company

28  ("NEW YORK MARINE") hereby requests that Plaintiff Travelers Commercial

_____
            DEFENDANT'S INTERROGATORIES, SET ONE          **Exhibit 5**

1   Insurance Company ("TRAVELERS") respond to the interrogatories set forth below.

2   Such responses should be stated separately, fully, in writing, and within 30 days of

3   service.

### DEFINITIONS

5       Words in capital are defined as follows:

6       1.      The term "COMMUNICATION" or "COMMUNICATED" means any

7   exchange of information, statement, or discussion between or among two or more

8   PERSONS, including but not limited to, face-to-face conversation, telephone

9   conversations, video conversations, correspondence, memoranda, emails, telegrams,

10  telexes, facsimiles, meetings, discussions, releases, statements, publications, or any

11  recordings or reproductions.

12      2.      The term "DOCUMENTS" means all materials within the full scope of

13  Rule 34 of the Federal Rules of Civil Procedure including but not limited to:  all

14  writings and recordings, including the originals and all non-identical copies, whether

15  different from the original by reason of any notation made on such copies or otherwise

16  (including but without limitation to, email and attachments, correspondence,

17  memoranda, notes, diaries, minutes, statistics, letters, telegrams, minutes, contracts,

18  reports, studies, checks, statements, tags, labels, invoices, brochures, periodicals,

19  telegrams, receipts, returns, summaries, pamphlets, books, interoffice and intraoffice

20  communications, offers, notations of any sort of conversations, working papers,

21  applications, permits, file wrappers, indices, telephone calls, meetings or printouts,

22  teletypes, telefax, invoices, worksheets, and all drafts, alterations, modifications,

23  changes and amendments of any of the foregoing), graphic or aural representations of

24  any kind (including without limitation, photographs, charts, microfiche, videotape,

25  recordings, motion pictures, plans, drawings, surveys), and electronic, mechanical,

26  magnetic, optical, or electric records or representations of any kind (including without

27  limitation, computer files and programs, tapes, cassettes, discs, recordings) including

28  metadata.

DEFENDANT'S INTERROGATORIES, SET ONE                    **Exhibit 5**

3. The term "IDENTIFY" as used herein in reference to facts means: (a) State the description of the fact; (b) State a foundational background for the fact; and (c) State a description of the evidence of the fact.

4. The term "INSURED" means and refers to the defendant in the UNDERLYING ACTION, Amber Laura Heard, to whom both TRAVELERS and NEW YORK MARINE issued insurance policies.

5. The term "NEW YORK MARINE" means and refers to New York Marine and General Insurance Company and includes anyone acting on New York Marine and General Insurance Company's behalf, such as all agents, representatives, attorneys and/or other person acting or purporting to act on behalf of New York Marine and General Insurance Company for any purpose. "NEW YORK MARINE" shall also mean and refer to ProSight Specialty Management Company, Inc. and includes anyone acting on ProSight Specialty Management Company, Inc.'s behalf, such as all agents, representatives, attorneys and/or other person acting or purporting to act on behalf of ProSight Specialty Management Company, Inc. for any purpose.

6. The term "PERSON" means a natural person, firm, association, organization, partnership, business trust, corporation, public entity or any other entity.

7. The term "UNDERLYING ACTION" means and refers to the action entitled *John C. Depp, II v. Amber Laura Heard*, which was filed on January 4, 2017 in Fairfax County, Virginia Circuit Court and bears case number CL-2019-0002911.

8. The term "YOU," "YOUR," and "TRAVELERS" mean and refer to Travelers Commercial Insurance Company and includes anyone acting on Travelers Commercial Insurance Company's behalf, such as all agents, representatives, attorneys, and/or other persons acting or purporting to act on behalf of Travelers Commercial Insurance Company for any purpose.

## INTERROGATORIES

### INTERROGATORY NO. 1:

State all facts in support of YOUR contention in paragraph 31 of the First

DEFENDANT'S INTERROGATORIES, SET ONE          **Exhibit 5**

Amended Complaint that "[s]ince the [UNDERLYING ACTION] was tendered to it, and through the present, [NEW YORK MARINE] has been obligated to provide the [INSURED] with a defense with independent defense counsel of the [INSURED]'s choosing."

**INTERROGATORY NO. 2:**

State all facts in support of YOUR contention in paragraph 18 of the First Amended Complaint that NEW YORK MARINE "compounded its breach of the duty to defend by having its appointed counsel do next to nothing and 'piggy-back' on the work of the mutual [INSURED]'s independent defense counsel, paid for by" TRAVELERS.

**INTERROGATORY NO. 3:**

State all facts in support of YOUR contention in paragraph 31 of the First Amended Complaint that "even if the court determines that [NEW YORK MARINE] was not obligated to defend the [INSURED] with independent defense counsel of the [INSURED]'s choosing, either because California law does not apply or for some other reason, [NEW YORK MARINE] still breached its duty to defend the [INSURED] by failing to provide it an adequate defense."

**INTERROGATORY NO. 4:**

State all facts in support of YOUR contention in paragraph 31 of the First Amended Complaint that NEW YORK MARINE should be responsible for 50 percent of all fees and costs incurred by the INSURED's independent counsel both before and after November 6, 2020.

**INTERROGATORY NO. 5:**

State all facts in support of YOUR contention in paragraph 31 of the First Amended Complaint that the Cameron McEvoy, PLLC law firm did not provide an "adequate defense" to the INSURED in the UNDERLYING ACTION.

**INTERROGATORY NO. 6:**

State all facts in support of YOUR contention in paragraph 18 of the First

**Exhibit 5**

Amended Complaint that NEW YORK MARINE "ha[d]" instructed, directed, or otherwise prompted or permitted the Cameron McEvoy, PLLC law firm to provide an inadequate defense to the INSURED in the UNDERLYING ACTION.

**INTERROGATORY NO. 7:**

Describe all actions TRAVELERS took to obtain independent counsel's cooperation with NEW YORK MARINE's appointed defense counsel, the Cameron McEvoy, PLLC law firm, in the defense of the INSURED in the UNDERLYING ACTION.

**INTERROGATORY NO. 8:**

Describe all actions TRAVELERS took to facilitate NEW YORK MARINE's appointed counsel's, the Cameron McEvoy, PLLC law firm, active and effective participation in the INSURED's defense in the UNDERLYING ACTION.

**INTERROGATORY NO. 9:**

Describe all COMMUNICATIONS which TRAVELERS engaged in to obtain independent counsel's cooperation with NEW YORK MARINE's appointed defense counsel, the Cameron McEvoy, PLLC law firm, in the defense to the INSURED in the UNDERLYING ACTION.

**INTERROGATORY NO. 10:**

Describe all COMMUNICATIONS which TRAVELERS made or engaged in to facilitate NEW YORK MARINE's appointed counsel's, the Cameron McEvoy, PLLC law firm, active and effective participation in the INSURED's defense in the UNDERLYING ACTION.

**INTERROGATORY NO. 11:**

IDENTIFY the names and contact information for all PERSONS who have or may have personal knowledge, information, or DOCUMENTS relating to the claims and contentions contained within in the First Amended Complaint.

**INTERROGATORY NO. 12:**

Describe the basis for the "capped fee" agreement with the Charlson Bredehoft

**Exhibit 5**

Cohen Brown & Nadelhaft P.C. firm memorialized in the June 10, 2020 Agreement between TRAVELERS and the Charlson Bredehoft Cohen Brown & Nadelhaft P.C. firm.

**INTERROGATORY NO. 13:**

State all reasons why TRAVELERS did not assert its right under Civil Code section 2860 to insist that payments made to independent counsel be limited to "the rates which are actually paid by" TRAVELERS "to attorneys retained by it in the ordinary course of business in the defense of similar actions in the community where the claim arose or is being defended."

**INTERROGATORY NO. 14:**

Describe the basis for the May 18, 2021 Agreement between TRAVELERS and the Charlson Bredehoft Cohen Brown & Nadelhaft P.C. firm.

**INTERROGATORY NO. 15:**

State all amounts paid by TRAVELERS to date for the defense of the INSURED in the UNDERLYING ACTION.

**INTERROGATORY NO. 16:**

For each response to the Requests for Admission served herewith that are not unqualified admissions, state all facts in support of YOUR denial or qualified admission.


Dated: March 19, 2022                    McCORMICK, BARSTOW, SHEPPARD,
                                                         WAYTE & CARRUTH LLP


                                         By: _____
                                                      James P. Wagoner
                                                      Nicholas H. Rasmussen
                                                      Alexander R. Morrow
                                         Attorneys for Defendant New York Marine and
                                                   General Insurance Company

8257318.3

**Exhibit 5**

1

## PROOF OF SERVICE

2

**Travelers Commercial Insurance Company v. New York Marine and General Insurance Company**

3

**STATE OF CALIFORNIA, COUNTY OF FRESNO**

4

5

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Fresno, State of California.  My business address is 7647 North Fresno Street, Fresno, CA 93720.

6

7

On March 19, 2022, I served true copies of the following document(s) described as **DEFENDANT NEW YORK MARINE AND GENERAL INSURANCE COMPANY'S INTERROGATORIES, SET ONE** on the interested parties in this action as follows:

8

9

Mark D. Peterson
Kathleen O. Peterson

10

Amy Howse
Cates Peterson LLP

11

4100 Newport Place, Suite 230
Newport Beach, CA 92660

12

Telephone: (949) 724-1180
Email: markpeterson@catespeterson.com

13

kpeterson@catespeterson.com
ahowse@catespeterson.com

14

15

*Attorneys for Plaintiff Travelers Commercial Insurance Company*

16

**BY ELECTRONIC SERVICE (E-MAIL):**  Based on a court order or an agreement of the parties to accept electronic service, my electronic service address is

17

marisela.taylor@mccormickbarstow.com, and I caused the document(s) to be sent to the persons at the electronic service address(es) listed in the Service List.  I did not

18

receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

19

20

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

21

22

Executed on March 19, 2022, at Fresno, California.

23

24

_____
Marisela Taylor

25

26

27

28

DEFENDANT'S INTERROGATORIES, SET ONE

**Exhibit 5**